**Vincent GUTIERREZ, TDCJ
No. 999262, Petitioner,**

v.

**Douglas DRETKE, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

**No. CIV. SA–01–CA–1033FB.**

United States District Court,
W.D. Texas,
San Antonio Division.

Sept. 27, 2005.

Alexander L. Calhoun, Law Office of Alexander L., Austin, TX, for Petitioner.

W. Erich Dryden, Office of the Attorney General, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

BIERY, District Judge.

Petitioner Vincent Gutierrez filed this federal habeas corpus action pursuant to Section 2254 of Title 28 United States Code challenging his Bexar County conviction for capital murder and sentence of death. For the reasons set forth at length below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

### I. Statement of the Case

#### A. Factual Background

##### 1. The Offense and Aftermath

There is no genuine dispute about the operative facts surrounding Vincent Gutierrez and Randy Arroyo's capital offense. On the evening of March 10, 1997, Randy Arroyo, Vincent Gutierrez, and several other persons met at the residence of Christopher Suaste to discuss Arroyo's desire to steal a Mazda RX-7 automobile for the purpose of obtaining parts for a similar vehicle Arroyo had recently acquired.[1] The following morning, Suaste drove Arroyo and Gutierrez to the residence of Miguel Riojas, Arroyo's cousin.[2] Riojas conversed briefly with Arroyo.[3] Arroyo then returned to Suaste's car and directed Suaste to drive to a nearby apartment complex where a red Mazda RX-7 owned by Air Force Captain Jose Cobo was parked.[4] Arroyo directed Suaste to park his vehicle a short distance from Cobo's red Mazda.[5] As soon as Suaste did so, Gutierrez exited the vehicle and ran to the

---

1. Statement of Facts from Trial (henceforth "S.F. Trial"), Volume XVI, testimony of Christopher Suaste at pp. 183–90, 228–29; Volume XVII, testimony of Christopher Suaste at pp. 21–23; Volume XIX, testimony of Sean Patrick Lowe at pp. 32–34 & 109–10.

2. S.F. Trial, Volume XVI, testimony of Christopher Suaste at pp. 192–95.

3. Id.

4. Id.

5. Id. at pp. 197–99.

driver's side of the red Mazda.[6] Arroyo followed closely behind Gutierrez.[7] Suaste watched as first Gutierrez, then Arroyo, entered the driver's side of the red Mazda, and then watched the Mazda drive out of the apartment complex's parking lot.[8] Suaste drove his vehicle back to his home.[9] Along the way, Suaste saw Captain Cobo lying on the shoulder of the highway with blood stains on his shirt.[10]

Several hours later, Suaste received a pair of telephone calls, first from Arroyo and then from Gutierrez, asking Suaste to come to a location in South San Antonio to pick them up.[11] Suaste and Sean Lowe drove to the location in question and picked up Arroyo and Gutierrez.[12] When Lowe and Suaste arrived, Gutierrez was wearing a brown tee shirt, a pair of black gym shorts bearing the USAF logo, but the same boots he had worn when Suaste dropped off Arroyo and Gutierrez at Captain Cobo's apartment earlier that day.[13] When Suaste criticized Gutierrez's strange apparel, Gutierrez explained his clothes had blood on them and he had obtained the clothes he then had on from the back of the red Mazda they had stolen earlier that day.[14]

When Lowe and Suaste questioned Arroyo and Gutierrez about what had happened, Gutierrez laughingly explained: (1)

he had forced Cobo at gunpoint to move to the passenger seat of the red Mazda and then climbed into the rear of the vehicle, (2) Arroyo drove the vehicle from the apartment complex, (3) when Cobo begged for his life and offered his wallet, Gutierrez reassured Cobo he would be released, (4) nonetheless, Cobo attempted to exit the vehicle but was restrained by a seat belt, (5) at that point, Gutierrez grabbed Cobo to prevent him from leaping from the moving vehicle, (6) Arroyo yelled "Shoot him. Shoot him. He's trying to escape," (7) Gutierrez fired his pistol twice, striking Cobo in the back, (8) Cobo began choking and coughing up blood, (9) as the robbers drove on, Gutierrez informed Arroyo he did not want to drive around with a "dead man" in the car with them, (10) Gutierrez directed Arroyo to slow the vehicle and, (11) when Arroyo did so, Gutierrez opened the passenger door, grabbed Cobo, and shoved Cobo out of the moving vehicle onto the shoulder of the highway.[15] Gutierrez also displayed two spent shell casings he identified as having come from the fatal shots.[16]

Later that evening, when a television news report about Cobo's murder was broadcast on the local news, Gutierrez again described his fatal shooting of Cobo and laughingly told others at Suaste's

---

6. *Id.* at pp. 200–01.

7. *Id.* at pp. 201–02.

8. *Id.* at pp. 202–03.

9. *Id.* at pp. 207–10.

10. *Id.* at pp. 207–08.

11. S.F. Trial, Volume XVI, testimony of Christopher Suaste at pp. 210–12; Volume XIX, testimony of Sean Patrick Lowe at pp. 40–42.

12. S.F. Trial, Volume XVI, testimony of Christopher Suaste at pp. 212–14; Volume XIX, testimony of Sean Patrick Lowe at pp. 42–44 & 53–54.

13. S.F. Trial, Volume XVI, testimony of Christopher Suaste at p. 213; Volume XIX, testimony of Sean Patrick Lowe at pp. 42–44, 53, & 96.

14. S.F. Trial, Volume XIX, testimony of Sean Patrick Lowe at pp. 53–54 & 96.

15. S.F. Trial, Volume XVI, testimony of Christopher Suaste at pp. 215–22 & 252; Volume XVII, testimony of Christopher Suaste at pp. 9–11; Volume XIX, testimony of Sean Patrick Lowe at pp. 54 & 96–99.

16. S.F. Trial, Volume XVI, testimony of Christopher Suaste at pp. 219–20.

apartment that Cobo got what he deserved for trying to escape.[17] Later still that same evening, Arroyo voluntarily confessed his involvement in Cobo's murder and led police to the .357 caliber handgun Gutierrez had used to kill Cobo, as well as the .25 caliber handgun Arroyo had carried during Cobo's robbery and kidnaping.[18]

On May 28, 1997, a Bexar County grand jury indicted Arroyo, Gutierrez, and Suaste on charges of capital murder arising from Captain Cobo's murder.[19]

### 2. *Pretrial Proceedings*

At a hearing December 1, 1997, the prosecution announced it had reached an agreement to sever the case against Suaste from that of Arroyo and Gutierrez.[20] Arroyo and Gutierrez both moved for severance of their joint capital murder trial.[21] During the course of that hearing, the prosecution expressly and specifically represented it had no intention of presenting any testimony at a joint trial establishing that either of the remaining two co-defendants had made any oral statements implicating the other defendant unless the trial court first authorized the admission of such testimony at a hearing outside the jury's presence.[22] Based on those representations, the state trial court denied both

---

**17.** S.F. Trial, Volume XIX, testimony of Sean Patrick Lowe at pp. 100–01; Volume XIX, testimony of Concepcion Suaste at pp. 188–91.

**18.** S.F. Trial, Volume XIX, testimony of Daniel Gonzales at pp. 64–73 & 76–80.

**19.** Gutierrez's indictment in state cause no. 97–CR–2457B appears among the pleadings, motions, and other documents filed in state court in connection with Arroyo's trial (henceforth "Trial Transcript"), Volume I of II at p. 9. An additional copy of the same indictment appears among the pleadings, motions, and other documents filed in Gutierrez's state habeas corpus proceeding (henceforth "State Habeas Transcript"), Volume II of II at p. 152.

In a single count, Gutierrez's indictment charged him in paragraph A with having intentionally and knowingly caused Captain Cobo's death by shooting him with a deadly weapon, i.e., a firearm, while in the course of committing and attempting to commit the robbery of Cobo. Paragraph B charged Gutierrez with having intentionally and knowingly caused Captain Cobo's death by shooting him with a deadly weapon, i.e., a firearm, while in the course of committing and attempting to commit the kidnaping of Cobo.

**20.** S.F. Trial, Volume II at p. 1.

**21.** S.F. Trial, Volume II at pp. 1–2 & 11.

**22.** *See* S.F. Trial, Volume II at pp. 10–12:

THE COURT: My concern is if an individual gets on there and says "One defendant told me that he and another defendant committed an offense," then if we are trying them together, there is a *Bruton* problem and cross-examination problem as to the one individual.

MR. RICHARDSON: I understand that. I would not intend to put that type of testimony in front of the jury. That would be probably double hearsay. I would ask the witness on the stand for example, "Did Vincent Gutierrez tell you he committed this offense?" If that persons says yes, we will leave it at that. That witness would be instructed not say "Vincent said both of us did it."

Even then in some scenarios I would not put it on until we had a hearing outside the presence of the jury. I think there is some case law that says in certain situations that is permissible, but I don't intend to do that at this point. I will not do it until we have had a hearing outside the presence of the jury.

THE COURT: So anything further on the severance issue?

MR. BERCHELMANN: He would adopt the same argument. It would be prejudicial to Mr. Gutierrez. I believe there are some statements made by some other parties that implicate the other two defendants, but that do not implicate Gutierrez, so again we have the same problem.

. . . .

motions for severance.[23]

At a hearing held January 16, 1998, both defendants re-urged their motions for severance and the state trial court denied same but admonished the prosecution that it would not admit any oral statements made by either of the co-defendants which implicated the other defendant in Cobo's murder.[24]

> THE COURT: .. Upon the representation then by the State once again these oral statements would be— if offered only offered in regard to one individual and there would be no hearsay attributable to the other individual at trial. And we will have a hearing outside the presence of the jury before those statements are offered, and the witnesses will be instructed and admonished not to mention any other alleged participation. I will deny the motion for severance between Mr. Arroyo and Mr. Gutierrez.

**23.** *Id.*

**24.** *See* S.F. Trial, Volume IV at pp. 4–6:

> MR. WILCOX: Before we take this up, I talked with Mr. Berchelmann, who is representing Mr. Gutierrez, and I am representing Mr. Arroyo. We would like at this point in time to re-urge our motion to sever on the grounds No. 1, Mr. Gutierrez has admissible felony convictions against him, and No. 2 is that the defenses in this case are going to be extremely inconsistent which may raise *Bruton* problems on both sides. And the third is, just to try these two individuals together under the state of the evidence as I understand it would not afford either individual a fair trial consistent with due process.
>
> MR. BERCHELMANN: I also adopted the motion for severance. My concern is the fact that there is a written statement by Mr. Arroyo and if introduced and he does not take the stand, I lose my right of cross-examination. Therefore, I feel like that would be highly detrimental to my client, and based on the other issues involved with the contradictory defenses in the case, and I would urge that the court sever these two cases.
>
> MR. RICHARDSON: I think on previous responses we agreed not to use the prior

### 3. *Guilt–Innocence Phase of Trial*

The guilt-innocence phase of Arroyo's and Gutierrez's joint capital murder trial commenced on February 23, 1998. In addition to Suaste's testimony, summarized above,[25] the jury heard testimony from Sean Lowe substantially corroborating Suaste's account of Gutierrez's purported narrative of Cobo's robbery, kidnaping,

> convictions, any admissible convictions against either defendant if they testified. Secondly, we also agreed that in the event we introduce Mr. Arroyo's confession that it would be redacted to the satisfaction of the Court so that it would not implicate Mr. Gutierrez.
>
> THE COURT: That was the previous discussion. Again, I want to just caution everybody that if we try these together at the behest of the State there will be no oral statements or written statements introduced that are inculpatory towards the other party in any way, shape or form, so you just need to be aware you won't be able to use those. As long as that is understood I will overrule the motion for severance.
>
> MR. WILCOX: Along that line, we have filed a motion in limine because we had requested a hearing prior to any jury selection because we do not want to have any proposed statements whether the State feels they are adoptive admissions or exceptions to the hearsay rule prior to voir dire, and is the court's ruling—
>
> THE COURT: I will grant the motion in limine and the State is instructed at this point that no hearsay statements are going to be admitted that are inculpatory until we have a hearing outside the presence of the jury. When I say statements, I am specifically referring to statements alleged to have been made by either defendant.
>
> MR. RICHARDSON: I am aware of that. There is only one statement that is in question and I talked to Mr. Wilcox about—I indicated to him that before we did that we would have a hearing on it. I would tender him all the case law to support our position and give it to the Court before anything comes up about it.

**25.** S.F. Trial, *supra* notes 1–13 & 15–16 and accompanying text.

and murder.[26] The medical examiner testified Cobo died from two gun shot wounds to the back, either of which would have independently proven fatal.[27] The prosecution introduced testimony from law enforcement officers and others regarding the recovery of Cobo's abandoned vehicle and Gutierrez's blood-stained clothing, both from locations near where Suaste and Lowe had picked up Gutierrez and Arroyo shortly after the murder.[28] Several other prosecution witnesses testified they had observed either Cobo's struggle to exit the red Mazda or Cobo's limp body being pushed from the moving vehicle during morning rush hour traffic.[29] A prosecution

26. S.F. Trial, *supra* notes 1, 11–15, & 17 and accompanying text.

27. S.F. Trial, Volume XX, testimony of Jan Garavaglia at pp. 35–45, 50, & 53.

28. Numerous prosecution witnesses testified regarding the recovery of Gutierrez's bloody clothing from a Dairy Queen dumpster on Fair Avenue. *See* S.F. Trial, Volume XVIII, testimony of Monica Luna at pp. 128–37 (Luna testified that around 9:15 a.m. on the morning of Cobo's murder, she found a blood-stained white tee shirt and pair of khaki pants in a dumpster at a business near where Cobo's vehicle was recovered); Volume XVII, testimony of Janet Hernandez at pp. 138–41 (Hernandez's testimony corroborated Luna's testimony regarding their discovery of the bloody clothing); Volume XVIII, testimony of Jose Molina (San Antonio Police Officer's testimony concerning his recovery of the blood-stained tee shirt, pants, and a pair of bloody gloves from the dumpster in question); Volume XVIII, testimony of Joe Delaluz at pp. 150–59 (San Antonio Police Detective's testimony corroborating Molina's testimony regarding recovery of the bloody clothing and gloves).

Several other prosecution witness testified regarding the recovery of Cobo's vehicle from a location near where the bloody clothing had been recovered. *See* S.F. Trial, Volume XVII, testimony of Antonio Pina at pp. 52–79 (Pina saw Arroyo and Gutierrez in Cobo's vehicle around nine a.m. on the morning of the murder at a location very close to where Cobo's vehicle was recovered later that same date); Volume XVIII, testimony of Kimberly Ramirez at pp. 182–84 (Ramirez saw Cobo's vehicle parked at the intersection of Naylor and Eads on the morning of the murder and called police); Volume XVIII, testimony of Robert Mesa at pp. 185–87 (Mesa also observed Cobo's vehicle, which was missing Cobo's distinctive Hawaii license plate, and telephoned police the morning of the mur-

der); Volume XVIII, testimony of Jason E. Pryor at pp. 188–94 (San Antonio Police Officer testified regarding his discovery of Cobo's abandoned vehicle at Naylor and Eads on the evening of the murder with a Hawaii license plate in hatchback/trunk); Volume XVIII, testimony of Raymond R. Perez at pp. 195–224 (San Antonio Police Detective's testimony regarding condition of Cobo's vehicle when located included videotaped record which was played for jury showing stereo speaker had been ripped out of the vehicle, the license plates had been removed and placed in the hatchback, and the presence of gunpowder residue on the back of the passenger seat).

29. Several eyewitnesses to Captain Cobo's unsuccessful struggle to flee the moving vehicle testified at trial. *See* S.F. Trial, Volume XVII, testimony of Steven Peters at pp. 79–98 (Peters was stuck in rush hour traffic when he heard two loud bangs in rapid succession and, as Cobo's red Mazda began to move through the intersection, the passenger door of the vehicle came open and he saw a pair of legs clad in blue pants dangling out the car); Volume XVII, testimony of Raul Lucio at pp. 98–111 (Lucio saw the passenger door swing open quickly as Cobo's red Mazda approached intersection and he saw someone trying to get out the passenger side of the vehicle but something restrained him, he heard two or three loud "pops," and then saw the vehicle take off with a pair of legs dangling out of the passenger side of the vehicle); Volume XVII, testimony of Charo Stewart at pp. 112–24, and Volume XVIII, testimony of Charo Stewart at pp. 48–54 (Stewart witnessed the passenger door of Cobo's vehicle swing open, saw an arm from the back seat reach over and grab the passenger, and watched the ensuing struggle as the vehicle sped away with two feet dangling outside the vehicle); Volume XVIII, testimony of Ronald Collins at pp. 55–81 (Collins saw the driver of the red Mazda striking the passenger, the

ballistics expert testified the .357 handgun to which Arroyo led police on the evening of the murder had fired both a bullet that fell out of Captain Cobo's chest when an Air Force flight surgeon attempted cardiopulmonary resuscitation at the scene where Cobo's body had been thrown and another bullet recovered from the floorboard of Cobo's red Mazda.[30] A prosecution DNA expert testified that the blood found on Gutierrez's clothing in a dumpster matched that of Captain Cobo.[31] Another prosecution witness identified the black USAF gym shorts and brown tee shirt worn by Gutierrez when Suaste and Lowe picked up Arroyo and Gutierrez shortly after the murder as similar to exercise clothing Captain Cobo kept in his vehicle.[32]

While Arroyo offered no evidence at the guilt-innocence phase of trial, Gutierrez presented a single alibi witness and argued that Sean Lowe was the person who actually shot Cobo.[33]

On March 2, 1998, the jury returned its verdicts, finding both Arroyo and Gutierrez guilty of capital murder.[34]

---

passenger door came open and a foot dangled out the door until the shoe came off, the other foot came out and bounced along until the other shoe came off, someone lifted the seat belt and pushed the passenger out of the vehicle, and the passenger landed on his back in a prone position, making no attempt to break his fall, and, after slowing briefly as the body was pushed out, the red vehicle sped away); Volume XVIII, testimony of William David Mauck at pp. 81–94 (Mauck, a USAF flight surgeon, saw a body laying on the right shoulder of the highway, stopped his vehicle and called 911, then attempted to administer first aid at the scene, frothy blood was coming out of Cobo's mouth and Mauck could not get a pulse).

30. Dr. Mauck testified that, when he and others applied pressure to one of Cobo's chest wounds, a bullet rolled out of another wound. S.F. Trial, Volume XVII, testimony of William David Mauck at pp. 87–88. A San Antonio Police Officer testified that when he arrived at the scene where Cobo's body had been unceremoniously dumped, a male handed him a bullet (State's Ex. no. 33) and told him the bullet had popped out of Cobo's chest when CPR was being performed on Cobo. S.F. Trial, Volume XVIII, testimony of Jesse McKinney at pp. 94–101. A San Antonio Police Detective testified that he took custody of the bullet (State's Ex. no. 33) from Officer McKinney at the scene. *Id.* testimony of Kevin Reeser at pp. 105–15. Another San Antonio Police Detective testified that a bullet (State's Ex. no. 84) was recovered from the passenger floorboard of Cobo's vehicle. *Id.* testimony of Raymond R. Perez at pp. 202–03. Yet another San Antonio Police Detective testified that

(1) on the evening of Cobo's murder, Arroyo led him to a bridge over the San Antonio River where Arroyo claimed he and Gutierrez had thrown both his .25 caliber semiautomatic handgun (State's Ex. no. 94) and Gutierrez's .357 revolver (State's Ex. no. 93) and (2) the following morning he retrieved both weapons and .25 caliber ammunition from shallow water along the edge of the river. S.F. Trial, Volume XIX, testimony of Daniel Gonzales at pp. 64–73 & 76–85.

The prosecution's ballistics expert testified that both State Ex. nos. 33 and 84 were fired from State's Ex. no. 93. S.F. Trial, Volume XIX, testimony of Ronald Crumley at pp. 165–66.

31. S.F. Trial, Volume XX, testimony of Garron Foster at pp. 57–66.

32. S.F. Trial, Volume XX, testimony of Geraldo Ramirez at pp. 71–72.

33. More specifically, Gutierrez presented the testimony of his 15–year–old girlfriend who had spent the night before Cobo's murder at the apartment of Christopher Suaste with Gutierrez suggesting that Gutierrez had been spent the entire morning of the murder with her there and had not worn khaki pants that day. S.F. Trial, Volume XX, testimony of Laurie Olivarez at pp. 90–102. However, Olivarez admitted during her testimony that she had gone to sleep late the night before the murder and did not wake up until 10 a.m the next morning. *Id.* at pp. 94–95.

34. S.F. Trial, Volume XXI at pp. 83–86; Trial Transcript, Volume II of II at p. 224.

#### 4. *Punishment Phase of Trial*

After Arroyo and Gutierrez unsuccessfully moved for severance of the punishment phase of the joint trial,[35] the trial continued on March 3, 1998. The prosecution's punishment phase witnesses testified regarding (1) an incident on July 15, 1996, in which Arroyo grabbed a 13–year–old boy in a headlock and repeatedly punched the boy in the mouth, causing the boy extensive injuries,[36] (2) Arroyo's association with a violent gang,[37] (3) Arroyo's persistently violent behavior and threatening conduct during pretrial detention,[38] (4) an incident on September 23, 1995, in which Arroyo was a passenger in a car from which Miguel Riojas fired numerous shots into the home of rival gang members,[39] (5) an incident in November, 1994, in which Arroyo and several other youths stole a car and drove it to a fast-food restaurant,[40] (6) an incident in which Arroyo and others fired shots at a pair of vehicles in which members of a rival gang were riding,[41] (7) an incident on June 16, 1996, in which Arroyo fired a gun just outside a pool hall after an altercation inside the establishment involving Arroyo's father,[42] (8) an incident on March 6, 1997, in which Arroyo held a gun to the head of a 13–year–old girl and demanded she engage in sex with him, Gutierrez, Suaste, and Lowe,[43] (9) numerous instances of violent, threatening conduct by Arroyo at school,[44] and (10) numerous incidents of violent conduct by Arroyo at the apartment complex where he lived with his alcoholic father.[45]

The prosecution also presented testimony (1) from several witnesses regarding a string of burglaries to which Gutierrez

---

**35.** S.F. Trial, Volume XXI at pp. 86–87.

**36.** A 15–year–old boy testified that, when he was only 13, Arroyo grabbed him in a headlock and repeatedly punched him in the mouth. S.F. Trial, Volume XXII, testimony of James Thomas at pp. 78–83. The boy's mother testified she rushed her son to the hospital where doctors discovered the boy's lip had been split and there was a gaping hole requiring 30 stitches. *Id.* testimony of Catherine Ann Payne at pp. 85–88.

**37.** A Northeast Independent School District security officer testified regarding Arroyo's membership in the Puro Mexican Kings gang. S.F. Trial, Volume XXII, testimony of Ramiro Sanchez at pp. 61–62. A pair of police officers testified the Puro Mexican Kings were a violent criminal organization engaged in drug trafficking, car thefts, and assaults. S.F. Trial, Volume XXII, testimony of Reyes M. Lozano, III at pp. 32–35; testimony of Robert R. Aguirre at p. 114.

**38.** S.F. Trial, Volume XXII, testimony of Jeffrey Okon at pp. 49–54; Volume XXII, testimony of Patrick Plate at pp. 57–59; Volume XXIII, testimony of Reynaldo Salinas at pp. 138–43.

**39.** S.F. Trial, Volume XXII, testimony of Justin Granderson at pp. 88–97; testimony of Michael Newhouse at pp. 97–107; and testimony of Carroll Chittendon at pp. 119–26.

**40.** S.F. Trial, Volume XXII, testimony of Wallace Barnett at pp. 127–29; Volume XXII, testimony of Carl Zimmerman at pp. 131–35; Volume XXIII, testimony of Thomas Rau at pp. 23–27.

**41.** S.F. Trial, Volume XXIII, testimony of Paul Lopez at pp. 28–32.

**42.** S.F. Trial, Volume XXIII, testimony of James Cline at pp. 33–39.

**43.** S.F. Trial, Volume XXIII, testimony of Krichelle Ricard at pp. 41–53; testimony of Cheryl Reed at pp. 54–65.

**44.** S.F. Trial, Volume XXII, testimony of Ramiro Sanchez at pp. 61–72; Volume XXIII, testimony of Steve Bazani at pp. 150–58; Volume XXIII, testimony of Peggy Clemens at pp. 158–94.

**45.** S.F. Trial, Volume XXIII, testimony of Rudy Zarote at pp. 66–78; Volume XXIII, testimony of Gracie Hernandez at pp. 79–92.

pleaded guilty,[46] (2) concerning Gutierrez's leadership role in the Puro Mexican Kings gang,[47] (3) regarding an incident on November 9, 1997, in which Gutierrez fought another jail inmate,[48] (4) about numerous instances of misbehavior by Gutierrez at school, including an incident on November 17, 1992, in which Gutierrez allegedly attempted to procure a pistol on campus, culminating in Gutierrez's expulsion,[49] and (5) regarding an essay Gutierrez wrote as an eighth-grader only days before he at-

tempted to obtain a handgun on campus in which Gutierrez fantasized about shooting a person with a rifle and fleeing to Mexico.[50]

Arroyo's trial counsel presented testimony at the punishment phase of trial: (1) from several of Arroyo's former teachers, school counselors, and an attorney who had previously represented Arroyo that Arroyo had always been polite to them and had never threatened them [51] and (2) from a long-time family friend that Arroyo was

---

**46.** Police officers and others testified about a string of burglaries committed in February and March, 1996 in which Gutierrez's fingerprints were found at the crime scenes. S.F. Trial, Volume XXII, testimony of Genaro Garza at pp. 136–41 (burglary at 812 Afterglow in February, 1996); Volume XXIII, testimony of Gina Holstein at pp. 92–98 (burglary at 810 Afterglow on March 13, 1996); *Id.* testimony of John Insalate at pp. 99–103 (police officer testified regarding fingerprints obtained at 810 Afterglow on March 13, 1996); *Id.* testimony of Hector R. Dominguez at pp. 103–06 (police officer testified regarding fingerprints found at scene of burglary on February 27, 1996 at 812 Afterglow); *Id.* testimony of Daniel Zamora at pp. 106–11 (police officer testified regarding fingerprints found on February 26, 1996 at 11614 Lida Rose following attempted burglary); *Id.* testimony of Anthony Smith at pp. 112–19 (police officer testified Gutierrez's fingerprints matched those found at three different burglary scenes occurring within weeks of March 13, 1996 and all burglaries occurred in an area near the apartment rented by Christopher Suaste).

**47.** Gutierrez admitted to a Bexar County court official preparing a pre-sentence report that he (Gutierrez) was a leader in the Puro Mexican Kings gang and Gutierrez failed to express any remorse for his involvement in the multiple burglaries. S.F. Trial, Volume XXII, testimony of Maria Elena Morales at pp. 123–24. A San Antonio Police detective testified that Gutierrez's tattoos indicated membership in the Puro Mexican Kings, a violent gang. S.F. Trial, Volume XXII, testimony of Reyes M. Lozano, III at pp. 31–32.

**48.** S.F. Trial, Volume XXIII, testimony of Jesus Gonzales at pp. 144–50.

**49.** S.F. Trial, Volume XXIII, testimony of Harry T. Green at pp. 187–200; *Id.* testimony of Marcus Doan at pp. 202–07 & 214; *Id.* testimony of John Kercheville at pp. 215–18.

**50.** S.F. Trial, Volume XXIV, testimony of Nancy Roell at pp. 143–48.

**51.** S.F. Trial, Volume XXIII, testimony of Nancy Draves at pp. 228–36; *Id.* testimony of Tim Draves at pp. 236–43; *Id.* testimony of Phyllis Beall at pp. 244–58; *Id.* testimony of Patricia E. Carlson at pp. 254–72; Volume XXIV, testimony of Mary Charlotte Shepherd at pp. 9–25.

More particularly, Patricia Carlson, Arroyo's former counselor at MacArthur High School, testified: (1) Arroyo was distraught following the death of his mother and thereafter had poor attendance and earned poor grades, (2) Arroyo was placed in Special Education because of emotional disturbances, (3) Arroyo never got over his mother's death, (4) Arroyo was denied the opportunities most students had, but (5) nonetheless, Arroyo was "very bright," "a smart kid," who was very talented in math and demonstrated an ability to learn. S.F. Trial, Volume XXII, testimony of Patricia E. Carlson at pp. 256–69.

Arroyo's former Special Education teacher at MacArthur High testified Arroyo: (1) was immature, selfish, and self-centered, traits which she described as common among teenagers, (2) was not close to his father and often commented he wished to be with his late mother, (3) required a structured environment was but was "salvagable." S.F. Trial, Volume XXIV, testimony of Mary Charlotte Shepherd at pp. 19–25.

"a fine young man" whose world came to an end when Arroyo's mother died.[52]

Gutierrez's trial counsel presented testimony from (1) numerous persons who knew Gutierrez through their church regarding Gutierrez's quiet demeanor and participation in church camps and service projects,[53] (2) family members and family friends concerning Gutierrez's non-violent, non-threatening character,[54] (3) many persons who expressed disbelief or surprise that Gutierrez had been convicted of such a violent offense,[55] (4) jail guards concerning Gutierrez's non-violent behavior throughout his pretrial detention,[56] and (5) Gutierrez's mother concerning his father's negative impact on Gutierrez's upbringing, as well as Gutierrez's childhood health problems, academic successes in elementary school, and good character.[57]

On March 6, 1998, the jury returned its verdicts at the punishment phase of trial and, based on the jury's answers to the capital sentencing special issues, the trial court sentenced both defendants to death.[58]

### 5. *Direct Appeal*

On October 15, 1999, Gutierrez filed his appellant's brief, asserting only two points of error arguing: (1) the state trial court erred in denying Gutierrez's requested jury instruction that Sean Lowe was an accomplice as a matter of law and (2) the death penalty violates the Eighth Amendment. In an unpublished opinion issued April 12, 2000, the Texas Court of Criminal Appeals affirmed Gutierrez's conviction and sentence.[59] Gutierrez did not file a petition for writ of certiorari seeking review of his conviction by the United States Supreme Court.

### 6. *State Habeas Corpus Proceeding*

On June 15, 2000, Gutierrez filed an

---

**52.** S.F. Trial, Volume XXIV, testimony of Toni Reyna at pp. 25–30.

**53.** S.F. Trial, Volume XXIV, testimony of Nancy Moore at pp. 31–46; testimony of Gabriel Moncada at pp. 46–54; testimony of Sue Ellen Ratliff at pp. 54–59; testimony of Janie Davila Ortega at pp. 60–64; testimony of Diane L. Bear at pp. 65–71; testimony of Mary Jane Stuart at pp. 71–75; testimony of Michael Anthony Stewart at pp. 76–79; testimony of Cynthia Potter at pp. 80–84; testimony of Fernando Vasquez at pp. 85–92.

**54.** S.F. Trial, Volume XXIV, testimony of Margarita Gutierrez (Gutierrez's sister) at pp. 99–108; testimony of Merle Pruett (longtime family friend) at pp. 110–16; testimony of Erin Berthune (family friend) at pp. 117–22; testimony of Kristin Garcia (family friend) at pp. 123–28.

**55.** More specifically, when confronted by Gutierrez's counsel with the details of Gutierrez's fatal shooting of Cobo, one of Gutierrez's character witnesses responded "If Vincent did that, he's not the Vincent that I know." S.F. Trial, Volume XXIV, testimony

of Sue Ellen Ratliff at p. 58. One of Gutierrez's character witnesses, who had known Gutierrez for 13 years, testified she did not believe he had shot Cobo. *Id.* testimony of Diane L. Bear at p. 69. Another of Gutierrez's character witnesses also expressed disbelief that Gutierrez could have committed murder. *Id.* testimony of Fernando Vasquez at pp. 88–89. Yet another of Gutierrez's character witnesses expressed sincere surprise that Gutierrez had been convicted of capital murder and several previous burglaries, remarking "I don't know that Vincent." *Id.* testimony of Mary Jane Stuart at pp. 74–75.

**56.** S.F. Trial, Volume XXIV, testimony of Jeffrey B. Okon at pp. 94–96; testimony of Patrick Plate at pp. 96–98.

**57.** S.F. Trial, Volume XXIV, testimony of Irene Gutierrez at pp. 129–42.

**58.** S.F. Trial, Volume XXVI at pp. 57–60; Trial Transcript, Volume II of II at pp. 233–35.

**59.** *Gutierrez v. State*, No. 73,065 (Tex.Crim. App. April 12, 2000).

application for state habeas corpus relief.[60] The state habeas trial court held an evidentiary hearing on March 27–29, 2001. On July 17, 2001, the state habeas trial court issued a 60–page Order containing its findings of fact, conclusions of law, and recommendation that Gutierrez's state habeas application be denied.[61] In an unpublished Order issued October 10, 2001, the Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied state habeas relief.[62]

### B. *Federal Procedural History*

Gutierrez filed his federal habeas corpus petition in this Court on April 30, 2002, asserting therein fourteen claims for relief.[63] On September 30, 2002, respondent filed an answer and motion for summary judgment, arguing in part that petitioner had procedurally defaulted on several of his claims herein by failing to exhaust available state remedies on those same claims.[64] On December 31, 2002, Gutierrez filed his reply to respondent's motion for summary judgment.[65]

### II. *AEDPA Standard of Review*

Because Gutierrez filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court

---

60. State Habeas Transcript, Volume I of II at pp. 1–70. Gutierrez presented eleven grounds for state habeas relief in his application, consisting of claims: (1) the trial court violated Gutierrez's constitutional rights under *Witherspoon* by excluding venire member Gerald Becker based on Becker's personal religious beliefs, (2) the trial court erroneously denied Gutierrez's motions for severance, (3) juror Rosemary Harrell was statutorily disqualified from serving on Gutierrez's jury by virtue of a prior conviction for theft, (4) Mrs. Harrell's false voir dire testimony regarding her theft conviction deprived Gutierrez of his right to a fair trial, (5) the prosecution deprived petitioner of a fair trial by concealing information in its custody regarding Harrell's prior conviction, (6) the prosecution violated the rule in *Brady v. Maryland* by withholding victim impact statements filed by Cobo's 15–year–old daughter Reena purportedly asserting no desire to see her father's killers executed, (7) his trial counsel rendered ineffective assistance by failing to (a) argue Harrell was ineligible for jury service or (b) seek a preliminary finding of the reliability of evidence regarding the circumstances surrounding Gutierrez's expulsion from school, and (8) his appellate counsel rendered ineffective assistance by failing to assert points of error on direct appeal arguing (a) a *Witherspoon* claim, (b) a complaint about the denial of severance, or (c) the admission of victim impact evidence at the punishment phase of trial violated the Constitution.

61. State Habeas Transcript, Volume II of II at pp. 202–62.

62. *Ex parte Vincent Gutierrez*, App. No. 49,-887–01 (Tex.Crim.App. October 10, 2001).

63. Docket entry no. 10. For unknown reasons, petitioner numbered his claims in his original petition herein as one through ten and twelve through fifteen, omitting number eleven.

64. Docket entry no. 16.

65. Docket entry no. 21. For unknown reasons, petitioner's response to respondent's motion for summary judgment refers to petitioner's claims herein as numbered one through thirteen, with two claims numbered thirteen. *Id.* at pp. 115–16. As best this Court can tell, the claims petitioner refers to in his response by numbers eleven through thirteen (including the second number thirteen) refer back to the claims petitioner identified as numbers twelve through fifteen in his original petition.

In the hope of avoiding further confusion, this Court will refer to petitioner's claims herein using the numerical designations assigned them in petitioner's original petition herein, i.e., numbers one through ten and twelve through fifteen.

cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, *per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions

contradicts them.' " *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable and an "unreasonable" application is different from a merely incorrect one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show the state court applied that case to the facts of his case in an objectively unreasonable manner.") Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, ——, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings, requiring a petitioner challenging state court factual findings es-

tablish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir.2004) ("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.'"), *cert. denied*, —— U.S. ——, 125 S.Ct. 421, 160 L.Ed.2d 325 (2004); *Pondexter v. Dretke*, 346 F.3d 142, 146, 149 (5th Cir.2003) (holding that, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir.2003) (holding the same), *cert. denied*, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); 28 U.S.C. § 2254(e)(1).

## III. *Witherspoon Claim*

### A. *The Claim*

In his first claim for federal habeas relief, petitioner argues the state trial court erroneously granted the prosecution's challenge for cause to venire member Gerald Becker based on Becker's personal religious objections to the death penalty.[66]

### B. *State Court Disposition*

During his voir dire examination, venire member Gerald Becker repeatedly testified he would find it extremely difficult, if not impossible, to vote to impose the death penalty because of his strong religious an-

tipathy toward the death penalty.[67] Becker testified further that while there might be a hypothetical circumstance in which there was a complete and total absence of any mitigating evidence, which would permit him to vote to impose the death penalty, he could not conceive of what such a situation would involve.[68] Eventually, the state trial court sustained the prosecution's challenge for cause.[69] Petitioner presented no complaint on direct appeal concerning Becker's exclusion.

The state habeas trial court concluded: (1) petitioner procedurally defaulted on his *Witherspoon* claim by failing to assert it on direct appeal and (2) the state trial court properly excluded Becker for cause based on Becker's testimony he could not perform his duties as an impartial juror.[70]

### C. *Procedural Default on the Witherspoon Claim*

The Texas Court of Criminal Appeals expressly adopted the state habeas trial court's findings and conclusions, including the conclusion that Gutierrez procedurally defaulted on his *Witherspoon* claim by failing to present same on direct appeal.

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be re-

---

**66.** Petitioner's Petition for Writ of Habeas Corpus, filed April 30, 2002, docket entry no. 10 (henceforth "Petition") at pp. 6–9; Petitioner's Response, filed December 31, 2002, docket entry no. 21 (henceforth "Response") at pp. 11–32.

**67.** S.F. Trial, Volume VIII, voir dire examination of Gerald Becker at pp. 9, 21, 25–26, 28–29, & 32–33.

**68.** *Id.* at pp. 22–23, 27, & 30–31.

**69.** *Id.* at p. 33.

**70.** State Habeas Transcript, Volume II of II at pp. 211–12.

quired to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). However, such procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

■ Gutierrez alleges no facts, and cites this Court to no Texas case law, showing the foregoing principle of state procedural default has been inconsistently followed by the state appellate courts in similar contexts. More specifically, Gutierrez identifies no instances in which the Texas Court of Criminal Appeals has entertained the merits of a *Witherspoon* claim when raised for the first time in a state habeas corpus application. More importantly, the Fifth Circuit has recognized the same procedural default rule relied upon by respondent in connection with the procedural default of Gutierrez's first claim herein was "firmly established" for federal procedural default purposes long before the date Gutierrez filed his brief on direct appeal. *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir.) (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.Crim.App.1996) *modified* on motion for rehearing on February 4, 1998, furnishes the foundation for this new state procedural rule); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001) (holding a federal habeas petitioner procedurally defaulted on an unexhausted newly discovered evidence theory supporting a *Brady* claim by failing to raise same on direct appeal); *Soria v. Johnson,* 207 F.3d 232, 249 (5th Cir.) (holding a federal habeas petitioner procedurally defaulted on a fair-cross-section complaint by failing to raise it in a direct appeal that became final in 1997), *cert. denied,* 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000). At the time petitioner filed his appellant's brief, in October of 1999, the law in Texas as established on rehearing in *Ex parte Gardner* required a convicted criminal defendant to present any and all claims then available as points of error on direct appeal. For unknown reasons, petitioner's appellate counsel failed to assert petitioner's *Witherspoon* claim on direct appeal. Thus, Gutierrez has procedurally defaulted on his *Witherspoon* claim.

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that Gutierrez's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" excep-

tion to the procedural default doctrine, as explained hereinafter Gutierrez's complaint regarding his appellate counsel's failure to assert a *Witherspoon* claim on direct appeal does not satisfy either prong of the *Strickland v. Washington* test for ineffective assistance.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). To satisfy the "factual innocence" standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *See Sawyer v. Whitley*, 505 U.S. at 335–40, 112 S.Ct. at 2517–19 (holding that to show "actual innocence" in the context of a capital sentencing scheme, one must show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state statute and that "factual innocence" means a fair probability that, in light of all the evidence, the trier of the facts would have entertained a reasonable doubt as to the defendant's guilt). In other words, to satisfy the "factual innocence" standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *Id.* The "factual innocence" test, therefore, requires the Court to give consideration to the all of the evidence now available to the Court on the issue of the petitioner's guilt or innocence. The defendant must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would

have convicted him. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998). Gutierrez has alleged no specific facts satisfying this "factual innocence" standard. Because Gutierrez has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the procedural default doctrine.

D. *No Merits on the Underlying Witherspoon Claim*

■ Having independently reviewed the vacillating voir dire examination of venire member Gerald Becker,[71] this Court concludes the state habeas court's alternative holding (that Gutierrez's *Witherspoon* claim was without merit) is reasonable under clearly established federal law.

In *Witherspoon v. Illinois*, 391 U.S. 510, 521–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), the Supreme Court held prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, the Supreme Court held as follows:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations

---

71. S.F. Trial, Volume VIII at pp. 7–33.

*Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas,* 448 U.S. at 45, 100 S.Ct. at 2526. The Supreme Court went on in *Adams* to discuss the many practical consequences of its *Witherspoon* holding:

If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality.

. . . .

... [A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the "guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon.*

. . . .

... The State could, consistently with *Witherspoon,* use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible.

. . . .

... [N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty .... Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt....

... [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas,* 448 U.S. at 46–50, 100 S.Ct. at 2527–29 (citations omitted).

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams* holding the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 469 U.S. at 424, 105 S.Ct. at 852. In *Wainwright,* the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and

that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.* at 430–35, 105 S.Ct. at 855–58.

The Supreme Court subsequently held the erroneous dismissal of a potential juror in violation of *Witherspoon* is not subject to harmless error analysis. *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987).

Both parties have quoted extensively from the voir dire examination of Gerald Becker in their pleadings in this cause. Becker represents the quintessential vacillating juror who appears intent on conscientiously asserting his personal views regarding the death penalty while tacitly acknowledging his responsibility as a citizen to serve on a criminal jury, even if those duties contravene his own personal views. In such cases, the Supreme Court has emphasized the importance of deferring to the state trial judge's determination of a potential juror's bias based on the trial court's firsthand examination of the potential juror's demeanor. *Wainwright*, 469 U.S. at 430–35, 105 S.Ct. at 855–58.

Mr. Becker consistently made clear he believed his personal views on the death penalty would interfere with his ability to serve on Mr. Gutierrez's jury. He repeatedly admitted he could not envision a situation in which he could vote to impose the death penalty, although he could not rule out the possibility he might be able to do so in a purely hypothetical case. At no point during his voir dire examination did Mr. Becker testify he would be able to put aside his personal beliefs regarding the death penalty and answer the capital sentencing special issues based solely on the evidence and the trial court's instructions. Thus, the state trial court's factual determination of bias was a reasonable determination of the facts based on the evidence then before that court in the form of Mr.

Becker's testimony and demeanor. *See Patton v. Yount*, 467 U.S. 1025, 1036–37 & n. 12, 104 S.Ct. 2885, 2891 & n. 12, 81 L.Ed.2d 847 (1984) (recognizing that, while the question of a venire member's disqualification is a mixed question of law and fact, a trial judge's determination regarding a venire member's bias is essentially a factual determination entitled to deference on collateral review); *Beazley v. Johnson*, 242 F.3d 248, 262 (5th Cir.2001) (recognizing a trial judge's finding of bias during voir dire is a determination of fact subject to a presumption of correctness on collateral review), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001). Petitioner Gutierrez presented the state habeas court with no "clear and convincing" evidence establishing the trial court's factual determination regarding Becker's bias was erroneous. There is no "clear and convincing" evidence now before this Court establishing the state trial court's implicit credibility determination regarding Gerald Becker's ability to set aside his personal views and follow the trial court's instructions regarding the death penalty was erroneous.

Under such circumstances, the state habeas court's rejection on the merits of Gutierrez's *Witherspoon* claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in Gutierrez's state habeas corpus proceeding.

### E. Conclusions

Petitioner Gutierrez procedurally defaulted on his *Witherspoon* claim. The Texas Court of Criminal Appeals' alternative conclusion that petitioner's *Witherspoon* claim was without merit was a reasonable application of the Supreme Court's

holdings in *Wainwright, Adams,* and *Witherspoon.* Mr. Gutierrez's first claim herein does not warrant federal habeas relief

## IV. *Denial of Motions for Severance*

### A. *The Claim*

In his third claim herein, petitioner complains the trial court erred when it denied his motions for severance, particularly his motion requesting severance made immediately prior to the start of the punishment phase of his and Mr. Arroyo's joint capital murder trial.[72]

### B. *State Court Disposition*

The state habeas trial court concluded: (1) petitioner procedurally defaulted on this complaint by failing to raise same on direct appeal, (2) petitioner also procedurally defaulted on his complaints about the denials of his motions to sever by failing to present the trial court with any evidence supporting petitioner's claims that prejudicial evidence would be admitted against him absent a severance, (3) the trial court's instruction to the jury at the punishment phase of trial to consider the evidence introduced during that phase only with regard to the defendant against whom it was introduced was effective to prevent any prejudicial impact on Gutierrez arising from the evidence of Arroyo's criminal background, and (5) the denial of Gutierrez's motions for severance did not deprive him of the individualized sentencing process mandated by the Eighth Amendment.[73]

### C. *Procedural Defaults on Complaints Re Denial of Severance*

Only those state procedural rules that were firmly established and regularly followed at the time of a claim's dismissal for procedural default bar subsequent federal habeas review of that claim. *See Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991) (holding that application of state procedural default rules bars federal habeas merits review of a claim only when the state procedural default rule is firmly established and regularly followed). The state habeas court's determination that petitioner procedurally defaulted on his complaints regarding the denial of his motions for severance by failing to present those same, record-based, claims on direct appeal represents precisely such a "firmly established and regularly followed" state procedural rule. *See Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir. 2004) (holding the Texas Court of Criminal Appeals' opinion in *Ex parte Gardner,* *modified* on motion for rehearing on February 2, 1998, furnishes the foundation for this new state procedural rule), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004). Petitioner filed his appellant's brief in October, 1999, long after the Texas Court of Criminal Appeals issued its landmark ruling in *Gardner.*[74]

■ Likewise, petitioner procedurally defaulted by failing to present the trial court with any evidence showing precisely what "prejudicial evidence" would be admitted against petitioner absent a severance. Petitioner identifies no instance in which Texas appellate courts have addressed the merits of a complaint regarding the denial of a motion to sever absent some evidence in the record establishing the trial court was aware at the time it was requested to rule on such a motion of

---

**72.** Petition at pp. 9–14; Response, at pp. 33–57.

**73.** State Habeas Transcript, Volume II of II at pp. 229–31.

**74.** *Ex parte Gardner,* 959 S.W.2d 189 (Tex. Crim.App.1996), *clarified on reh'g* (Feb. 4, 1998).

exactly what allegedly prejudicial evidence would be admitted against a criminal defendant absent the severance. In this Circuit, the burden is ordinarily on the petitioner to establish that a state procedural barrier has not been regularly followed; to avoid the impact of a finding of state procedural default, the petitioner must show the state procedural rule furnishing the basis for the default finding was not faithfully applied by the state courts in an evenhanded manner in the vast majority of similar cases. *See Johnson v. Cain,* 215 F.3d 489, 494 (5th Cir.2000) (holding there is a presumption a state procedural ground is adequate and independent, i.e., regularly followed, and the burden is on the petitioner to show otherwise); *Hughes v. Johnson,* 191 F.3d 607, 614 & n. 5 (5th Cir.1999) (holding the same), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000).

As is explained hereinafter, petitioner's assertions regarding his appellate counsel's failure to present a point of error on direct appeal complaining about the denial of his motions for severance does not satisfy either prong of the *Strickland* test for ineffective assistance.

### D. *No Merits to Complaints Re Denial of Severance*

■ The Supreme Court's holding in *Zafiro v. United States* [75] controls the disposition of petitioner's complaints about the trial court's failure to sever his capital murder trial from of Mr. Arroyo. In *Zafiro,* the Supreme Court held a federal district court is only required to sever properly-joined defendants if there is a serious risk a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.[76] Sev-

erance of the guilt-innocence phase of Gutierrez's capital murder trial from the same phase of Arroyo's capital murder trial would have had absolutely no effect on the quantity or quality of the evidence the prosecution could have admitted against Gutierrez. Petitioner Gutierrez's highly inculpatory admissions to Sean Lowe, Christopher Suaste, and others regarding the graphic details of his and Arroyo's murder of Captain Cobo would have been admissible against Gutierrez regardless of whether Arroyo had been tried with Gutierrez. Arroyo's written confession was not admitted into evidence at petitioner's joint trial with Arroyo. Petitioner identifies no other "prejudicial" evidence which would have been rendered inadmissible at the guilt-innocence phase of his capital murder trial had Arroyo's trial been severed from petitioner's. Petitioner does not seriously contend otherwise. Instead, the focus of his third claim lies on the punishment phase of his joint capital murder trial and the potential prejudice Gutierrez claims he suffered through guilt by association and by virtue of the punishment-phase testimony the jury heard which established Arroyo's hot-headed nature and clear propensity for violent conduct.

■ Petitioner argues there was substantially greater evidence of Arroyo's violent criminal record and propensity for future violence introduced at the punishment phase of their joint capital murder trial than his own. However, it is well-settled in this Circuit that disparity in the amount of evidence presented against codefendants does not justify severance in the absence of a showing of prejudice. *See United States v. Dale,* 374 F.3d 321, 325 (5th Cir.), *cert. denied, sub nom. Spencer*

---

**75.** 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

**76.** *Zafiro v. United States,* 506 U.S. at 539, 113 S.Ct. at 938.

*v. United States,* —— U.S. ——, 125 S.Ct. 513, 160 L.Ed.2d 383 (2004) (holding a general claim of prejudice arising from "spill-over effect" of a joint trial does not outweigh the prosecution's interest in judicial economy); *United States v. Simmons,* 374 F.3d 313, 318 (5th Cir.2004) (holding the mere presence of spillover effect does not warrant severance); *United States v. Bieganowski,* 313 F.3d 264, 287 (5th Cir. 2002), *cert. denied,* 538 U.S. 1014, 123 S.Ct. 1956, 155 L.Ed.2d 851 (2003) (holding spillover, by itself, is an insufficient predicate for a severance).

Moreover, the Supreme Court noted in *Zafiro* that, ordinarily, proper jury instructions can suffice to prevent any possibility of prejudice. *See Zafiro v. United States,* 506 U.S. at 540–41, 113 S.Ct. at 939 (recognizing juries are presumed to follow their instructions). In the jury charge at the punishment phase of petitioner's joint capital murder trial with Arroyo, the state trial court specifically instructed the jury to consider evidence separately whenever it was admitted against one defendant but not the other.[77]

The prosecution's evidence introduced during the punishment phase of petitioner's joint trial with Arroyo was readily amenable to logical compartmentalization by the jury, in accordance with the trial court's instruction. A number of prosecution witnesses testified regarding incidents in which Arroyo engaged in criminal conduct, violent behavior during pretrial detention, or both.[78] Only one of those prosecution witnesses made any mention of petitioner and that witness, Krichelle Ricard, testified petitioner had acted to protect her. More specifically Ms. Ricard testified that after Arroyo demanded at gunpoint she have intercourse with him, petitioner and others, all the men except Gutierrez left and Gutierrez thereafter offered to tell the others they had engaged in intercourse even though they had not done so.[79] While the prosecution presented numerous witness who testified regarding petitioner's criminal acts and an episode of violence during petitioner's pretrial detention, none of those incidents were linked in any way to Arroyo.[80] Thus, there does not appear to have been any logical reason why, during its punishment-phase deliberations, petitioner's jury could not have kept the evidence then before it relating to petitioner's misdeeds separate and distinct from similar but distinct punishment-phase evidence it had heard regarding Arroyo's misdeeds. *See United States v. Ramirez,* 145 F.3d 345, 355 (5th Cir.) (if the jury can keep separate the evidence that is relevant to each defendant, even if that task is difficult, and render a fair and impartial verdict as to each defendant, a severance should not be granted), *cert. denied,* 525 U.S. 1046, 119 S.Ct. 602, 142 L.Ed.2d 543 (1998).

Furthermore, petitioner alleges no facts showing that any of the testimony of Arroyo's six punishment-phase witnesses prejudiced petitioner at that phase of trial. All of Arroyo's punishment-phase wit-

---

**77.** Trial Transcript, Volume II of II at p. 225:

> You are instructed that certain evidence has been introduced concerning prior acts of misconduct, other offenses, prior convictions and evidence of bad character against both defendants. This evidence pertains only to the particular defendant against whom the evidence was offered. In no way are you to consider any such evidence offered against one Defendant and apply it against the other Defendant in reaching your decision.

**78.** *See supra* notes 36–45 and accompanying text.

**79.** S.F. Trial, Volume XXIII, testimony of Krichelle Ricard at pp. 44–47.

**80.** *See supra* notes 46–50 and accompanying text.

nesses focused their testimony on either the circumstances of Arroyo's difficult childhood or on Arroyo's redeeming personal qualities. Likewise, while petitioner presented sixteen witnesses during the punishment phase of trial, all of these witnesses testified solely with regard to Gutierrez's own difficult childhood and redeeming qualities. Finally, by the conclusion of the punishment phase of petitioner's joint capital murder trial with Arroyo, there was no longer any genuine dispute as to which of the defendants had actually shot Captain Cobo or any of the other circumstances of Captain Cobo's murder. Neither defendant offered the jury any evidence at the punishment phase of trial, or presented any jury arguments, which tended to diminish his responsibility for Captain Cobo's murder or which attempted to enhance the jury's perception of his co-defendant's comparative role in that offense. This was not a case in which multiple criminal defendants presented conflicting evidence or argument at the punishment phase of a joint capital murder trial in an attempt to create the impression that their own criminal responsibility was less than that of their co-defendants'. Under such circumstances, the trial court's instruction should have been sufficient to avoid any prejudice to Gutierrez arising from his joint punishment-phase trial with Arroyo. *See United States v. Bernard,* 299 F.3d 467 (5th Cir.2002) (holding a federal district court was not required to *sua sponte* sever the punishment phase trials of multiple capital murder defendants where the court instructed the jury to consider each defendant's punishment separately and there was an insufficient showing the defendants' punishment phase evidence was either mutually antagonistic or irreconcilable), *cert. denied,* 539 U.S. 928, 123 S.Ct. 2572, 156 L.Ed.2d 607 (2003).

Under such circumstances, the trial court's denial of Gutierrez's motion for severance at the punishment phase of trial did not deprive Gutierrez of a fair trial or deprive Gutierrez of the individualized sentencing determination required by the Eighth Amendment. The Texas Court of Criminal Appeals' alternative denial of this same claim on the merits during petitioner's state habeas corpus proceeding was the product of a reasonable application of clearly established federal law.

### E. *Teague Foreclosure*

■ Insofar as petitioner argues the Eighth Amendment compels a state trial court to hold a separate trial on punishment for every capital murder defendant found guilty with other defendants of participating in the same capital murder, respondent correctly points out that this Court is foreclosed from recognizing such a new rule in this habeas corpus proceeding by the non-retroactivity doctrine of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt

compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *See Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for: (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes on July 12, 2000, i.e., 91 days after the date the Texas Court of Criminal Appeals issued its opinion affirming petitioner's conviction on direct appeal and the date peti-

tioner's deadline for filing a petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); 28 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); SUP. CT. R. 13.1. *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.) (recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

Admittedly, the Supreme Court has recognized that individualized sentencing is an important goal in the capital sentencing process. *See Jones v. United States,* 527 U.S. 373, 381, 119 S.Ct. 2090, 2098, 144 L.Ed.2d 370 (1999) (recognizing that, at the selection phase, capital sentencing decisions must rest upon an individualized inquiry, which allows broad inquiry into the constitutionally relevant mitigating evidence); *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (recognizing that, in the selection phase of a capital sentencing proceeding, there is a need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination); *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994) (holding "what is important at the selec-

tion phase is an individualized determination on the basis of the character of the individual and the circumstances of the crime", (quoting *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983))). However, the Supreme Court has never held this consideration mandates that a separate punishment-phase trial be held for each capital murder defendant convicted jointly with other defendants under the Texas law of parties or similar theories of joint criminal responsibility.

The rule advocated by petitioner in his third claim herein was most certainly *not* mandated by existing Supreme Court precedent as of the date petitioner's conviction became final. Thus, *Teague* forbids this Court from adopting such a new rule in the context of this federal habeas corpus proceeding.

## F. *Conclusions*

Petitioner procedurally defaulted on his complaints about the state trial court's denials of his motions for severance by failing to present the trial court with any evidence supporting his assertions that he would be prejudiced absent a severance and by petitioner's failure to present similar complaints on direct appeal. Furthermore, petitioner's complaints lack merit and amount to little more than a request for adoption of a new rule of constitutional criminal procedure which is prohibited in this federal habeas corpus proceeding by the *Teague* non-retroactivity doctrine. Therefore, petitioner's third claim herein does not warrant federal habeas corpus relief.

# V. *Voir Dire Testimony of Rosemary Harrell*

## A. *The Claim*

In his fifth claim herein, petitioner complains venire member Rosemary Harrell testified falsely regarding her criminal history and her qualifications to serve as a juror and thereby managed to serve as a juror despite being unqualified to do so under state law, depriving petitioner of a fair trial.[81]

## B. *State Court Disposition*

Venire member Rosemary Harrell filled out a juror information questionnaire in which she indicated, in part: (1) she had never been charged with theft or shoplifting but (2) she had been convicted of DWI.[82] During her voir dire examination, however, Rosemary Harrell testified: (1) in 1979, she had been charged with theft of under five dollars but that charge was totally dismissed, (2) she never paid any fine and never appeared in court in connection with that charge, (3) she did not recall being arrested in connection with the 1979 theft charge, but (4) she was certain she never went to court in connection with that charge.[83] Neither party made any challenge for cause to Mrs. Harrell, and she served on petitioner's jury.

In the course of his state habeas corpus proceeding, petitioner argued that, contrary to her voir dire testimony, Mrs. Harrell had been convicted of theft of less than five dollars in connection with her 1979 arrest and, therefore, under applicable state law, was ineligible to serve on petitioner's jury. At the evidentiary hearing held in petitioner's state habeas corpus

---

**81.** Petition at pp. 17–20; Response at pp. 63–78.

**82.** A copy of Rosemary Harrell's juror questionnaire was admitted into evidence during the evidentiary hearing held in petitioner's

state habeas corpus proceeding as Petitioner's Gutierrez's Exhibit no. 2 and appears in the exhibit volume from that proceeding.

**83.** S.F. Trial, Volume VII, testimony of Rosemary Harrell at pp. 81–82 & 99–100.

proceeding, petitioner presented the state habeas trial court with a computer printout and another document (Gutierrez Exhibit no. 1) purporting to show Mrs. Harrell had been convicted of such an offense. The document in question consisted of a single-page letter from the San Antonio Municipal Court Clerk stating only: (1) a charge of theft of less than five dollars, a Class C misdemeanor, had been filed against Rosemary Harrell on January 8, 1979, (2) a forty-dollar cash bond was forfeited in connection with this charge on January 15, 1979, and (3) "the case was paid" on January 17, 1979.[84] The January 20, 1998 computer printout of Mrs. Harrell's criminal record included an ambiguous reference to an event on January 6, 1979, but no clear indication that she had been convicted of any offense in connection with that matter.[85]

Petitioner's co-counsel at trial, attorney William Berchelmann, testified during petitioner's state habeas corpus proceeding: (1) in his opinion, nothing in the ambiguous documents presented by petitioner established Rosemary Harrell had, in fact, been convicted of a criminal offense in 1979, (2) he relied on her voir dire testimony to satisfy himself she was qualified to serve as a juror at petitioner's trial, (3) there was no formal judgment of conviction on a charge of theft for Rosemary Harrell in any of the documents then before the court, and (4) she was acceptable to him as

a juror because she was Catholic, had no military ties, expressed reluctance with regard to imposing the death penalty, and had unpleasant experiences with law enforcement.[86] Petitioner's other co-counsel at trial, attorney Lisa Jarrett, testified during the same proceeding: (1) she was not concerned about Mrs. Harrell's questionnaire answers after hearing her voir dire testimony, (2) she was satisfied with Mrs. Harrell's answers to the prosecution's voir dire questions regarding Mrs. Harrell's criminal record, and (3) Mrs. Harrell was acceptable to both her and Mr. Berchelmann.[87]

Mr. Arroyo's co-counsel at trial, attorney Michael Granados, testified during the joint evidentiary hearing held in petitioner's and Arroyo's state habeas corpus proceeding: (1) nothing in the documents then before the court convinced him Mrs. Harrell had a final shoplifting conviction on her criminal record, (2) the fact there was no arrest warrant pending for Mrs. Harrell as of the date of voir dire in petitioner's trial convinced him that no theft charge was then outstanding against her, (3) he was satisfied by Mrs. Harrell's voir dire testimony she was qualified to serve as a juror, (4) in his experience in the San Antonio Municipal Court, it was common for a misdemeanor charge to be disposed of without a final judgment of conviction being entered simply by the court treating the charge as a failure to appear and for-

---

**84.** This document was admitted into evidence during the evidentiary hearing held in petitioner's state habeas corpus hearing as Petitioner Gutierrez's Exhibit no. 1 and is the cover page to the larger of the two exhibit volumes from petitioner's state habeas corpus proceeding. The state habeas trial court accurately reproduced this one-page document in its factual findings. State Habeas Transcript, Volume II of II at p. 236.

**85.** The computer printout in question was admitted into evidence during petitioner's state

habeas corpus hearing as Petitioner Gutierrez's Exhibit no. 3 and appears in the exhibit volume from that proceeding.

**86.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at pp. 32, 34–35, 39, 52–53, & 56.

**87.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of Lisa Catherine Jarrett at pp. 181–83 & 188–89.

feiting the bond, and (5) none of the documents then before the court led him to believe Mrs. Harrell had testified falsely during her voir dire examination.[88] Arroyo's other trial counsel, attorney Gus Wilcox, testified: (1) after talking with Mrs. Harrell during voir dire, he wanted her on the jury because she had bad experiences with law enforcement, (2) nothing in the documents then before the court led him to believe Mrs. Harrell had been convicted of theft, and (3) while he had experience as a former prosecutor with San Antonio Municipal Court documents, he could not tell the nature of the disposition of Mrs. Harrell's theft charge from the documents then before the court.[89]

Former prosecutor Bert Richardson testified: (1) it was hard to tell from the documents then available whether Mrs. Harrell had been convicted in 1979, (2) he contacted the San Antonio Municipal Court to verify the processing of Mrs. Harrell's case and was informed by an unidentified municipal court employee Mrs. Harrell did not have a conviction, there was no active case pending against her, and there was no warrant outstanding against her, (3) Mrs. Harrell appeared older than her listed age and had only a vague recollection of what had happened to her almost twenty years before, (4) the same, unidentified, municipal court employee advised him that at the time of Harrell's 1979 charge, the city often disposed of such cases by keeping the bond but entering no judgment of conviction, (5) while Mrs. Harrell's testimony she had never been arrested in connection with her theft charge was apparently erroneous, he did not believe she had committed perjury when she so testified, (6) he believed Harrell had clarified the disposition of her theft charge during her voir dire testimony, and (7) based upon his review of the documents then before the court, he believed that at the time of petitioner's trial, Mrs. Harrell had no final conviction for theft, no theft charge pending against her, and no active warrant outstanding against her.[90]

A municipal court employee who first began working for the San Antonio Municipal Court more than a year after the disposition of Mrs. Harrell's theft charge testified: (1) the booking number on Mrs. Harrell's San Antonio Municipal Court documents indicated she had been arrested on a theft charge and the bond on that charge was forfeited on January 15, 1979, (2) the municipal court jacket on Mrs. Harrell's case had been destroyed, (3) bond forfeiture money is applied in the same manner as a fine but, in such instances, the defendant does not enter a plea and the court simply closes the case administratively, (4) during her employment with the municipal court, bond forfeitures had been treated as pleas of nolo contendere and convictions, but (5) no judgment of conviction had ever been entered against Mrs. Harrell in connection with the 1979 theft charge.[91]

At the conclusion of petitioner's state habeas corpus hearing, the state habeas trial court found: (1) there was no evidence Mrs. Harrell had ever entered any plea in connection with the 1979 theft charge, (2) no judgment of conviction nor

88. S.F. State Habeas Hearing, Volume 2 of 6, testimony of Michael Granados at pp. 72, 75–77, & 79–80.

89. S.F. State Habeas Hearing, volume 2 of 6, testimony of Gus Wilcox at pp. 148–50 & 152–53.

90. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Bert Richardson at pp. 19–21, 23, 27, 30–31, 46–47, 50–51, & 77.

91. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Margarita C. Castaneda at pp. 95–99, 101, 103, & 105.

abstract of judgment for the 1979 theft charge was presented, and (3) during her voir dire, Mrs. Harrell answered all questions concerning her 1979 theft charge truthfully, to the best of her knowledge, and any mistakes she might have made in her juror questionnaire were unintentional and not designed to deceive.[92]

The state habeas trial court also determined: (1) under Texas law, even if she had been disqualified, Mrs. Harrell's service as a juror at petitioner's trial did not warrant reversal of petitioner's conviction absent a showing petitioner had made a timely objection thereto or established that he sustained significant harm as a result of same, (2) petitioner did not object to Mrs. Harrell's jury service at trial, in a motion for new trial, or on direct appeal, (3) petitioner thereby procedurally defaulted on his complaint about Mrs. Harrell's jury service, (4) Mrs. Harrell's theft arrest did not result in a final conviction for that offense, (5) there was no pending theft charge outstanding against Mrs. Harrell at the time of petitioner's trial, (6) therefore, Mrs. Harrell was not disqualified from service on petitioner's jury or subject to a challenge for cause, (7) petitioner was not denied a fair and impartial jury by virtue of Mrs. Harrell's jury service, (8) there was no evidence Mrs. Harrell knew her bond had been forfeited, (9) Mrs. Harrell withheld no information regarding her theft charge during her voir dire testimony, (10) her bond forfeiture did not subject her to absolute disqualification or a challenge for cause under state law, (11) petitioner's substantial rights were not affected by Mrs. Harrell's jury service, (12) Mrs. Harrell's jury service did not render petitioner's whole trial fundamentally unfair, and (13) any mistaken responses Mrs. Harrell might have given during her voir

dire examination would not have affected her legal ability to serve as a juror at petitioner's trial.[93]

## C. *Procedural Default*

 Respondent correctly argues petitioner procedurally defaulted on his complaints that Mrs. Harrell was disqualified from state jury service and had testified falsely during her voir dire examination regarding her arrest and the disposition of her misdemeanor theft charge. Despite the fact the municipal court records relating to Mrs. Harrell's 1979 theft charge submitted to the state habeas court by petitioner were matters of public record at the time of petitioner's trial, petitioner voiced none of these complaints about Mrs. Harrell at trial, in a timely motion for new trial, or on direct appeal. Instead, petitioner first raised his complaints about juror Harrell in his state habeas corpus proceeding. It has been clearly established since the Texas Court of Criminal Appeals' opinion in *Ex parte Bronson*, 254 S.W.2d 117, 121 (Tex.Crim.App.1952), that an otherwise final criminal judgment is not subject to collateral attack in Texas on the ground that an individual statutorily disqualified from jury service based on a prior criminal conviction actually served on the jury.

Petitioner presents no argument or authorities suggesting the Texas courts have applied this rule in an inconsistent or sporadic manner. *See Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991) (holding the application of state procedural default rules bars federal habeas merits review of a claim only when the state procedural default rule is firmly established and regularly followed). Thus, petitioner has failed to overcome the

---

**92.** State Habeas Transcript, Volume II of II at pp. 240–41.

**93.** *Id.* at pp. 242–48.

presumption of regularity that accompanies applications of state procedural default rules in this Circuit. *See Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir.2000) (holding there is a presumption a state procedural ground is adequate and independent, i.e., regularly followed, and the burden is on the petitioner to show otherwise).

██ The Fifth Circuit has held a defendant's failure to timely object to a Texas trial court's rulings during jury selection can result in a procedural default of complaints regarding same. *See, e.g., Corwin v. Johnson*, 150 F.3d 467, 472–73 (5th Cir.) (holding defendant's failure to object to his absence during a portion of voir dire waived any complaint regarding the disqualification of venire members during the defendant's absence), *cert. denied*, 525 U.S. 1049, 119 S.Ct. 613, 142 L.Ed.2d 548 (1998); *Duff–Smith v. Collins*, 973 F.2d 1175, 1180 (5th Cir.1992) (holding a petitioner procedurally defaulted on a complaint regarding the exclusion of potential jurors by failing to contemporaneously object thereto), *cert. denied*, 507 U.S. 1056, 113 S.Ct. 1958, 123 L.Ed.2d 661 (1993). These opinions are consistent with longstanding Fifth Circuit case law holding a state habeas court's determination that a petitioner failed to comply with the Texas contemporaneous objection rule an adequate and independent basis for precluding federal habeas review. *See Rowell v. Dretke*, 398 F.3d 370, 375–75 (5th Cir.2005) (holding a defendant's failure to timely object to alleged errors in a jury charge determined by a Texas appellate court to be a violation of the Texas contemporaneous objection rule barred federal habeas relief of the alleged erroneous jury charge under the procedural default doctrine); *Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir.2003) (holding violation of the Texas contemporaneous objection rule is an ade-

quate and independent barrier to federal habeas review), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir.2000) (holding the Texas contemporaneous objection rule is strictly or regularly and evenhandedly applied in the vast majority of cases and, therefore, an adequate state bar), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001).

By failing to either make a challenge for cause or otherwise timely object to the state trial court's failure to exclude venire member Harrell and, thereafter, failing to challenge Mrs. Harrell's jury service either through a motion for new trial or on direct appeal, petitioner procedurally defaulted on his fifth claim for federal habeas relief herein. For the reasons set forth hereafter, neither of petitioner's complaints regarding his trial or appellate counsel's performance vis-a-vis Mrs. Harrell's jury service satisfy the dual prongs of *Strickland.*

### D. *No Merits on Federal Claim*

#### 1. *Reasonable State Habeas Court Factual Findings*

██ The state habeas trial court found there was no evidence Rosemary Harrell had been convicted of theft in connection with her 1979 shoplifting charge. Having independently reviewed the record from Mrs. Harrell's voir dire examination and all of the testimony and other evidence admitted during petitioner's state habeas corpus proceeding, this Court concludes that factual determination was reasonable in light of the evidence then before the state habeas court. The two ambiguous documents presented by petitioner during his state habeas corpus hearing to support petitioner's contention that Mrs. Harrell was convicted of theft in 1979, and hence disqualified from jury service, neither ex-

plicitly nor implicitly suggested Mrs. Harrell was ever convicted of such an offense. No less than five different attorneys, i.e., the lead prosecutor and all four defense counsel who participated in petitioner's and Arroyo's joint trial, reviewed those same documents and testified they could not ascertain from them whether Mrs. Harrell had ever been convicted of theft. The sole municipal court employee who testified during petitioner's state habeas hearing did not begin her employment until more than a year after the disposition of Mrs. Harrell's theft charge and possessed no personal knowledge regarding same. While the state habeas trial court was presented with speculation as to how the San Antonio Municipal Court might have disposed of Mrs. Harrell's 1979 theft charge, the one point everyone agreed upon, including the San Antonio Municipal Court employee who testified at petitioner's state habeas hearing, was there was no record of a judgment of conviction ever having been entered against Mrs. Harrell. Petitioner has presented this Court with no clear and convincing evidence establishing Mrs. Harrell was ever, in fact, convicted of misdemeanor theft in connection with her 1979 theft charge. Speculation on what might have transpired in 1979 or how the municipal court might have administratively disposed of that charge does not satisfy the "clear and convincing evidence" standard.

The state habeas court also reasonably determined there was no evidentiary support for petitioner's complaint Mrs. Harrell testified falsely during her voir dire examination regarding the disposition of her 1979 theft charge. Petitioner offered the state habeas court no additional testimony from Mrs. Harrell or any other witness possessing personal knowledge re-

garding the disposition of Mrs. Harrell's 1979 theft charge. The documents petitioner presented to the state habeas court indicated only that a cash bond had been forfeited and "the case was paid." [94] The state habeas court also reasonably found petitioner presented no evidence showing either: (1) Mrs. Harrell or any attorney representing her had ever entered any plea on the theft charge or (2) the existence of a judgment of conviction or an abstract of judgment for a 1979 theft conviction against Mrs. Harrell.[95] Insofar as petitioner complains Mrs. Harrell was statutorily disqualified from jury service or testified falsely during her voir dire examination regarding the disposition of her 1979 theft charge, those complaints are refuted by the state habeas court's reasonable factual determinations and factually unsubstantiated when examined *de novo* by this Court.

■ Under the AEDPA, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence. *Woodford v. Garceau,* 538 U.S. 202, 207, 123 S.Ct. 1398, 1402, 155 L.Ed.2d 363 (2003); *Hopkins v. Cockrell,* 325 F.3d 579, 583 (5th Cir.2003), *cert. denied,* 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); 28 U.S.C. § 2254(e)(1). There is no evidence, much less any clear and convincing evidence, before this Court establishing any error in the state habeas court's factual determinations regarding the absence of any evidence showing Mrs. Harrell had a 1979 theft conviction or had testified falsely during her voir dire testimony conviction concerning the disposition of her 1979 theft charges. The presumption of correctness that accompanies state court factual determination applies not only to

---

**94.** State Habeas Transcript, Volume II of II at p. 236.

**95.** *Id.* at pp. 240–41.

explicit fact findings but also to "those unarticulated findings" which are necessary to the state court's conclusions of mixed law and fact. *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir.2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir.2001), *cert. denied*, 537 U.S. 883, 123 S.Ct. 106, 154 L.Ed.2d 141 (2002); *see also Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding a state court's conclusion the petitioner had failed to satisfy the prejudice prong of *Strickland* necessarily implied certain factual findings to which the federal habeas court was required to give deference under the AEDPA), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004).

■ Petitioner alleges no facts showing he was prevented by anything other than his own state habeas counsel's failure to exercise due diligence from presenting the state habeas court with the same affidavit from Rosemary Harrell that was attached to petitioner's petition herein. Under the AEDPA, when a state court's rejection on the merits of a federal claim for relief was premised on that court's factual findings, the proper role for a federal habeas court is to review the reasonableness of the state court's ultimate conclusion in light of the evidence before the state court at the time it made its ruling, not based upon new evidence which through the exercise of due diligence could have been, but was not, presented to the state court. 28 U.S.C. § 2254(d)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000).

Petitioner does not allege the Texas Court of Criminal Appeals applied the wrong federal constitutional standard in rejecting this aspect of his state habeas claims. On the contrary, petitioner's pleadings herein rely on the same governing federal case law the Texas habeas trial court cited in its findings of fact and conclusions of law, i.e., the Supreme Court's holding in *McDonough Power Equipment, Inc. v. Greenwood.* Thus, the issue before this Court is whether the state habeas court's alternative rejection on the merits of petitioner's complaints about Mrs. Harrell's allegedly false voir dire testimony was based on an unreasonable determination of the facts in light of the evidence then before that court. Having independently reviewed the record from petitioner's trial and state habeas corpus proceedings, this Court concludes the state habeas court's factual findings, both express and implied, regarding the absence of any proof in the record of either Mrs. Harrell's 1979 theft conviction or any material falsity in her voir dire testimony were reasonable in light of the evidence before that court.

### 2. State Law Complaints Do Not Mandate Federal Habeas Relief

■ Insofar as petitioner complains Mrs. Harrell's jury service violated Texas law, that complaint, standing alone, does not present an arguable basis for federal habeas relief. Petitioner alleged no specific facts showing Mrs. Harrell was biased against petitioner or otherwise unable to render an impartial verdict at petitioner's trial. *See Montoya v. Scott*, 65 F.3d 405, 418–20 (5th Cir.1995) (recognizing an allegation a juror was acquainted with the victim does not, standing alone, establish bias sufficient to disqualify the juror from service), *cert. denied*, 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). An alleged violation of state law during jury selection does not furnish a basis for federal habeas corpus relief absent a showing

the violation rendered the entire trial fundamentally unfair. *See Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982) (holding the state trial court's alleged failure to correctly instruct a jury on Ohio law regarding self-defense did not furnish a basis for federal habeas relief); *Fuller v. Johnson,* 158 F.3d 903, 908 (5th Cir.1998) (holding a convicted capital murder defendant's complaint that one of his jurors was disqualified from jury service under Texas law failed to assert a basis for federal habeas relief in the absence of a showing the juror's service rendered the entire trial fundamentally unfair), *cert. denied,* 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) (recognizing federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. *Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris,* 465 U.S. at 41, 104 S.Ct. at 874. "When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.' The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*" *Coleman v. Thompson,* 501 U.S. at 730, 111 S.Ct. at 2554. Thus, even if petitioner had established Mrs. Harrell was disqualified from jury service under applicable Texas law, her presence on petitioner's petit jury did not, standing alone, establish a violation of petitioner's federal constitutional rights.

### 3. *No Showing of Mrs. Harrell's Bias*

The Sixth Amendment to the Constitution guarantees a defendant on trial for his life the right to an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 720, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). The determination of whether an individual juror is biased or incapable of rendering an impartial verdict is a question of fact and, in an ordinary criminal case, turns on whether the juror can set aside any opinion he might hold and decide the case on the evidence. *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). In the context of a capital murder trial, the critical inquiry regarding a potential juror's bias is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *United States v. Hall,* 152 F.3d 381, 407 (5th Cir.1998), *cert. denied,* 526 U.S. 1117, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999). Petitioner alleged no specific facts before the state habeas court and alleges none before this Court establishing Mrs. Harrell possessed any such disqualifying bias or lack of impartiality.

Ordinarily, the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to

prove actual bias. *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). Petitioner had precisely such an opportunity during his state habeas corpus proceeding but offered no evidence showing Mrs. Harrell bore any bias against petitioner or in favor of the prosecution.

The Fifth Circuit has recognized a juror's disqualifying bias may be either actual or implied, i.e., bias in fact or bias conclusively presumed as a matter of law. *Solis v. Cockrell,* 342 F.3d 392, 395 (5th Cir.2003) (citing *United States v. Wood,* 299 U.S. 123, 134, 57 S.Ct. 177, 180, 81 L.Ed. 78 (1936), and Justice O'Connor's concurring opinion in *Smith v. Phillips,* 455 U.S. at 222–24, 102 S.Ct. at 948–49), *cert. denied,* 540 U.S. 1151, 124 S.Ct. 1149, 157 L.Ed.2d 1045 (2004). However, the Fifth Circuit's holding in *Solis* emphasized the extremely narrow scope of presumed bias. *See Solis v. Cockrell,* 342 F.3d at 393–98 (holding no presumption of bias arose where a member of the jury in a burglary case failed to disclose during voir dire he knew the accused and had heard rumors the accused and the accused's brothers had committed other burglaries). In *Solis,* the Fifth Circuit relied on its holding in *Willie v. Maggio,* 737 F.2d 1372, 1379–81 (5th Cir.1984), *cert. denied,* 469 U.S. 1002, 105 S.Ct. 415, 83 L.Ed.2d 342 (1984), that no presumption of prejudice arose from the fact that four members of a petitioner's jury had sat through voir dire during the trial of a co-defendant during which that co-defendant's trial counsel had suggested the co-defendant's theory at trial would be the petitioner, rather than the co-defendant, had actually committed the murder in question. More significantly for petitioner, the Fifth Circuit has refused to presume juror bias where a venire member mistakenly failed to disclose during voir dire she had previously been convicted of a felony because she had received deferred adjudication. *United States v. Bishop,* 264 F.3d 535, 554–57 (5th Cir. 2001), *cert. denied,* 535 U.S. 1016, 122 S.Ct. 1605, 152 L.Ed.2d 620 (2002). Bias cannot be presumed based on a venire member's failure to disclose a prior felony conviction, regardless of whether that failure to disclose was due to a mistake or a deliberate attempt to conceal a basis for disqualification. *United States v. Bishop,* 264 F.3d at 555–56.

Similarly, analysis of Fifth Circuit precedent addressing claims a juror possessed "bias in fact" demonstrates the equally narrow range of that concept. *See Miniel v. Cockrell,* 339 F.3d 331, 339–40 (5th Cir. 2003) (holding venire member's voir dire answer that the Texas capital sentencing scheme was "more or less a mechanical process" did not evidence bias, nor did same venire member's voir dire testimony suggesting society might be better off from a more expedited justice system, society was too lenient, he did not feel inclined to mitigate punishment, and society had an obligation to remove persons who are a danger to society as a whole), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *United States v. Duncan,* 191 F.3d 569, 573–74 (5th Cir.1999) (holding no disqualifying bias arose where venire member's questionnaire answers indicated she would give more weight to the testimony of a law enforcement officer than another witness and her voir dire testimony was she respected authority and saw a law enforcement officer as an authority figure), *cert. denied,* 529 U.S. 1122, 120 S.Ct. 1991, 146 L.Ed.2d 817 (2000); *United States v. Hall,* 152 F.3d at 408 (holding no disqualifying bias arose where a capital murder venire member stated she was uncertain whether she could consider the fact a defendant grew up in a dysfunctional family environment as a mitigating factor). Petitioner failed to demonstrate

Mrs. Harrell possessed any actual bias against petitioner or in favor of the prosecution, i.e., petitioner failed to allege, much less prove, Mrs. Harrell could not put aside her own opinions and render a verdict based solely on the evidence and the trial court's instructions on the law.

■■■ A finding that an individual who served on a capital murder jury was disqualified under state law from jury service does not, standing alone, establish that same individual was so biased or so partial as to deprive the defendant of his federal constitutional rights. *See Montoya v. Scott*, 65 F.3d 405, 418–20 (5th Cir.1995) (recognizing juror disqualification under state law and a showing of bias are two, entirely different issues), *cert. denied*, 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). Petitioner's attempts to equate Mrs. Harrell's alleged status as a person disqualified from jury service under the intricacies of Texas law do not establish Mrs. Harrell was biased against petitioner or otherwise unable to render an impartial verdict at petitioner's trial. Just as the fact Mrs. Harrell had been convicted of driving while intoxicated did not render her "biased" as a matter of law, even if the state courts had determined she had been convicted of theft in 1979, that fact, standing alone, would not have established Mrs. Harrell was biased or partial toward or against either party at petitioner's trial. *United States v. Bishop*, 264 F.3d at 555–57.

### 4. *No Due Process Violation*

■■■ Due process does mandate a new trial when a venire member's failure to accurately answer a material question on

voir dire deprived the defendant of information that would have furnished a valid basis for a challenge for cause. *United States v. Bishop*, 264 F.3d at 554 (to warrant a new trial, the defendant must show a venire member failed to answer a material voir dire question honestly and a correct response would have been a valid basis for a challenge for cause); *Montoya v. Scott*, 65 F.3d at 417–20 (federal habeas review of a state capital murder conviction applying the standard announced in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 555, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984), to resolve a complaint about an allegedly disqualified venire member who served on the jury). Insofar as petitioner complains Mrs. Harrell testified falsely during her voir dire examination and thereby deprived petitioner of the opportunity to exercise a challenge for cause against her, petitioner's complaint fails for two, equally compelling reasons: first, as the Texas Court of Criminal Appeals reasonably determined during petitioner's state habeas corpus proceeding there was no evidence presented to that court establishing Mrs. Harrell did in fact testify falsely regarding the disposition of her 1979 theft charge [96]; second, in view of the ready availability of public records addressing her 1979 theft charge and the Texas Court of Criminal Appeals' reasonable finding of a lack of any evidence presented during petitioner's state habeas corpus proceeding showing Mrs. Harrell was ever convicted of that charge, petitioner failed to establish Mrs. Harrell was disqualified under applicable state law or otherwise subject to a valid challenge for

---

**96.** State Habeas Transcript, Volume II of II at pp. 241 & 244.

More specifically, the state habeas trial court found there was no evidence Mrs. Harrell knew or understood her bond in her 1979

theft case had been forfeited. *Id.* at p. 244. This Court concludes this determination was reasonable in view of the evidence then before that court.

cause.[97] This Court finds nothing unreasonable with the Texas Court of Criminal Appeals' implicit factual determinations underlying either of these conclusions. The Texas Court of Criminal Appeals' alternative rejection on the merits of petitioner's complaints about Mrs. Harrell's allegedly erroneous voir dire testimony was an objectively reasonable application of the standard in *McDonough.*

### E. *Conclusion*

Petitioner procedurally defaulted on his complaints regarding Mrs. Harrell's voir dire testimony and his assertion she was a biased juror. The state habeas court's factual determinations that Mrs. Harrell had not been convicted of theft in 1979 and that she did not testify falsely during her voir dire examination were both reasonable determinations of historical fact based on the evidence then before that court and are not refuted by any clear or convincing evidence now before this Court. The Texas Court of Criminal Appeals' alternative rejection on the merits, in the course of petitioner's state habeas proceeding, of petitioner's complaints about Mrs. Harrell's voir dire testimony and jury service was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### VI. *Giglio–Napue Failure–to–Correct–False–Testimony Claim*

### A. *The Claim*

In his thirteenth claim herein, petitioner alleges his constitutional rights "may have been" violated by virtue of the prosecution's failure to disclose unspecified agreements between the State and prosecution witness Sean Lowe.[98]

### B. *Procedural Default on Unexhausted Claim*

■ Respondent correctly points out petitioner failed to present any similar claim to the state courts, either on direct appeal or in petitioner's state habeas corpus proceeding. Petitioner admits this claim is unexhausted, yet argues, in contravention of applicable state law, he was denied adequate resources with which to fully investigate and develop this claim during his state habeas corpus proceeding.[99] Regardless of the merits of petitioner's complaints concerning the allegedly untimely and parsimonious funding for investigative expenses petitioner received from his state habeas court, any such deficiencies in investigative funding during petitioner's state habeas proceeding did not prevent petitioner from presenting his state habeas court with a skeletal claim identical to that which petitioner has presented to this Court in his thirteenth claim herein. Additionally, petitioner does not allege any specific facts showing inadequate or untimely funding prevented him from subpoenaing and calling witnesses to testify on this subject during the evidentiary hearing held in his state habeas corpus hearing.

Petitioner also alleges no facts establishing the factual basis for his complaints of an undisclosed agreement between Sean Lowe and petitioner's prosecutors were unavailable to petitioner, despite the exercise of due diligence, during petition-

---

**97.** *Id.* at p. 243.

**98.** Petition at pp. 31–33; Response at pp. 116–24.

**99.** Response at pp. 116–24.

er's state habeas corpus proceeding. In fact, petitioner alleges no specific facts showing: (1) when he first became aware of allegations of an undisclosed agreement between Sean Lowe and petitioner's prosecutors, (2) what facts or information currently exist suggesting Lowe and petitioner's prosecutors ever entered into such an undisclosed agreement, (3) what steps, if any, petitioner has undertaken to date to ascertain whether any such undisclosed agreement has ever existed, or (4) the reasons why petitioner's state habeas counsel was unable, despite the exercise of due diligence, to discover the facts or information currently in possession of petitioner's federal habeas counsel that suggest such an undisclosed agreement existed at the time of petitioner's trial. In short, while unreasonable restrictions on funding for investigative expenses may have prevented petitioner from fully investigating and developing the facts and evidence supporting his unexhausted thirteenth claim herein during his state habeas corpus proceeding, petitioner has alleged no specific facts establishing those limitations precluded him from presenting his state habeas court with, at the very least, the same allegations petitioner has presented to this Court.

Petitioner argues he was precluded from fully developing the factual basis for his complaint regarding allegedly undisclosed agreements between Sean Lowe and petitioner's prosecutors but admits he did receive substantial funding ($1,500) for investigative expenses during his state habeas corpus proceeding. Petitioner alleges no specific facts showing how his state habeas counsel utilized the funding in question or why the funds afforded petitioner during his state habeas proceeding were insufficient to permit petitioner to investigate his thirteenth claim herein at least well enough to determine whether any factual or evidentiary basis existed to support

such a claim. In sum, petitioner has failed to allege any facts showing he was precluded, despite the exercise of due diligence, from at least alleging in his state habeas pleadings the same facts regarding the existence of undisclosed agreements between the prosecution and Sean Lowe petitioner has included in his pleadings in this Court.

While petitioner complains a lack of adequate funding prevented him from locating and interviewing Sean Lowe, petitioner alleges no facts showing inadequate funding prevented petitioner and his state habeas counsel from locating or interviewing either Lowe's attorneys of record, the Assistant District Attorneys who prosecuted Lowe's motion to revoke, petitioner's prosecutors, or any court personnel who had custody of public documents relating to the motion to revoke Lowe's deferred adjudication probation. Petitioner alleges no facts showing he was precluded from calling any of these persons to testify at petitioner's state habeas corpus hearing concerning their personal knowledge of any agreements between the prosecution and Lowe. While both of petitioner's prosecutors testified during petitioner's state habeas corpus hearing, petitioner asked said counsel no questions regarding any undisclosed agreements with Sean Lowe. Petitioner alleges no facts showing the factual basis for his thirteenth claim herein became reasonably available to him, through the exercise of due diligence, only after the conclusion of his state habeas corpus proceeding. Under such circumstances, petitioner's inadequate funding allegations do not excuse his failure to exercise any diligence, much less due diligence, to fairly present his thirteenth claim herein to his state habeas court.

The Supreme Court recognizes no distinction between a failure to properly assert a federal claim in state court and a

failure to properly develop the facts supporting such a claim in state court. *Williams v. Taylor*, 529 U.S. 420, 433, 120 S.Ct. 1479, 1488–89, 146 L.Ed.2d 435 (2000) (holding in adopting the AEDPA, Congress "raised the bar" on prisoners who were not diligent in state court proceedings). Diligence requires, at a minimum, that a prisoner request an evidentiary hearing in state court in the manner prescribed by state law. *Williams v. Taylor*, 529 U.S. at 437, 120 S.Ct. at 1490. However, making such a request does not, standing alone, satisfy the prisoner's duty of diligence. *See Roberts v. Dretke*, 381 F.3d 491, 500–01 (5th Cir.2004) (holding a prisoner complaining about his trial counsel's performance in presenting medical evidence and utilizing a mental health expert at trial failed to exercise due diligence by failing to (1) seek and obtain the prisoner's own medical records or (2) obtain supporting affidavits from the prisoner's family members during the prisoner's state habeas corpus proceeding and rejecting the prisoner's contention that limited state funding for investigative expenses excused these failures), *cert. denied*, — U.S. —, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005); *Roberts v. Dretke*, 356 F.3d 632, 641 (5th Cir.2004) (granting CoA); *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir.2000) (holding mere requests for evidentiary hearings will not suffice, the petitioner must be diligent in pursuing the factual development of his claim), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001). Petitioner was granted a not-insubstantial amount of investigative expenses and an evidentiary hearing during petitioner's state habeas corpus proceeding. Petitioner alleges no facts showing his inability to locate and interview Sean Lowe completely precluded him from

properly asserting or otherwise developing the factual basis for his unexhausted thirteenth claim herein.[100]

Insofar as petitioner contends the state habeas court's limitations on investigative expenses impeded or prevented petitioner, despite the exercise of due diligence, from investigating sufficiently during his state habeas corpus proceeding to ascertain whether an undisclosed agreement existed between Sean Lowe and petitioner's prosecutors at the time of petitioner's trial, petitioner fails to comprehend the true nature of the due diligence requirement. Nothing required petitioner's state habeas counsel to rely exclusively on a licensed investigator to investigate the facts surrounding allegations of an undisclosed agreement between Sean Lowe and petitioner's prosecutors. As explained above, petitioner's state habeas counsel had several avenues available for obtaining information on that subject, other than by personally interviewing Lowe. The existence of any undisclosed agreements between Lowe and petitioner's prosecuting attorneys would have been known to petitioner's prosecutors, both of whom testified during petitioner's state habeas corpus evidentiary hearing, but petitioner made no effort to develop facts surrounding the existence of any undisclosed agreement with Lowe during that hearing.

Likewise, petitioner also failed to subpoena and question Lowe's counsel of record or Lowe's prosecuting attorneys during petitioner's state habeas hearing regarding said counsels' knowledge of the existence of any such undisclosed agreement. Petitioner also alleges no facts showing his state habeas counsel made any effort to contact Lowe's former coun-

**100.** One possible explanation for petitioner's failure in this regard might be the fact petitioner's petition in this Court erroneously

spelled Lowe's last name as "Low." Petition at pp. 31–33.

sel of record or Lowe's former prosecutors to make informal inquiry regarding that subject. Nor does petitioner allege his state habeas counsel made any effort to examine public records in Lowe's case that might have revealed the existence of any such undisclosed agreement. Examination of public records did not require an investigator's license. Nor did any legal barrier preclude petitioner's state habeas counsel from placing telephone calls to Lowe's former counsel of record or Lowe's former prosecutors or petitioner's former prosecutors. Under such circumstances, petitioner has failed to establish his failure to properly present his thirteenth claim herein to his state habeas court resulted from any cause other than petitioner's state habeas counsel's failure to exercise due diligence during petitioner's state habeas corpus proceeding.

█ Insofar as petitioner argues his state habeas corpus evidentiary hearing was not the appropriate forum in which to investigate and develop the factual basis for his unexhausted claims herein, petitioner is incorrect. Under the AEDPA, a state habeas corpus hearing is precisely the proper forum in which the factual validity of alleged violations of a criminal defendant's constitutional rights is to be fully explored, developed, and resolved. *See Hernandez v. Johnson*, 108 F.3d 554, 558 & n. 4 (5th Cir.1997) (holding under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"), *cert. denied*, 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997); 28 U.S.C. § 2254(e)(1). "Federal courts sitting in habeas are not an

alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. at 437, 120 S.Ct. at 1491. By failing to fairly present the state courts with his unexhausted claim alleging the existence of undisclosed agreements between the prosecution and Sean Lowe, petitioner has procedurally defaulted on same in this Court. *Coleman v. Thompson*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

### C. *No Merits*

█ When a claim has not been adjudicated on the merits in state court, the AEDPA's deferential standard of review is inapplicable. *Solis v. Cockrell*, 342 F.3d 392, 394 n. 2. (5th Cir.2003), *cert. denied*, 540 U.S. 1151, 124 S.Ct. 1149, 157 L.Ed.2d 1045 (2004). Thus, this Court's alternative examination of the merits of petitioner's unexhausted, procedurally defaulted *Giglio–Napue* claim is conducted under a *de novo* standard.

Sean Lowe testified during petitioner's capital murder trial: (1) he was then facing a motion to revoke his deferred adjudication on a burglary charge and the possibility of receiving a sentence of up to twenty years but (2) the only agreement he had reached with prosecutors relating to his testimony at petitioner's trial was the prosecution would not object to Lowe living outside the State until the hearing on the motion to revoke his deferred adjudication probation.[101]

█ A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972);

---

**101.** S.F. Trial, Volume XIX, testimony of Sean Lowe at pp. 28–29 & 102–07.

*Napue v. Illinois*, 360 U.S. 264, 269–70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing: (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood it affected the judgment of the jury, and (3) the prosecution used the testimony in question knowing it was false. *Giglio v. United States*, 405 U.S. at 153–54, 92 S.Ct. at 766.

 Taking these requirements in order, petitioner has alleged no specific facts showing: (1) any additional agreements existed between Lowe and the prosecution at the time of petitioner's trial, (2) Lowe gave any materially false testimony during petitioner's capital murder trial, or (3) the prosecution was aware at the time of petitioner's trial that any of the testimony Sean Lowe gave during that trial was false. Conclusory assertions on an ultimate issue do not furnish a basis for federal habeas relief. *See Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir.1994) (holding a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief), *cert. denied*, 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.1994) (holding that without a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance). Un-

der such circumstances, petitioner has failed to allege any specific facts sufficient to satisfy any of the prongs of the *Giglio–Napue* standard.

## VII. *Jury Misconduct Claims*

### A. *The Claims*

In his final claim herein, petitioner alleges: (1) Rosemary Harrell engaged in misconduct by testifying falsely during her voir dire testimony and (2) one or more members of petitioner's jury "may have" engaged in unspecified misconduct during deliberations.[102]

### B. *Procedural Default on Unexhausted Claims*

#### 1. *Failure to Fairly Present Misconduct Claim as a Federal Constitutional Claim*

 Petitioner argued in his state habeas corpus application Mrs. Harrell's allegedly false voir dire testimony prevented him from properly exercising his peremptory challenges and, thereby, violated his rights under applicable Texas statutes and state constitutional provisions.[103] However, nothing in this portion of petitioner's state habeas corpus pleading suggested, implied, or otherwise reasonably advised the state habeas court that petitioner was attempting to present a federal constitutional complaint Mrs. Harrell's allegedly false testimony constituted jury misconduct. Petitioner cited to no federal case law, no federal statutory or constitutional provisions, and no other federal legal authority to support this claim for state habeas corpus relief.

 A state prisoner must exhaust available state remedies thereby giving the

---

**102.** Petition at pp. 34–35; Response at pp. 116–24.

**103.** State Habeas Transcript, Volume I of II at pp. 39–40.

State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29–33, 124 S.Ct. at 1349–51 (rejecting the argument a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844–45, 119 S.Ct. at 1732–33 (holding comity requires a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162–63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding for purposes of exhausting state remedies, a claim for federal relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); *Duncan v. Walker*, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

■ The exhaustion requirement is satisfied when the substance of the federal habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29–33, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to federal law or a citation to an opinion applying federal law to such a claim). The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6–7, 103 S.Ct. 276, 277–78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir.2003) ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."), *cert. denied*, —— U.S. ——, 125 S.Ct. 866, 160 L.Ed.2d 781 (2005); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir.2001) ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied

upon in the state court, he fails to satisfy the exhaustion requirement"). To have "fairly presented" his federal claim, the petitioner must have reasonably alerted the state courts to the federal nature of his complaint. *Baldwin v. Reese*, 541 U.S. at 29–33, 124 S.Ct. at 1349–51; *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

Because petitioner's state habeas corpus pleading did not furnish any reasonable notice to the state habeas court petitioner was asserting a federal jury misconduct complaint, as opposed to one based solely on state law, arising from Mrs. Harrell's allegedly false voir dire testimony, petitioner failed to fairly present the state habeas court with the same federal complaint regarding Mrs. Harrell's voir dire testimony petitioner includes in his final claim in this Court. Petitioner has failed to exhaust available state court remedies on that claim and federal habeas review of same is foreclosed in this proceeding. *Coleman v. Thompson*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

2. *Failure to Exhaust State Remedies on Claim of Jury Misconduct During Deliberations*

Petitioner presented the Texas Court of Criminal Appeals with no point of error on direct appeal and no ground for state habeas relief asserting any jury misconduct occurred during deliberations at his capital murder trial. As was the case with petitioner's unexhausted thirteenth claim herein, petitioner has failed to allege any specific facts showing his failure to fairly present this same claim to his state habeas court was the product of anything more than a lack of due diligence on the part of petitioner's state habeas counsel. Petitioner was afforded an evidentiary hearing during his state habeas corpus proceeding yet failed to present any evidence showing any jury misconduct occurred during deliberations at petitioner's trial. Petitioner alleges no specific facts showing the factual basis for his jury misconduct claim (regarding alleged misconduct during deliberations) was unavailable to him, despite the exercise of due diligence, at the time of petitioner's state habeas corpus proceeding. Petitioner does not allege the portion of his final claim herein alleging misconduct during jury deliberations at his trial is premised on any newly discovered evidence or other information that was unavailable, despite the exercise of due diligence, at the time of petitioner's state habeas corpus proceeding. Nor does petitioner allege any facts showing the prosecution has ever concealed or withheld evidence of jury misconduct during the deliberations at petitioner's trial.

Petitioner's complaints of limitations on state funding for investigative expenses during his state habeas corpus proceeding do not excuse the failure of petitioner's state habeas counsel to interview petitioner's former petit jurors. Both trial and appellate attorneys routinely interview jurors following criminal trials without the assistance of state-licensed investigators. Petitioner alleges no facts showing his state habeas counsel was prevented by any external impediment from interviewing petitioner's former petit jurors to ascertain whether jury misconduct occurred during deliberations at petitioner's trial. Additionally, petitioner received a considerable sum for payment of investigative expenses during his state habeas proceeding and was afforded an evidentiary hearing. Yet, petitioner presented the state habeas court with no fact-specific allegations suggesting any jury misconduct occurred during delib-

erations at petitioner's trial. Petitioner subpoenaed neither Rosemary Harrell nor any of petitioner's other petit jurors to testify during the evidentiary hearing held in petitioner's state habeas corpus proceeding. Petitioner has alleged no specific facts establishing a factual basis for his allegation that jury misconduct "may have" occurred during deliberations at his trial has ever existed or showing when petitioner first became aware of these allegations. Under such circumstances, petitioner has failed to establish his failure to present this portion of his final claim herein to his state habeas court was the product of anything more than a lack of due diligence on the part of his state habeas counsel.

Accordingly, petitioner procedurally defaulted on the unexhausted portion of his fifteenth claim herein by failing to fairly present some form of this claim to the state courts either on direct appeal or in petitioner's state habeas corpus proceeding. *Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

### C. *No Merits*

As with petitioner's other, unexhausted, procedurally defaulted claims, this Court's alternative review of the merits of those claims is conducted under a *de novo* standard. *Solis v. Cockrell,* 342 F.3d 392, 394 n. 2. (5th Cir.2003), *cert. denied,* 540 U.S. 1151, 124 S.Ct. 1149, 157 L.Ed.2d 1045 (2004).

#### 1. *Unspecified Misconduct During Deliberations*

Petitioner has alleged no specific facts showing any identified juror engaged in any extraneous act of misconduct during deliberations at petitioner's trial.

#### 2. *Rosemary Harrell's Allegedly False Voir Dire Testimony*

As this Court explained in Section V.D.1. above, the state habeas trial court expressly found there was no evidence showing: (1) Mrs. Harrell had been convicted of theft in 1979 or (2) her voir dire testimony regarding the disposition of her 1979 theft charge was inaccurate. This Court independently reviewed the entire record from Mrs. Harrell's voir dire examination and all of the testimony given during petitioner's state habeas corpus proceeding under a *de novo* standard and reaches the same conclusions as the state habeas court. No less than five licensed attorneys reviewed the two, ambiguous documents regarding her 1979 theft charge presented by petitioner to the state habeas court and to this Court. Each of those legal experts testified they could find nothing in those documents establishing Mrs. Harrell had ever entered a plea or had otherwise been convicted of misdemeanor theft. The only San Antonio Municipal Court employee who testified before the state habeas court had no personal knowledge regarding the disposition of Mrs. Harrell's 1979 theft charge, admitted no judgment of conviction for Mrs. Harrell on that charge could be found among municipal court records, and offered only speculative assertions regarding what might have transpired in 1979, a year before she began her employment with the San Antonio Municipal Court. Petitioner offers no fact-specific allegations, much less any evidence, showing Mrs. Harrell, or any attorney acting on her behalf, ever entered a plea before any judicial officer in connection with the 1979 theft charge. Nor does petitioner offer any fact-specific allegations showing Mrs. Harrell: (1) was ever given notice or an opportunity to be heard regarding the forfeiture of her cash bond or (2) possessed personal knowledge at time of her voir dire testimo-

ny that her bond had been forfeited almost twenty years before.

Accordingly, this Court's independent, *de novo,* review of the evidence now before this Court, including Harrell's April 10, 2002 affidavit attached to petitioner's petition herein, leads to the conclusion Mrs. Harrell's 1979 theft charge was administratively dismissed and her cash bond forfeited by the San Antonio Municipal Court without any advance or contemporaneous notice of same to her. There is likewise no evidence now before this Court establishing Mrs. Harrell possessed any personal knowledge regarding the forfeiture of her cash bond at the time she testified during the voir dire phase of petitioner's trial. Under such circumstances, there is no evidence now before this Court to support a finding Mrs. Harrell testified falsely during her voir dire examination. Thus, there is no valid factual basis underlying petitioner's complaint Mrs. Harrell engaged in jury misconduct by testifying falsely regarding the disposition of her 1979 theft conviction during her voir dire testimony. In fact, Mrs. Harrell's voir dire testimony appears to this Court to have been an accurate description, for a lay person, of the manner in which her 1979 theft charge was administratively resolved by the San Antonio Municipal Court.

As explained above, due process considerations justify a new trial when a venire member's failure to accurately answer a material question on voir dire deprived the defendant of information that would have furnished a valid basis for a challenge for cause. *See United States v. Bishop,* 264 F.3d 535, 554 (5th Cir.2001) (to warrant a new trial, the defendant must show a venire member failed to answer a material voir dire question honestly and a correct response would have been a valid basis for a challenge for cause), *cert. denied,* 535 U.S.

1016, 122 S.Ct. 1605, 152 L.Ed.2d 620 (2002); *Montoya v. Scott,* 65 F.3d 405, 417–20 (5th Cir.1995) (applying same standard to federal habeas review of a state capital murder conviction), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). There is no evidentiary basis in the record now before this Court supporting a finding Rosemary Harrell: (1) was convicted of theft in 1979 or was otherwise subject to a challenge for cause in connection with that charge at the time of petitioner's capital murder trial or (2) gave any false material testimony regarding her 1979 theft charge during her voir dire examination.

### D. *Brooks Distinguished*

The Fifth Circuit recently held in *Brooks v. Dretke,* 418 F.3d 430 (5th Cir. 2005) (petition for rehearing filed August 15, 2005), a defendant was entitled to a new capital sentencing hearing without a showing of actual bias because a juror was arrested for carrying a handgun into the courthouse on the morning the punishment phase of the defendant's capital trial began. Here, Gutierrez's complaints of alleged jury misconduct by Rosemary Harrell and others are not governed by the rule announced in *Brooks* because: (1) as explained in Section VII.B. above, Gutierrez procedurally defaulted on his federal complaints of jury misconduct and (2) as explained in Section VII.C. above, the state habeas court expressly found as a matter of fact Mrs. Harrell had not been convicted of a theft offense which rendered her ineligible to serve on Gutierrez's jury. Petitioner has neither overcome his procedural default nor presented this Court with clear and convincing evidence sufficient to overcome the state habeas court's factual finding on the latter point. Therefore, the Fifth Circuit's holding in *Brooks* furnishes no basis for overturning Gutierrez's conviction or sentence.

## VIII. *Brady Claims*

### A. *The Claims*

In his sixth, eighth, and fourteenth claims herein, petitioner argues his constitutional rights were violated when the prosecution withheld from petitioner's trial counsel information or evidence: (1) establishing Rosemary Harrell was disqualified from jury service,[104] (2) in the form of victim impact statements of Captain Cobo's 15–year–old daughter Reena in the cases involving Gutierrez, Arroyo, and Suaste,[105] and (3) that could have been used to impeach prosecution witness Antonio Pina.[106]

### B. *Clearly Established Federal Law*

■ Few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (*quoting Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963)). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland,* applies even when there has been no request by the accused. *Banks v. Dretke,* 540 U.S. at 690, 124 S.Ct. at 1272 (*quoting Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)); *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

This duty applies to impeachment evidence. *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley,* 473 U.S. 667, 676, 685, 105 S.Ct. 3375, 3380, 3385, 87 L.Ed.2d 481 (1985). The rule encompasses evidence known only to police investigators and not to the prosecutor. *Strickler v. Greene,* 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene,* 527 U.S. at 281, 119 S.Ct. at 1948 (*quoting Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke,* 540 U.S. at 698–99, 124 S.Ct. at 1276.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does not require demonstration by a preponderance that disclosure of the sup-

---

**104.** Petition at pp. 20–21; Response at pp. 79–84.

**105.** Petition at pp. 23–25; Response at pp. 90–98.

**106.** Petition at pp. 31–33; Response at pp. 116–24.

pressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is not a sufficiency of the evidence test. *Kyles v. Whitley,* 514 U.S. at 434–35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley,* 514 U.S. at 435–36, 115 S.Ct. at 1566–67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley,* 514 U.S. at 436–37, 115 S.Ct. at 1567.

### C. *Evidence of Rosemary Harrell's Bond Forfeiture*

#### 1. *State Court Disposition*

■ During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner's lead prosecutor testified in pertinent part and without contradiction: (1) he contacted the San Antonio Municipal Court to verify the processing of Rosemary Harrell's 1979 theft charge, (2) municipal court personnel informed him Mrs. Harrell did not have a conviction and no pending case or active warrant existed with regard to Mrs. Harrell, and (3) the same municipal court employee informed him that at the time of Mrs. Harrell's theft charge, the municipal court often kept bond money but entered no judgment of conviction.[107] The other prosecuting attorney in petitioner's capital

murder case testified at the same state habeas hearing but was not questioned regarding his knowledge of Rosemary Harrell's criminal record.[108] Petitioner's lead trial counsel at trial testified: (1) he believed the documents then before petitioner's state habeas court were, at best, ambiguous with regard to whether Mrs. Harrell was ever convicted in connection with her 1979 theft charge, (2) he and his co-counsel had strategic reasons for wanting her to serve on petitioner's jury, specifically because she was Catholic, opposed to the death penalty, had no ties to the military, and had unpleasant experiences with law enforcement, and (3) nothing in the documents then before the state habeas court indicated Mrs. Harrell ever entered a guilty plea to her 1979 theft charge.[109] The state habeas trial court concluded from the foregoing testimony and the other evidence introduced during petitioner's state habeas corpus proceeding: (1) Mrs. Harrell's 1979 bond forfeiture did not render her disqualified or subject to a challenge for cause, (2) therefore, the prosecution's failure to disclose evidence of her bond forfeiture did not constitute a withholding of "favorable" evidence, and (3) even if the information in question could be considered "favorable," there was no reasonable probability that, but for its non-disclosure, the outcome of petitioner's trial would have been different.[110]

#### 2. *AEDPA Review*

For the reasons set forth in Sections V.D.1. and VII.C.2. above, the state habeas

---

**107.** S.F. State Habeas Hearing, Volume 3 of 6, testimony of Bert Richardson at pp. 10–31, 46–47, 50–51, & 77.

**108.** *Id.* testimony of Joey Contreras at pp. 107–15.

**109.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at pp. 32–39 & 52–53.

**110.** State Habeas Transcript, Volume II of II at pp. 246.

court's factual determinations that Mrs. Harrell had not been convicted of theft in 1979 and had not testified falsely during her voir dire examination regarding the disposition of her 1979 theft charge were reasonable determinations of fact in light of the evidence before that court. Petitioner has failed to present this Court with clear and convincing evidence showing either of those factual determinations were erroneous.

Given those factual determinations, the state habeas court's conclusion the prosecution's alleged "withholding" of information regarding Mrs. Harrell's 1979 bond forfeiture failed to satisfy the materiality prong of *Brady* was an objectively reasonable application of clearly established federal law. Absent a showing that disclosure of Mrs. Harrell's 1979 bond forfeiture would have furnished a factual basis for her disqualification or revealed a material portion of her voir dire testimony to be inaccurate, there is no reasonable probability that, but for the non-disclosure of that information, the outcome of either phase of petitioner's capital murder trial would have been different.

Moreover, the state habeas court's reasonable factual determinations likewise fully support that court's equally reasonable conclusion petitioner's complaints about allegedly withheld documentation relating to Mrs. Harrell's 1979 theft charge and bond forfeiture failed to satisfy the requirement of *Brady* that the evidence in question be favorable to the defense. Because Mrs. Harrell was not disqualified or subject to a challenge for cause under state law, evidence regarding her 1979 theft charge and bond forfeiture was not "favorable" to petitioner within even the broadest sense of that term. The evidence petitioner presented to his state habeas court regarding Mrs. Harrell's 1979 theft charge and bond forfeiture was neither exculpatory nor mit-

igating in nature and would have furnished no basis for impeaching any prosecution witness at trial. Because the state habeas court reasonably found Mrs. Harrell had testified accurately during her voir dire examination regarding her 1979 theft charge and because petitioner failed to present to that court and to this Court any fact-specific allegations showing Mrs. Harrell knew at the time of her voir dire examination the precise disposition of her cash bond in 1979, the documents in question would have had no impeachment value during Mrs. Harrell's voir dire examination. Petitioner failed to confront Mrs. Harrell with the documents in question during his state habeas corpus hearing and, thereby, failed to establish those documents possessed any impeachment value had petitioner's trial counsel obtained them prior to or during Mrs. Harrell's voir dire examination.

Under such circumstances, the state habeas court's rejection on the merits of this portion of petitioner's *Brady* claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. On the contrary, the Texas Court of Criminal Appeals' rejection on the merits of this aspect of petitioner's *Brady* claims was a reasonable application of the clearly established principles set forth in *Brady* and its progeny discussed above.

### 3. *No Prosecutorial "Suppression" of Public Records*

 Furthermore, this Court independently concludes petitioner's complaints regarding the prosecution's non-disclosure of Mrs. Harrell's 1979 bond forfeiture fail to establish the prosecution ac-

tually "withheld" or "suppressed" any information on that subject within the meaning of *Brady*. At all times relevant to petitioner's trial, the very same information regarding Mrs. Harrell's 1979 bond forfeiture which petitioner complains the prosecution "withheld" from petitioner's trial counsel, i.e., the documents regarding the 1979 theft charge and bond forfeiture petitioner presented to his state habeas court, was a matter of public record in the San Antonio municipal courts. Evidence is not "suppressed" if the defendant either knew, should have known, or with the exercise of due diligence could have learned of the essential facts permitting him to take advantage of the exculpatory evidence. *See Bigby v. Dretke*, 402 F.3d 551, 574–75 (5th Cir.2005) (holding prosecutors had no duty under *Brady* to furnish petitioner's trial counsel with copies of jail medical records showing the numerous psychotropic medications petitioner was taking while incarcerated awaiting trial because those records could have been obtained by petitioner's counsel through the exercise of reasonable diligence), *petition for cert. filed*, (July 15, 2005) (No. 05–5390); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.) (holding *Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to a defendant through the exercise of reasonable diligence), *cert. denied*, 536 U.S. 978, 123 S.Ct. 14, 153 L.Ed.2d 877 (2002); *In re Smith*, 142 F.3d 832, 836 (5th Cir.1998) (holding if defendant using reasonable diligence could have obtained the information, no claim arises under *Brady* ); *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir.1997) (holding the State has no obligation to point the defense toward potentially exculpatory evidence if that evidence is either in the possession of the defendant or can be discovered by exercising due diligence), *cert. denied*, 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998); *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir.) (holding a defendant asserting a *Brady* claim must show the information allegedly withheld was unavailable to him through due diligence), *cert. denied*, 522 U.S. 848, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997); *United States v. Aubin*, 87 F.3d 141, 148–49 (5th Cir.1996) (holding due diligence on the part of the defendant is a necessary element in a successful *Brady* claim and the government is not obligated to conduct a defendant's investigation or to make a defendant's defense for him), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997); *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir.1994) (holding a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information), *cert. denied*, 513 U.S. 1137, 115 S.Ct. 959, 130 L.Ed.2d 901 (1995); *Blackmon v. Scott*, 22 F.3d 560, 564–65 (5th Cir.) (holding the state is not required to furnish the defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994).

■ Every attorney present during Rosemary Harrell's voir dire testimony was well aware she had faced a theft charge in 1979. However, only the lead prosecutor made any effort to contact the San Antonio Municipal Court to ascertain the precise disposition of Mrs. Harrell's 1979 charge. Nothing prevented petitioner's trial counsel from undertaking the same inquiry as the lead prosecutor. Petitioner furnished the state habeas court and this Court with no rational explanation for his trial counsel's failure to undertake even a cursory review of the public records available at the time of petitioner's trial addressing Mrs. Harrell's 1979 theft charge and bond forfeiture. Thus, peti-

tioner has failed to allege any specific facts showing any of the information regarding Mrs. Harrell's 1979 theft charge and bond forfeiture available to petitioner's state habeas counsel was unavailable through the exercise of due diligence to petitioner's trial counsel. Under such circumstances, petitioner has failed to establish the prosecution "withheld" or "suppressed" this public information from petitioner's trial counsel within the meaning of those two terms as used in *Brady* and its progeny. Contrary to the implication underlying this portion of petitioner's *Brady* claims, *Brady* does not mandate that prosecutors and law enforcement agents serve as *de facto* clerical assistants for criminal defense counsel gathering public information that might assist the defense or that prosecutors must collect and furnish defense counsel with information already in the public domain which defense counsel could obtain just as easily as the prosecution through the exercise of due diligence. *See Bigby v. Dretke,* 402 F.3d 551, 574 (5th Cir.2005) (holding the state bears no responsibility to direct the defense toward potentially exculpatory evidence that either is in the possession of the defense or can be discovered through the exercise of due diligence); *Graves v. Cockrell,* 351 F.3d 143, 154 (5th Cir.2003) (holding proof that the non-discovery of allegedly favorable evidence was not the result of a lack of due diligence is an essential element of a *Brady* claim), *cert. denied,* 541 U.S. 1057, 124 S.Ct. 2160, 158 L.Ed.2d 757 (2004); *United States v. Garza,* 165 F.3d 312, 314 (5th Cir.) (holding the prosecution is not obligated to conduct a defendant's investigation or to make a defendant's case for him), *cert. denied,* 528 U.S. 1006, 120 S.Ct. 502, 145 L.Ed.2d 388 (1999); *Lawrence v. Lensing,* 42 F.3d 255, 257 (5th Cir.1994) (holding the prosecution did not "withhold" from defense counsel documents admitted into evidence at trial). Petitioner has alleged no specific facts showing his trial counsel was unable, despite the exercise of due diligence, to obtain the same information regarding Rosemary Harrell's 1979 theft charge and bond forfeiture that petitioner's state habeas counsel presented to the state habeas court.

### D. *Reena Cobo's Victim Impact Statements*

#### 1. *State Court Disposition*

 Petitioner presented documentary evidence during his state habeas corpus proceeding establishing on October 13, 1997, Captain Cobo's 15-year-old daughter Reena executed separate Victim Impact Statements for Gutierrez, Arroyo, and Suaste.[111]

---

**111.** While the state habeas trial court's Order setting forth its findings and conclusions identified these documents as Gutierrez Exhibit nos. 4 and 5 and State Exhibit no. 1 from petitioner's state habeas corpus proceeding, the copies of those documents included in the state court records in this case do not correspond with the documents discussed during the interrogation of petitioner's and Arroyo's trial counsel which occurred during petitioner's and Arroyo's joint state habeas corpus hearing. More specifically, the documents that appear as Gutierrez Exhibit Nos. 4 & 5 in the exhibit volume from petitioner's state habeas corpus proceeding appear to be a confusing amalgam of Reena Cobo's and Ruben Cobo's Victim Impact Statements. State Exhibit no. 1, however, included in a separate exhibit volume from petitioner's state habeas proceeding, appears to be Reena Cobo's Victim Impact Statement in Arroyo's case. Several confusingly assembled pages of what appear to be Reena Cobo's Victim Impact Statements in petitioner's and Christopher Suaste's cases appear as attachments to petitioner's state habeas corpus application at State Habeas Transcript, Volume I of II at pp. 114–25. Thus, the state court records currently before this Court do not include accurate copies of Reena Cobo's Victim Impact Statements in either Suaste's or Gutierrez's cases but do include an accurate

In Christopher Suaste's case, Reena Cobo's Victim Impact Statement included the following hand-written language:

I miss him so much it hurts. When I think about it, I know he is in heaven with my grandmother and God is taken care of him. I want to see the murderers punished not necessarily by death. I feel sorry that they wasted theirs and my father's life.[112]

In Randy Arroyo's case, Reena Cobo's Victim Impact Statement included the following handwritten language:

I know he won't be there in my future, (college graduation, wedding, family) but I know he is in heaven. I think I took it different than the rest of my family. I'm more at peace with the situation and I was so close to him. I loved him greatly, but there is nothing I can do but make sure the murderers get punished.[113]

In petitioner's case, Reena Cobo's Victim Impact Statement included the following handwritten language:

I know he won't be there in my future, (college graduation, wedding, family) but I know he is in heaven. I think I took it a lot different than most of my family. I'm at peace with it and I don't hate the ones who sacrificed his life, rather I feel sorry for them. They ruined their young lives and ended my father's all for

a stupid reason. I miss him so much but there's nothing I can do about it so I go on but keep his memory alive.[114]

Petitioner's lead trial counsel testified during petitioner's state habeas corpus hearing: (1) the ambiguous statements contained in Reena Cobo's victim impact statements would have been "mitigating" in nature, (2) however, those statements did not clearly indicate she was opposed to the imposition of the death penalty on petitioner or his co-defendants, (3) he did not know what testimony Reena Cobo would have given had she been called to testify at the punishment phase of petitioner's capital murder trial, (4) there was an obvious danger in putting Reena Cobo on the stand without knowing what her testimony would be, and (5) while attempting to contact the family of a murder victim would have been a "touchy subject," he would have considered doing it had he been given access to the statements in question.[115] Petitioner's co-counsel at trial testified: (1) she was familiar with victim impact statements generally, (2) had she seen Reena Cobo's statements, she would have explored the apparent inconsistency between the comments in Suaste's case and petitioner's case and would have explored Reena Cobo's willingness to testify at trial, but (3) she had no knowledge regarding what testimony Reena Cobo

copy of Reena Cobo's Victim Impact Statement in Arroyo's case.

Fortunately, the lack of proper documentation in the state court records now before this Court does not preclude application of the AEDPA's standard of review. Having carefully reviewed the testimony from petitioner's and Arroyo's state habeas hearing, this Court finds the quotations of the relevant language from each of Reena Cobo's Victim Impact Statements contained in the state habeas trial court's factual findings quoted verbatim in the text hereinafter accurately reflect the contents of those documents.

**112.** State Habeas Transcript, Volume II of II at p. 249.

**113.** S.F. State Habeas Hearing, Exhibit Volume, State Exhibit no. 1. The state habeas trial court's factual findings accurately quotes the foregoing language. State Habeas Transcript, Volume II of II at p. 250.

**114.** State Habeas Transcript, Volume II of II at p. 250.

**115.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at pp. 25–30, 50–51, & 56–57.

would have given had she been called to testify at petitioner's trial.[116] Petitioner offered no testimony from Reena Cobo.

The state habeas court concluded that because petitioner failed to present any evidence showing what testimony Reena Cobo would have been willing to give at petitioner's trial, petitioner failed to establish the non-disclosure of Reena Cobo's victim impact statements to petitioner's trial counsel deprived petitioner of either "favorable" or "material" evidence within the meaning of those terms as used in *Brady*.[117]

### 2. *AEDPA Review*

Petitioner does not allege Reena Cobo could have furnished any testimony that would have been admissible at the guilt-innocence phase of petitioner's capital murder trial. Thus, the focus of this Court's *Brady* analysis must be on the issues that were before the jury at the punishment phase of petitioner's capital murder trial. The three special issues submitted to the jury during the punishment phase of petitioner's trial inquired whether: (1) the evidence established beyond a reasonable doubt there was a probability Gutierrez "would commit criminal acts of violence that would constitute a continuing threat to society," (2) the evidence established beyond a reasonable doubt that Gutierrez himself actually caused the death of Jose Cobo or, if Gutierrez did not actually cause Captain Cobo's death, that Gutierrez intended to kill Captain Cobo or another, or that Gutierrez anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including

the circumstances of the offense, Gutierrez's character and background, and Gutierrez's personal moral culpability, sufficient mitigating circumstance(s) existed to warrant a life sentence.[118]

To reiterate, the evidence presented during the guilt-innocence phase of petitioner's capital murder trial established Gutierrez personally shot Captain Cobo in the back twice while restraining him during his attempt to flee a moving vehicle and Gutierrez repeatedly laughed and joked while recounting the incident to others in the hours immediately after Captain Cobo's fatal shooting. The evidence presented during the punishment phase of petitioner's capital murder trial established Gutierrez: (1) pleaded guilty to participating in a string of home burglaries, (2) fought another inmate during his pretrial detention, (3) wrote an essay while in middle school in which he fantasized about shooting someone and then fleeing to Mexico, and (4) was on probation at the time of Captain Cobo's murder.

The state habeas trial court reasonably concluded petitioner failed to show that Jose Cobo's 15–year–old daughter would have furnished any mitigating evidence had she been called to testify at the punishment phase of Gutierrez's trial. Complaints about uncalled witnesses are not favored in federal habeas corpus proceedings because allegations of what a witness would have testified are largely speculative. *Graves v. Cockrell,* 351 F.3d at 156; *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir.2002); *Sayre v. Anderson,* 238 F.3d 631, 635–36 (5th Cir.2001). Petitioner failed to call Reena Cobo to testify during his state habeas corpus proceeding. In-

---

**116.** *Id.* testimony of Lisa Catherine Jarrett at pp. 176–80 & 189.

**117.** State Habeas Transcript, Volume II of II at pp. 251–52.

**118.** Trial Transcript, Volume II of II at pp. 233–34.

stead, petitioner sought to rely exclusively on three, hearsay "victim impact statements" executed by Reena Cobo. Absent some admissible evidence showing Reena Cobo was available at the time of Gutierrez's trial and willing to testify she actually opposed the imposition of the death penalty on Gutierrez, there was no evidence before the state habeas court showing a reasonable probability that, but for the trial testimony of Reena Cobo, the jury would have answered any of Gutierrez's capital sentencing special issues differently. Thus, there was nothing unreasonable with the state habeas trial court's conclusion Gutierrez failed to satisfy the materiality prong of *Brady*.

Likewise, the state habeas court reasonably concluded petitioner failed to establish the non-disclosure of Reena Cobo's victim impact statements deprived petitioner's trial counsel of any favorable evidence. Reena Cobo's victim impact statements were hearsay. The only potentially admissible evidence identified by petitioner's trial counsel in their testimony during petitioner's state habeas corpus proceeding which might have become available had Reena Cobo's statements been disclosed to petitioner's trial counsel was the testimony of Reena Cobo, herself.[119] Absent admissible evidence showing precisely what testimony Reena Cobo would have given during the punishment phase of petitioner's capital murder trial, the state habeas court reasonably concluded petitioner had failed to establish the non-disclosure of Reena Cobo's written statements deprived petitioner of favorable testimony. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.1994) (holding that without a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, or present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot begin to apply the *Strickland* analysis because it is impossible to determine whether the defendant was "prejudiced" by the absence of such evidence).

Petitioner's lead trial counsel testified during petitioner's state habeas corpus proceeding he would not have called Reena Cobo to testify at petitioner's trial without interviewing her first.[120] Reena Cobo had an absolute right to refuse to talk with petitioner's trial counsel had said trial

---

**119.** This Court expresses no opinion on the admissibility under state evidentiary rules applicable at the time of petitioner's trial of any proffered testimony from Reena Cobo regarding the appropriate punishment to be imposed on petitioner. This is because petitioner failed to offer the state habeas court any evidence establishing that, in fact, Reena Cobo was available and willing to testify at the punishment phase of petitioner's trial in a manner beneficial to petitioner. The Texas Court of Criminal Appeals' holding in *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim.App.2003) (the wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible), *cert. denied*, 542 U.S. 905, 124 S.Ct. 2837, 159 L.Ed.2d 270 (2004), appears to foreclose such testimony under current Texas law.

Even if Reena Cobo had been willing to testify at petitioner's trial in a manner favorable to petitioner, and such testimony had been admissible, it remains unlikely her testimony would have had any impact on the outcome of the punishment phase of petitioner's trial. It is apparent from a cursory review of the Victim Impact Statements of other members of Captain Cobo's family included in the exhibits from petitioner's state habeas corpus proceeding that, had Reena Cobo testified and offered such an opinion favorable to petitioner's fate, the prosecution would likely have had available several other members of Cobo's family, including Ruben Cobo, April Cobo Butz, Jennifer Ruiz, Paul E. Cobo, and Gladys Ruiz, who would have expressed a vastly different opinion.

**120.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at p. 47.

counsel attempted to contact her. *See Johnson v. Puckett,* 176 F.3d 809, 816 (5th Cir.1999) (holding a prosecution witness's refusal to talk with defense counsel did not rise to the level of "cause" sufficient to overcome a procedural default where there was no showing the witness's refusal was the result of official intimidation, threats, or duress); *United States v. Soape,* 169 F.3d 257, 271 n. 9 (5th Cir.) (recognizing a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so), *cert. denied,* 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999); *United States v. Caldwell,* 750 F.2d 341, 347 (5th Cir.1984) (noting a defendant's right of access to a witness exists coextensively with that witness's right to refuse to say anything), *cert. denied,* 471 U.S. 1007, 105 S.Ct. 1873, 85 L.Ed.2d 166 (1985); *United States v. Benson,* 495 F.2d 475, 479 (5th Cir.) (holding the uniform rule is a government witness who does not wish to be interviewed by the defense may not be required to do so), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 310 (1974). It is well-settled that potential witnesses are under no legal obligation to talk with a criminal defendant's counsel before trial. *See Puckett,* 176 F.3d at 816; *Soape,* 169 F.3d at 271 n. 9; *Caldwell,* 750 F.2d at 347; *Benson,* 495 F.2d at 479. Petitioner presented the state habeas court with no evidence showing Reena Cobo would have been willing to talk with petitioner's trial counsel, or any other representative of petitioner, had any such person contacted her prior to or during petitioner's trial. Thus, petitioner failed to establish a reasonable probability that, but for the failure of the prosecution to disclose Reena Cobo's victim impact statements to petitioner's trial counsel, petitioner would have had the benefit of any favorable testimony from Reena Cobo at the punishment phase of his capital murder trial.

Under such circumstances, the state habeas court's rejection on the merits of this aspect of petitioner's *Brady* claims herein was neither contrary to, nor involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

E. *Unidentified Impeachment Evidence Regarding Antonio Pina*

1. *Procedural Default on Unexhausted Claim*

 Petitioner presented the state courts with no point of error on direct appeal and no ground for state habeas corpus relief alleging the prosecution withheld from petitioner's trial counsel any evidence that could have been used to impeach the trial testimony of prosecution witness Antonio Pina. Likewise, petitioner offers this Court no fact-specific allegations showing his failure to discover, factually develop, and present this same claim during his state habeas corpus proceeding was the product of anything more than his state habeas counsel's failure to exercise due diligence.

Although petitioner again complains about the amount of state funding for investigation of new claims permitted him during his state habeas corpus proceeding, petitioner fails to acknowledge that during his state habeas corpus proceeding, he was granted the sum of $1,500 to defray or reimburse investigative expenses and afforded an evidentiary hearing to develop the factual bases for his claims. Petitioner offers this Court no explanation of how his state habeas counsel utilized this not-insubstantial quantity of investigative funds. There is no right to funding of state habe-

as counsel or state habeas investigators at any particular level. *Roberts v. Dretke,* 356 F.3d 632, 640 (5th Cir.2004).

Petitioner also alleges no specific facts showing his penultimate claim herein regarding Antonio Pina is premised on facts which only became available to petitioner after the date of petitioner's state habeas corpus proceeding. Petitioner did not call Antonio Pina to testify during his state habeas corpus proceeding and offered the state habeas court no evidence showing the prosecution withheld any evidence from petitioner's trial counsel that could have been used to impeach Pina's trial testimony. Petitioner alleges no specific facts showing any such impeachment evidence has ever existed. In short, petitioner offers this Court no rational explanation for the failure of his state habeas counsel to discover, develop, and present this same claim during the course of petitioner's state habeas corpus proceeding. Petitioner does not allege any specific facts showing he was prevented, despite the exercise of due diligence on the part of his state habeas counsel, from discovering, developing, and presenting this same claim during petitioner's state habeas corpus proceeding. Petitioner has failed to establish he exercised due diligence with regard to discovering, developing the factual basis for, and presenting this same claim during his state habeas corpus proceeding. Thus, petitioner has procedurally defaulted on this unexhausted *Brady* claim. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991).

#### 2. *No Merits*

 The principle announced in *Brady* clearly applies to impeachment evidence. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999);

*United States v. Bagley,* 473 U.S. at 667, 676, 685, 105 S.Ct. 3375, 3380, 3385, 87 L.Ed.2d 481 (1985). However, petitioner has alleged no facts showing any evidence has ever existed that could have been used to impeach prosecution witness Antonio Pina's trial testimony. Likewise, petitioner alleges no facts showing the prosecution withheld or suppressed any such evidence from petitioner's trial counsel.

Moreover, Antonio Pina's testimony at the guilt-innocence phase of petitioner's trial was far from crucial on any contested issue. At trial, Pina testified: (1) on the morning of Captain Cobo's murder he saw two men inside a Mazda sports car with the windows down (other witnesses identified the vehicle as Captain Cobo's), (2) he was able to identify Gutierrez as the person who was in the back seat of that vehicle but could not be certain whether Arroyo was the driver, (3) later that date, he went to a location near his home, not far from where he had seen the vehicle that morning, and observed the police had recovered the vehicle, and (4) he had seen Gutierrez on television prior to picking Gutierrez's picture from a photo array several months after Captain Cobo's murder.[121] Pina was simply one of several prosecution witnesses whose testimony placed Gutierrez inside Captain Cobo's vehicle on the morning of the murder.

In view of the trial testimony of Christopher Suaste and Sean Lowe recounting Gutierrez's boastful accounts of his brutal murder of Captain Cobo and Gutierrez's admissions he took clothing from Captain Cobo's vehicle, as well as the other evidence of Gutierrez's guilt, there is no reasonable probability that, but for the failure of the prosecution to disclose any evidence that would have impeached Pina, the outcome of the guilt-innocence phase

---

**121.** S.F. Trial, Volume XVII, testimony of Antonio Pina at pp. 52–79.

of petitioner's trial would have been any different. Likewise, given the facts of Gutierrez's offense and the total absence of any evidence showing Gutierrez has ever expressed any sincere remorse for Captain Cobo's brutal and senseless murder, there is no reasonable probability the impeachment of Pina would have had any impact whatsoever on the outcome of the punishment phase of Gutierrez's trial. This Court's independent, *de novo*, review of petitioner's final *Brady* claim compels the conclusion petitioner has alleged no facts sufficient to satisfy the materiality prong of *Brady* analysis.

### F. *Teague Foreclosure*

Insofar as petitioner argues that any of his complaints of undisclosed evidence herein are premised on generic due process principles or constitutional principles other than those set forth in *Brady* and its progeny, those complaints are foreclosed by the *Teague* non-retroactivity doctrine. This Court is not free to construct new rules of constitutional criminal procedure in the context of this federal habeas corpus proceeding. The Supreme Court has never held the Constitution requires prosecutors to employ an open file policy in all criminal cases. *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995). Petitioner has failed to allege any facts showing his prosecutors withheld from petitioner's trial counsel or otherwise "suppressed" any exculpatory, impeachment, or mitigating evidence material to the outcome of either

phase of petitioner's trial. *Teague* forecloses this Court's recognition of the new, general discovery rule advocated by petitioner in his sixth claim herein.[122]

### IX. *Ineffective Assistance Claims*

#### A. *Overview of the Claims*

##### 1. *Complaints About Trial Counsel*

In his seventh, ninth, and twelfth claims herein, petitioner alleges his trial counsel rendered ineffective assistance by failing to: (1) challenge venire member Rosemary Harrell for cause,[123] (2) object to or request a preliminary finding of credibility concerning the prosecution's evidence of the circumstances surrounding Gutierrez's expulsion from school,[124] (3) adequately investigate petitioner's background, present mitigating evidence showing petitioner's father physically and emotionally abused petitioner, petitioner's mother was an alcoholic, and petitioner's family had a history of mental illness, or (4) have petitioner evaluated for mental illness.[125]

##### 2. *Complaints About Appellate Counsel*

In his second, fourth, and tenth claims herein, petitioner alleges his appellate counsel rendered ineffective assistance by failing to raise a point of error on direct appeal complaining about: (1) the trial court's exclusion of venire member Gerald Becker,[126] (2) the trial court's denial of petitioner's motions for severance,[127] and (3) the trial court's admission of victim

---

**122.** *See* Response at p. 84 (arguing generic due process considerations mandate a broader disclosure requirement than that mandated under *Brady* ).

**123.** *Petition at pp. 22–23; Response at pp. 85–89.*

**124.** Petition at pp. 26–27; Response at pp. 99–109.

**125.** Petition at pp. 29–31; Response at pp. 116–24.

**126.** Petition at pp. 8–9; Response at pp. 26–32.

**127.** Petition at pp. 15–16; Response at pp. 58–62.

impact testimony regarding Captain Cobo's good character at the punishment phase of petitioner's trial.[128]

## B. *Clearly Established Federal Law and Complaints Concerning Trial Counsel*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish his counsel's performance was constitutionally deficient, a convicted defendant must show counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v.*

*Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.

The same standard applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both: (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's

---

**128.** Petition at pp. 28–29; Response at pp. 110–15.

objectively unreasonable conduct, the petitioner would have prevailed on appeal).

### C. Failure to Challenge Rosemary Harrell for Cause

#### 1. State Court Disposition

As this Court explained in Section V.B. above, all four defense counsel at petitioner's capital murder trial testified during petitioner's state habeas corpus hearing: (1) they were satisfied with Mrs. Harrell's voir dire testimony regarding the disposition of her 1979 theft charge and (2) they had legitimate, objectively reasonable, strategic reasons for wanting her to serve on the jury—she is Catholic, her answers to the juror questionnaire revealed some hesitancy regarding the propriety of the death penalty, she had no ties to the military, and she had both a prior conviction for DWI and a second, "unpleasant experience" with law enforcement, i.e., her 1979 theft charge.[129] As explained in Sections V.B., V.D.1., and VII.C.2. above, the state habeas court reasonably determined Mrs. Harrell was never convicted of theft in connection with her 1979 arrest for shoplifting and reasonably concluded she was not disqualified from jury service or otherwise subject to a challenge for cause under applicable Texas law. Based on those determinations, the state habeas court concluded further petitioner's trial counsel had not rendered ineffective assistance by failing to make a challenge for cause to Mrs. Harrell during jury selection.[130] More specifically, the state habeas court determined: (1) petitioner's trial counsel made the decision to accept Mrs. Harrell as a juror after consulting with petitioner, (2) petitioner failed to challenge any of the tactical reasons his trial counsel asserted as having influenced said counsels' decision to accept Mrs. Harrell, and (3) petitioner had, therefore, failed to satisfy either prong of the *Strickland* analysis.[131]

#### 2. AEDPA Review

Applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*

#### a. No Deficient Performance

■ There was nothing objectively unreasonable with the state habeas court's conclusion petitioner's complaint about his

---

**129.** *See supra* notes 82 & 86–89 and accompanying text.

Additionally, Mrs. Harrell's juror questionnaire, which was admitted into evidence during petitioner's state habeas corpus proceeding as Gutierrez Exhibit no. 2, included the following handwritten answers explaining Harrell's categorization of her view of the death penalty as "somewhat in favor" and response to a question about how long she held her opinion:

I think there should be a better way to deal with a murder issue but because our society has become so volient [sic] I believe in some cases the death penalty is just. In my younger days I did not believe in the death

penalty as I grew older & observed our society I feel in some cases it is just.

In response to a question asking her what she felt should be the purpose of punishing persons convicted of a crime, Mrs. Harrell replied "Re educate [sic] their way of thinking & just punishment must be exercised to have a moral & civilized society."

Gutierrez Exhibit no. 2, State Habeas Exhibits, S.F. State Habeas proceeding, Volume 5.

**130.** State Habeas Transcript, Volume II of II at p. 248.

**131.** *Id.*

trial counsel's failure to challenge Mrs. Harrell for cause failed to satisfy the deficient performance prong of *Strickland.* All four trial counsel for Gutierrez and Arroyo testified during the petitioner's and Arroyo's joint state habeas corpus hearing they were satisfied with Rosemary Harrell's voir dire testimony explaining the disposition of her 1979 theft charge. The state habeas court reasonably determined from the evidence then before it that Mrs. Harrell had not been convicted of theft in 1979 and was not, therefore, disqualified from jury service or otherwise subject to a challenge for cause under state law. Furthermore, all four defense counsel at trial testified they had strategic reasons for wishing to have Mrs. Harrell serve on the jury. Chief among these were said counsels' objectively reasonable belief Rosemary Harrell's religion and past "unpleasant experiences" with law enforcement would render her likely to be sympathetic to the defense at trial. In short, petitioner's trial counsel had legitimate, objectively reasonable, strategic reasons for wishing to have Mrs. Harrell serve on petitioner's jury. Likewise, there was nothing objectively unreasonable with the reliance by petitioner's trial counsel on Mrs. Harrell's answers to her juror questionnaire and the prosecutor's extensive voir dire examination regarding her 1979 theft charge in said trial counsels' determination not to challenge Mrs. Harrell for cause.[132]

#### b. *Nothing Deficient or Prejudicial*

There was also nothing objectively unreasonable with the state habeas court's conclusion petitioner's complaint about his trial counsel's failure to challenge Harrell

for cause failed to satisfy the prejudice prong of *Strickland.* The state habeas court reasonably determined, as a matter of fact, Mrs. Harrell had not been convicted of theft in connection with her 1979 theft charge. Petitioner has failed to present this Court with clear and convincing evidence sufficient to rebut the presumption of correctness to which that factual determination is entitled. Accordingly, the state habeas court reasonably concluded Mrs. Harrell was neither disqualified nor subject to a challenge for cause under applicable state law. Under such circumstances, the failure of petitioner's trial counsel to challenge Mrs. Harrell for cause neither caused the performance of said counsel to fall below an objective level of reasonableness nor prejudiced petitioner within the meaning of *Strickland. See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson,* 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied,* 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Meanes v. Johnson,* 138 F.3d 1007, 1012 (5th Cir.) (holding counsel was not constitutionally deficient for failing to raise an objection if,

---

**132.** *See Mayo v. Cockrell,* 287 F.3d 336, 341 (5th Cir.) (holding trial counsel acted in an objectively reasonable manner in relying on the state trial judge's generic juror screening questions and the jurors' written question-

naire answers to identify those members of the jury venire who were unqualified for jury service), *cert. denied,* 537 U.S. 975, 123 S.Ct. 443, 154 L.Ed.2d 332 (2002).

at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied,* 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998); *Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Gibson,* 55 F.3d 173, 179 (5th Cir.1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) ("[C]ounsel is not required to make futile motions or objections."); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984) ("Counsel is not required to engage in the filing of futile motions.").

#### c. *No Prejudice*

■ Moreover, even if petitioner's trial counsel had challenged Mrs. Harrell for cause, there is no reasonable probability such a challenge would have altered the outcome of either phase of petitioner's capital murder trial. First, given the state habeas court's factual findings and legal conclusion Mrs. Harrell was not disqualified or otherwise subject to a challenge for cause under applicable state law, there is no reasonable probability such a challenge for cause would have affected the conduct of voir dire or preserved any reversible error for state appellate review. Second, even if such a challenge had been made and granted by the trial court, there is no reasonable probability a change in the composition of petitioner's jury would have resulted in a different outcome at either phase of petitioner's capital murder trial. There is no evidence now before this Court establishing Mrs. Harrell was biased against petitioner or in favor of the prosecution.

Additionally, the evidence at both phases of petitioner's capital murder trial was compelling if not overwhelming. Petitioner not only shot Captain Cobo twice in the back but pushed him from a moving vehicle amid rush hour traffic and, shortly thereafter, boasted and joked about doing so to several people who later testified as prosecution witnesses at petitioner's trial. There is not a scintilla of evidence before this Court suggesting petitioner has ever expressed any sincere remorse for Captain Cobo's brutal and senseless murder. In fact, petitioner has never formally admitted his involvement in Captain Cobo's murder. At the time of Captain Cobo's murder, petitioner was on probation for a string of residential burglaries and had only recently been released from boot camp. Petitioner's jury unanimously determined there was a probability: (1) Gutierrez would commit future acts of violence constituting a continuing threat to society, (2) Gutierrez acted with at least the expectation a human life would be taken, and (3) there were insufficient mitigating circumstances (despite the testimony of sixteen character witnesses on petitioner's behalf) to warrant a life sentence for petitioner.

#### d. *Conclusion*

Under such circumstances, the Texas Court of Criminal Appeals' conclusion petitioner's complaint about his trial counsel's failure to challenge Mrs. Harrell for cause failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### D. *Failure to Challenge Evidence of Expulsion*

#### 1. *State Court Disposition*

■ Petitioner argued in his state habeas proceeding his trial counsel rendered

ineffective assistance by failing to object to the prosecution's evidence regarding the circumstances surrounding petitioner's expulsion from middle school on either hearsay or Confrontation Clause grounds and by failing to request a preliminary hearing, outside the jury's presence, to ascertain the admissibility of this same testimony.[133] Petitioner focused specifically on the trial testimony of several prosecution witnesses: (1) Harry T. Green, a Northeast Independent School District ("NEISD") student disciplinary hearing officer, who testified: (a) petitioner earned disciplinary infractions on October 28, 1991, for going through another student's property without permission, on January 23, 1992, for possession of a library book without permission, on October 27, 1992, for verbally threatening to kill another student, and on November 17, 1992, for attempting to procure a pistol and have it delivered to him on school property, and (b) petitioner was expelled for persistent misbehavior on November 25, 1992;[134] (2) Marcus Doan, a NEISD police officer, who testified: (a) on an occasion in November, 1992, he stopped two young men he knew to be gang members who had approached the Krueger Middle School campus, (b) during a patdown search, he discovered one of the two was carrying a .22 caliber pistol, and (c) based on information he obtained from the other individual, he later confronted petitioner;[135] and (3) John Kercheville, vice principal of Krueger Middle School, who testified: (a) on the date in question, he personally observed petitioner acting in a "suspicious" manner, i.e., petitioner was alone outside a fenced concourse area, and (b) petitioner was in the vicinity of the location where two persons were arrested the same day for carrying a handgun.[136]

On cross-examination, petitioner's trial counsel elicited admissions from Mr. Green: (1) he had collected no evidence concerning any of the charges against petitioner, (2) the evidentiary standard for school disciplinary hearing is a preponderance of the evidence, (3) he made his disciplinary rulings based solely on written reports concerning the incidents in question and not based on live testimony from witnesses, (4) no students were injured in any of the incidents involving petitioner, (5) he never felt threatened by petitioner and petitioner cooperated with him during each disciplinary hearing, (6) at petitioner's expulsion hearing, notarized statements were admitted in lieu of live testimony except for hearsay testimony from school officials regarding information related to them by students, and (7) petitioner was never actually in possession of a gun on campus.[137] On cross-examination, petitioner's trial counsel elicited testimony from Officer Doan he had never seen either of the two gang members he arrested on the date in question actually hand their gun to anyone else.[138] Likewise, on cross-examination, petitioner's trial counsel elicited testimony from vice-principal Kercheville he had not seen petitioner receive anything from any other person and petitioner's only "suspicious" activity that day was being outside the fenced-in concourse by himself.[139]

---

**133.** State Habeas Transcript, Volume I of II at pp. 51–59.

**134.** S.F. Trial, Volume XXIII, testimony of Harry T. Green at pp. 187–92.

**135.** *Id.* testimony of Marcus Doan at pp. 202–07.

**136.** *Id.* testimony of John Kercheville at pp. 215–17.

**137.** *Id.* testimony of Harry T. Green at pp. 192–201.

**138.** *Id.* testimony of Marcus Doan at p. 214.

**139.** *Id.* testimony of John Kercheville at p. 218.

Petitioner's lead trial counsel testified during petitioner's state habeas corpus proceeding: (1) he received notice from the prosecution prior to trial regarding the State's intention to offer evidence concerning petitioner's expulsion from school; (2) he discussed that subject with petitioner; (3) he was aware a procedure was available under state law to obtain a ruling on the admissibility of that testimony outside the jury's presence; (4) he believed the state trial court would have admitted evidence showing the petitioner had been expelled from school, regardless of whether he sought to exclude same; (5) his trial strategy was to challenge the evidence concerning the incident that led to petitioner's expulsion through cross-examination; and (6) he chose this strategy because he did not want to tip off the prosecution to the approach he planned to take on cross-examination he believed would minimize the negative impact of the prosecution's evidence on this subject, i.e., show petitioner had never possessed a gun on campus and the school's disciplinary hearing procedure relied on pure hearsay.[140]

The state habeas trial court concluded: (1) petitioner's trial counsel had a "legitimate tactical or strategic reason for not objecting to the evidence"; (2) petitioner failed to rebut the strong presumption said counsel's performance fell within the range of reasonable professional assistance; and (3) given the totality of the evidence, petitioner failed to establish a reasonable probability that, but for the failure of his trial counsel to voice such an objection, the outcome of the punishment phase of petitioner's trial would have been different.[141]

## 2. AEDPA Review

### a. No Deficient Performance

The state habeas court reasonably concluded petitioner's trial counsel's decision not to object to the prosecution's evidence on hearsay or Confrontation Clause grounds and not to request a preliminary hearing on the admissibility of the evidence in question was itself, an objectively reasonable strategy or tactic. Petitioner's trial counsel testified he consulted with his client, learned the facts surrounding the incident in question, and believed the state trial court would admit, at a minimum, evidence showing the petitioner had been expelled from school.

Petitioner argues state evidentiary rules applicable at the time of petitioner's trial precluded admission of any evidence regarding any extraneous criminal conduct committed by the petitioner unless that evidence established the petitioner's guilt for that extraneous offense beyond a reasonable doubt.[142] Petitioner's analysis of state evidentiary principles is fundamentally flawed. At the time of petitioner's trial, Article 37.071 of the Texas Code of Criminal Procedure governed the admission of evidence at the punishment phase of a capital murder trial. *See Burks v. State*, 876 S.W.2d 877, 909 (Tex.Crim.App. 1994) (holding Article 37.071 authorized the trial court to admit any evidence relevant to a defendant's deathworthiness, including evidence of any extraneous transactions where the prosecution "clearly proved" the offense was committed and the defendant was the perpetrator), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Adanandus v. State*, 866 S.W.2d 210, 233–34 (Tex.Crim.App.

---

**140.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at pp. 40–45.

**141.** State Habeas Transcript, Volume II of II at pp. 255–56.

**142.** Response at pp. 104–05.

1993) (holding as "well-settled" the principle that "absent a showing of unfair surprise, proof of unadjudicated, extraneous offenses at the punishment stage of a capital case is admissible and rejecting the contention such evidence may be admitted only if the prosecution proves beyond a reasonable doubt the defendant committed the extraneous offense"), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Kemp v. State,* 846 S.W.2d 289, 307–08 (Tex.Crim.App.1992) (holding: (1) Article 37.071 has been construed to afford trial judges wide latitude in admitting or excluding evidence at the punishment stage of a capital trial; (2) evidence of unadjudicated, extraneous, offenses is admissible if the prosecution "clearly proves" the offense was committed and the defendant was the perpetrator; and (3) the standard of appellate review of a trial judge's determination on this subject is "whether that decision is within that zone of reasonable disagreement, in which 'reasonable men may disagree whether in common experience a particular inference is available' "), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993); *Harris v. State,* 827 S.W.2d 949, 961–62 (Tex.Crim.App.) (holding evidence of extraneous misconduct admissible at the punishment phase of a capital murder trial if the prosecution presents evidence showing the defendant committed the extraneous misconduct), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Gentry v. State,* 770 S.W.2d 780, 792–93 (Tex.Crim.App.1988)

(holding under Article 37.071, absent a showing of surprise, proof of unadjudicated, extraneous offenses is admissible at the punishment phase of a capital trial and does not violate due process or equal protection principles), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1013 (1989); *Allridge v. State,* 762 S.W.2d 146, 161–62 (Tex.Crim.App.1988) (holding Article 37.071 authorizes the trial court to admit any evidence relevant to punishment and evidence of unadjudicated extraneous offenses is admissible at the punishment phase of a capital trial absent a showing of unfair surprise), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989); *Morin v. State,* 682 S.W.2d 265, 269 (Tex.Crim.App.1985) (holding under Article 37.071, absent a showing of surprise, proof of unadjudicated, extraneous offenses is admissible at the punishment phase of a capital trial and does not violate due process or equal protection principles); *Williams v. State,* 622 S.W.2d 116, 120 (Tex.Crim.App.1981) (holding the same), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Brooks v. State,* 599 S.W.2d 312, 321–22 (Tex.Crim.App. 1979) (holding trial courts have wide discretion under Article 37.071 in admitting and excluding evidence and nothing in Article 37.071 requires there be a final conviction for evidence of an extraneous offense to be admissible at the punishment phase of a capital murder trial), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Hammett v. State,* 578 S.W.2d 699, 709 (Tex.Crim.App.1979) (holding the same), *cert. denied,* 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980). For decades prior to petitioner's trial, the Texas Court of Criminal Appeals construed Article 37.071 as granting trial judges wide latitude with regard to admitting and excluding evidence at the punishment phase of a capital murder trial. *See Burks,* 876 S.W.2d at 909; *Adanandus,* 866 S.W.2d at 233–34; *Kemp,* 846 S.W.2d at 307–08; *Harris,* 827 S.W.2d at 961–62; *Gentry,* 770 S.W.2d at 792–93; *Allridge,* 762 S.W.2d at 161–62; *Morin,* 682 S.W.2d at 269; *Williams,* 622 S.W.2d at 120; *Brooks,* 599 S.W.2d at 321–22; *Hammett,* 578 S.W.2d at 709.

Instead of acknowledging this long line of "well-settled" state case law construing Article 37.071, petitioner cites state court opinions in support of his ninth claim herein that apply an entirely different statutory provision addressing the admissibility of evidence of extraneous misconduct at the guilt-innocence and punishment phases of non-capital trials. *See Mitchell v. State*, 931 S.W.2d 950 (Tex.Crim.App.1996) (applying Section 3 of Article 37.07 to the punishment phase of a criminal trial following the defendant's conviction for delivery of cocaine); *Harrell v. State*, 884 S.W.2d 154, 157–60 (Tex.Crim.App.1994) (applying the Texas Rules of Criminal Evidence to ascertain the admissibility of extraneous offense evidence at the guilt-innocence phase of a trial where the defendant was charged with engaging in organized crime). These two opinions, in turn, relied principally on a pair of opinions that addressed the admissibility of extraneous offenses evidence in non-capital trials. More specifically, in *Mitchell*, the Texas Court of Criminal Appeals discussed *George v. State*. *Mitchell*, 931 S.W.2d at 954 (discussing *George v. State*, 890 S.W.2d 73, 74–76 (Tex.Crim.App.1994) (addressing the jury instructions that must accompany admission of extraneous offense evidence at the guilt-innocence phase of a trial for making a terroristic threat)). In *Harrell*, that court discussed *McCann v. State*. *Harrell*, 884 S.W.2d at 158 (discussing *McCann v. State*, 606 S.W.2d 897, 901 (Tex.Crim.App.1980) (holding inadmissible evidence of the victim's capital murder at the guilt-innocence phase of a trial for conspiracy to commit the burglary of a habitation where no evidence linked the alleged burglary co-conspirator to the burglary victim's subsequent murder)). Admittedly there is dicta supporting the state-law argument underlying petitioner's ninth claim herein to be found in the dissenting opinion of a single judge of the Texas

Court of Criminal Appeals in *Powell v. State*, 898 S.W.2d 821, 837 (Tex.Crim.App. 1995) (Baird, J., dissenting on denial of motion for rehearing), *cert. denied*, 516 U.S. 991, 116 S.Ct. 524, 133 L.Ed.2d 431 (1995). However, neither a majority nor even a substantial minority of the Texas Court of Criminal Appeals has ever adopted the rule proposed in Justice Baird's dissenting opinion in *Powell*. The dissenting opinions of individual judges of the Texas Court of Criminal Appeals do not govern this Court's analysis of the objective reasonableness of a particular criminal defense counsel's strategic or tactical decisions, particularly when a majority of that court has repeatedly rejected the same proposition urged by the dissenting judge. Thus, none of the foregoing opinions relied upon by petitioner actually support the principle for which petitioner has cited them.

Petitioner also misrepresents the Texas Court of Criminal Appeals' holdings in *Burks* and *Kemp*, as supporting a rule that evidence of extraneous offenses is admissible at the punishment phase of a capital trial only when supported by evidence showing beyond a reasonable doubt the defendant committed the extraneous offense. Neither *Burks* nor *Kemp* supports this proposition. On the contrary, *Burks* and *Kemp* are merely two in a long line of Texas Court of Criminal Appeals opinions, both predating and subsequent to petitioner's trial, which have consistently construed Article 37.071 of the Texas Code of Criminal Procedure as providing that evidence of unadjudicated extraneous misconduct is admissible when the prosecution "clearly proves" the defendant engaged in the misconduct in question. *See Paredes v. State*, 129 S.W.3d 530, 540–41 (Tex. Crim.App.2004) (holding the admission of unadjudicated extraneous offenses at the punishment phase of a capital cases is

proper where the prosecution also presents evidence, if believed, establishes the defendant committed the extraneous misconduct); *Hughes v. State,* 24 S.W.3d 833, 842–43 (Tex.Crim.App.) (holding: (1) under Article 37.071, only a showing of unfair surprise will render proof of unadjudicated extraneous offenses inadmissible at the punishment phase of a capital trial, (2) Article 37.071, § 2(a) affords trial judges wide latitude in admitting or excluding evidence of extraneous offenses at the punishment phase of a capital trial where the prosecution clearly proves the extraneous offense was committed and the defendant was the perpetrator, and (3) the trial judge's wide discretion to determine whether the prosecution has "clearly proved" the defendant committed the extraneous offense is evaluated "solely to determine whether it was in that zone of reasonable disagreement in which reasonable men may disagree whether in common experience a particular inference is available"), *cert. denied,* 531 U.S. 980, 121 S.Ct. 430, 148 L.Ed.2d 438 (2000); *Chamberlain v. State,* 998 S.W.2d 230, 235–36 (Tex.Crim.App.1999)

(holding: (1) admission of unadjudicated extraneous offenses is contingent upon clear proof the offense was committed and the defendant perpetrated the offense and (2) appellate review of the trial court's determinations is solely to ascertain whether it was in that zone of reasonable disagreement), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000); *Jackson v. State,* 992 S.W.2d 469, 477–78 (Tex.Crim.App.1999) (expressly rejecting a claim, premised on *Mitchell,* that a trial court was required to instruct the jury it must find beyond a reasonable doubt the defendant committed an unadjudicated extraneous offense before the jury could consider evidence of that extraneous offense at the punishment phase of a capital murder trial); *Matchett v. State,* 941 S.W.2d

922, 937–38 (Tex.Crim.) (holding Article 37.071 governs the punishment phase of a capital trial and permits evidence of unadjudicated extraneous offenses), *cert. denied,* 521 U.S. 1107, 117 S.Ct. 2487, 138 L.Ed.2d 994 (1997); *Cantu v. State,* 939 S.W.2d 627, 648 (Tex.Crim.App.) (holding Article 37.07 does not apply to capital trials and the admission of unadjudicated extraneous offenses at the sentencing phase of a capital trial does not offend the Eighth and Fourteenth Amendments), *cert. denied,* 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997); *Cockrell v. State,* 933 S.W.2d 73, (Tex.Crim.App.1996) (holding Article 37.071 and not Article 37.07 controls the sentencing phase of a capital murder trial), *cert. denied,* 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997); *Butler v. State,* 872 S.W.2d 227, 239–40 (Tex.Crim.App.1994) (holding Article 37.071 gives the trial court wide discretion at the punishment phase of a capital trial to admit or exclude relevant evidence and any error in the admission of evidence is subject to harmless error analysis), *cert. denied,* 513 U.S. 1157, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995).

The Texas Court of Criminal Appeals has consistently construed Article 37.071 as requiring the prosecution to "clearly prove" the defendant committed an unadjudicated extraneous offense before evidence of same is admissible at the punishment phase of a capital trial. *See, e.g., Paredes v. State,* 129 S.W.3d at 540–41; *Hughes v. State,* 24 S.W.3d at 842–43; *Chamberlain v. State,* 998 S.W.2d at 235–36; *Burks v. State,* 876 S.W.2d at 909; *Kemp v. State,* 846 S.W.2d at 307–08. However, both before and after petitioner's trial, that same court has expressly rejected arguments attempting to equate the requirement the prosecution "clearly prove" the defendant committed an unadjudicated extraneous offense with a re-

quirement that the prosecution furnish the trial court with evidence establishing same "beyond a reasonable doubt." *See Jackson v. State,* 992 S.W.2d at 477–78 (rejecting an argument that a capital sentencing jury must be instructed to disregard any evidence of unadjudicated extraneous offenses unless it first concludes beyond a reasonable doubt the defendant committed the offense); *Powell v. State,* 898 S.W.2d at 830 (plurality opinion distinguishing the purposes of the punishment phase of a capital trial from the guilt-innocence phase of a criminal trial and holding the burden of proof with regard to admissibility of evidence of extraneous offenses is lower when offered at the punishment phase of a capital trial); *Adanandus v. State,* 866 S.W.2d at 233–34 (specifically rejecting the argument a capital sentencing jury must be instructed to disregard extraneous offense evidence unless it first finds beyond a reasonable doubt the defendant committed the extraneous offense). Contrary to the arguments contained in petitioner's ninth claim herein, Texas law did not preclude the admission of testimony or other evidence at the punishment phase of petitioner's capital murder trial regarding petitioner's expulsion from school absent a showing beyond a reasonable doubt petitioner had engaged in the conduct which led to his expulsion.

Furthermore, both before and after petitioner's trial, the Fifth Circuit has consistently held admission of evidence of unadjudicated extraneous misconduct at the punishment phase of a capital murder trial does not violate the Constitution. *See Harris v. Cockrell,* 313 F.3d 238, 246 (5th Cir.2002) (the introduction of evidence of extraneous offenses, even those of which the defendant has been acquitted, does not violate due process and there is no constitutional requirement extraneous offenses offered at the punishment phase of a capital trial be proven beyond a reasonable doubt), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Vega v. Johnson,* 149 F.3d 354, 359 (5th Cir. 1998) (extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt and may be admitted even after the defendant has been acquitted of those charges), *cert. denied,* 525 U.S. 1119, 119 S.Ct. 899, 142 L.Ed.2d 899 (1999); *Muniz v. Johnson,* 132 F.3d 214, 224 (5th Cir.) (the introduction of evidence of unadjudicated extraneous offenses at the punishment phase of a capital trial does not violate the Eighth or Fourteenth Amendments), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Hogue v. Johnson,* 131 F.3d 466, 478 n. 16 (5th Cir.1997) (recognizing under Article 37.071, evidence may be presented at the punishment phase of a Texas capital trial as to any matter the court deems relevant to sentence and there is no need for a final conviction for an extraneous offense to be admissible at the punishment phase), *cert. denied,* 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998); *Turner v. Johnson,* 106 F.3d 1178, 1189 (5th Cir.1997) (recognizing neither the Supreme Court nor the Fifth Circuit has ever held a burden of proof beyond a reasonable doubt exists with regard to evidence of extraneous misconduct offered at the punishment phase of a criminal trial); *Harris v. Johnson,* 81 F.3d 535, 541 (5th Cir.) (use of evidence of unadjudicated extraneous offenses at the sentencing phase of Texas capital murder trials does not implicate constitutional concerns), *cert. denied,* 517 U.S. 1227, 116 S.Ct. 1863, 134 L.Ed.2d 961 (1996).

Finally, at the time of petitioner's trial, several years before the Supreme Court rendered its decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court had held the prosecution was required to

prove factual matters by only a preponderance of the evidence in federal sentencing hearings. *See United States v. Watts,* 519 U.S. 148, 157, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997) (a jury's verdict of acquittal does not prevent a federal sentencing court from considering the conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence). Likewise, in *McMillan v. Pennsylvania,* 477 U.S. 79, 87–92, 106 S.Ct. 2411, 2416–19, 91 L.Ed.2d 67 (1986), the Supreme Court upheld against a due process challenge a Pennsylvania statute which imposed a mandatory minimum sentence on certain felony offenders whenever the trial judge found by a preponderance of the evidence the convicted defendant "visibly possessed a firearm" during commission of the offense.

At the time of petitioner's capital murder trial in February and March of 1998, neither Texas law nor federal law required the prosecution to establish beyond a reasonable doubt the petitioner had engaged in unadjudicated extraneous misconduct before evidence concerning that conduct could be admitted at the punishment phase of petitioner's trial. Thus, neither then-applicable Texas law nor federal law furnished any impediment to the admission of evidence concerning either the fact petitioner had been expelled from school or the reasons therefor. Furthermore, petitioner neither alleged nor presented the state habeas court with any evidence showing he was not expelled from school or that the "persistent misbehavior" that formed the basis for his expulsion did not include the incident in November, 1992, in which petitioner allegedly sought to procure a handgun while on campus.

Petitioner argues, in a conclusory manner, unspecified portions of the trial testimony regarding the latter incident might have been subject to a valid hearsay or Confrontation Clause objection. However, this Court's independent review of the trial testimony of prosecution witnesses Green, Doan, and Kercheville reveals no basis for such objections. On the contrary, the prosecution took great pains during direct examination of these trial witnesses to avoid eliciting any hearsay testimony or any testimony concerning any admissions petitioner might have made during his disciplinary hearings.

Given petitioner's trial counsel's objectively reasonable belief that at least some evidence showing the fact petitioner had been expelled, and possibly the reasons therefor, was going to be admitted at trial, said counsel's decision to challenge the efficacy of that evidence through cross-examination was objectively reasonable. Petitioner's trial counsel elicited testimony on cross-examination establishing: (1) petitioner never possessed a gun on school property and (2) the accusation against petitioner that led to petitioner's expulsion was based exclusively on hearsay. The state habeas court correctly noted there is a strong presumption the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. In view of the fact petitioner's trial counsel did attempt through cross-examination to attack the more damaging aspects of the trial testimony of prosecution witnesses Green, Doan, and Kercheville, and did achieve a degree of success in so doing, petitioner's ninth claim herein fails to overcome that presumption.

Petitioner has alleged no facts and has furnished no evidence attacking the objective reasonableness of his trial counsel's determination the prosecution could satisfy the applicable Texas evidentiary predicate with regard to evidence of petitioner's expulsion from school or the circumstances

surrounding same. Petitioner's trial counsel testified at petitioner's state habeas corpus hearing that, after consulting with petitioner, he concluded the state trial court would likely admit at least some evidence showing petitioner had been expelled from school.[143] Said counsel also testified he was aware that he could request a preliminary hearing outside the jury's presence on the admissibility of testimony concerning petitioner's expulsion but consciously chose not to do so because such a move might have tipped off the prosecution to the approach he intended to take during his cross-examination of the prosecution's witnesses on this subject and, thereby, give the prosecution an opportunity to find additional witnesses to bolster their case.[144] As explained above, petitioner's trial counsel elicited admissions from prosecution witnesses Green, Doan, and Kercheville on cross-examination as follows: (1) none of them had personally seen petitioner in possession of a gun on school property or otherwise engaging in suspicious conduct on the date in question and (2) the only evidence supporting the decision to expel petitioner considered by school officials was hearsay in nature. Under such circumstances, the Texas Court of Criminal Appeals reasonably concluded petitioner's trial counsel's failures to seek a preliminary hearing on the admissibility of the evidence regarding the circumstances surrounding petitioner's expulsion or to raise hearsay and Confrontation Clause objections to same did not cause the performance of said counsel to fall below an objective level of reasonableness.

###### b. *No Prejudice*

█ The same is true for the Texas Court of Criminal Appeals' conclusion petitioner's ninth claim for relief herein fails to satisfy the prejudice prong of *Strickland.* Even assuming a timely hearsay or Confrontation Clause objection from petitioner's trial counsel might have excluded unspecified portions of the punishment phase trial testimony of prosecution witnesses Green and Kercheville, petitioner offers no rational explanation as to how his trial counsel could have excluded certified copies of petitioner's public school records addressing the circumstances of petitioner's expulsion which contained the same basic information as that furnished by these trial witnesses. Rule 803(8)(a) of the current version of Texas Rules of Evidence, which became effective March 1, 1998 (prior to the start of the punishment phase of petitioner's capital murder trial on March 3, 1998), clearly permits the admission into evidence of certified copies of public records setting forth the activities of a public office or agency such as a public school district. Thus, the Texas Court of Criminal Appeals could have reasonably concluded the failure of petitioner's trial counsel to voice the hearsay and Confrontation Clause objections would not have significantly altered the substance of the evidence properly before the jury at the punishment phase of petitioner's capital murder trial.

More significantly, the Texas Court of Criminal Appeals reasonably concluded the failure of petitioner's trial counsel to object to or otherwise seek to exclude portions of the trial testimony of Green, Doan, and Kercheville did not have an outcome-determinative impact on the punishment phase of petitioner's trial. That court correctly recognized that, at the punishment phase of petitioner's trial, the jury had

---

**143.** S.F. State Habeas Hearing, Volume 2 of 6, testimony of William Berchelmann at pp. 40–45.

**144.** *Id.*

before it not only compelling evidence of petitioner's brutal slaying of Captain Cobo (primarily through petitioner's own highly inculpatory statements to others in the hours shortly after the crime) but also evidence showing petitioner: (1) had pled guilty to engaging in a string of residential burglaries, (2) had only recently left a boot camp, and (3) was on probation at the time of Captain Cobo's murder, and (4) had never expressed any semblance of remorse for Captain Cobo's death. This Court also notes the prosecution presented rebuttal testimony at the punishment phase of petitioner's trial establishing that only weeks before the incident that led to petitioner's expulsion, petitioner turned in a creative writing assignment in which he fantasized about killing a person with a gun and then absconding to Mexico. Petitioner suggests no viable legal basis for excluding this testimony. This Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to exclude any portion of the trial testimony of Green, Doan, and Kercheville, the outcome of the punishment phase of petitioner's trial would have been any different. Under such circumstances, the Texas Court of Criminal Appeals reasonably concluded the failure of petitioner's trial counsel to challenge the admission of evidence concerning the circumstances surrounding petitioner's expulsion from school did not "prejudice" petitioner within the meaning of *Strickland*.

### c. *Conclusion*

The Texas Court of Criminal Appeals' conclusion that petitioner's complaint about his trial counsel's failure to challenge the admission of trial testimony concerning the circumstances of petitioner's expulsion from school failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law

as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### E. *Failure to Present Mitigating Evidence*

#### 1. *Procedural Default on Unexhausted Claims*

■■■ In his twelfth claim herein, petitioner argues for the first time his trial counsel should have: (1) further investigated petitioner's background and presented evidence at the punishment phase of petitioner's capital murder trial which petitioner contends would have been "mitigating" in nature, i.e., testimony from petitioner's family showing petitioner's father had physically and emotionally abused petitioner, petitioner's mother was an alcoholic, and petitioner's family had a history of mental illness, and (2) had petitioner evaluated for mental illness. It is undisputed petitioner failed to present these complaints to the Texas Court of Criminal Appeals either on direct appeal or in the course of petitioner's state habeas corpus proceeding. Thus, petitioner has failed to exhaust available state remedies on these complaints about his trial counsel's performance. As explained above, ordinarily a petitioner is deemed to have procedurally defaulted on an unexhausted factual or legal theory of relief. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). Once again, however, petitioner attempts to circumvent his apparent procedural default on these complaints about his trial counsel's performance by arguing arbitrary restrictions on the amount and timing of investigative expense reimbursement available to him during his state habeas corpus proceeding effectively prevented him from

fully investigating and developing the factual bases for these complaints.

■■■ This Court concludes petitioner's factual and legal arguments do not satisfy the standard of "due diligence" described by the Supreme Court and the Fifth Circuit in their opinions construing the AEDPA. The Supreme Court has made it clear, for purposes of determining whether a petitioner failed to exercise diligence (and therefore should bear the ultimate responsibility for his failure to present or develop a claim in state court), there is no analytical difference between a petitioner's failure to properly assert a claim in state court and a failure to properly develop the factual basis supporting such a claim. *Williams v. Taylor*, 529 U.S. at 433, 120 S.Ct. at 1489. In either instance, the burden lies with the petitioner to establish he made a reasonable attempt, in light of the information available at the time, to investigate and pursue the claim in state court. *Williams v. Taylor*, 529 U.S. at 435, 120 S.Ct. at 1490.

The Fifth Circuit has rejected arguments, such as those presented by petitioner herein, suggesting the unavailability of professional investigative assistance can excuse a petitioner's failure to secure and present the state habeas court with affidavits or testimony from the petitioner, the petitioner's family, or others who were once aligned with the petitioner. *See Roberts v. Dretke*, 381 F.3d 491, 500–01 (holding a petitioner's complaints of inadequate investigative funding did not excuse his state habeas counsel's failure to obtain an affidavit from the mental health expert who assisted petitioner's counsel at trial); *Roberts v. Dretke*, 356 F.3d at 641 (holding similar complaints of inadequate funding did not excuse the same petitioner's state habeas counsel's failure to obtain copies of the petitioner's medical records and affidavits from the petitioner's family members);

*Riddle v. Cockrell,* 288 F.3d 713, 719 (5th Cir.) (holding a petitioner asserting a claim of ineffective assistance failed to establish he exercised diligence where the petitioner failed to present the state habeas court with an affidavit from his trial counsel and failed to request a hearing), *cert. denied,* 537 U.S. 953, 123 S.Ct. 420, 154 L.Ed.2d 300 (2002); *Dowthitt v. Johnson,* 230 F.3d 733, 758 (5th Cir.2000) (rejecting complaints of inadequate funding as justification for a petitioner's failure to present his state habeas court with affidavits from petitioner's family, noting that "[o]btaining affidavits from family members is not cost prohibitive"), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001).

Petitioner was furnished with a not-in-substantial amount of investigative expenses ($1,500) and permitted to interrogate both of his former trial counsel during the evidentiary hearing held in petitioner's state habeas corpus proceeding. Petitioner also had the opportunity during his state habeas hearing to present testimony from petitioner or his family concerning this new, purportedly mitigating, evidence. Despite this, petitioner presented his state habeas court with no allegations and no evidence showing his trial counsel rendered deficient performance by failing to present petitioner's sentencing jury with evidence of the petitioner's abusive father, alcoholic mother, or family history of mental illness. Petitioner does not allege any specific facts showing any of the factual bases for these unexhausted complaints about the performance of his trial counsel are based solely on newly discovered evidence or were otherwise unavailable to him during the pendency of petitioner's state habeas corpus proceeding. More specifically, petitioner alleges no specific facts showing a diligently conducted series of interviews with petitioner or his family at the time of petitioner's state habeas

corpus proceeding would have failed to disclose this new, purportedly mitigating evidence.

Petitioner alleges no specific facts showing why, despite the exercise of diligence, his state habeas counsel was unable to discover the factual bases for these unexhausted claims or to present the state habeas court with testimony supporting same during the evidentiary hearing held in petitioner's state habeas proceeding. Petitioner's state habeas counsel did not need the assistance of a professional investigator to interview either his client or the petitioner's family about petitioner's family background and, thereby, discover the existence of this new, purportedly mitigating evidence.

Nor did petitioner's state habeas counsel require professional investigative assistance to inquire of petitioner's trial counsel during their testimony at petitioner's state habeas hearing: (1) precisely what steps said trial counsel took to investigate petitioner's background in search of potentially mitigating evidence, (2) whether said trial counsel's investigation revealed to them evidence of petitioner's father's abusive conduct toward petitioner, petitioner's mother's history of alcoholism, or petitioner's family history of mental illness, (3) why, if they were aware of same, said trial counsel chose not to present such purportedly "mitigating" evidence to petitioner's capital sentencing jury, or (4) why, if they were unaware of same, said trial counsel chose not to investigate petitioner's background any further than they did. *See Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (recognizing in evaluating the performance of trial counsel against a claim counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003). These are the essential inquiries necessary to support a claim a trial counsel's alleged failure to adequately investigate, develop, and present mitigating evidence in a capital murder trial was "objectively unreasonable." *See Wiggins v. Smith,* 539 U.S. 510, 521–22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (*quoting Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066):

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Assuming the existence of additional, potentially mitigating evidence was discernable through the exercise of due diligence at the time of a petitioner's state habeas corpus proceeding, any state habeas petitioner who has been furnished with an opportunity to interrogate his former trial counsel on these four subjects during an evidentiary hearing and who fails to do so fails to exercise due diligence in pursuit of such an ineffective assistance claim.

Petitioner has offered this Court no rational explanation for his state habeas counsel's failure to interrogate his trial

counsel concerning said trial counsel's alleged failure to adequately investigate, develop, and present the new, purportedly mitigating evidence to petitioner's sentencing jury. Nor has petitioner furnished this Court with any rational explanation for his state habeas counsel's failure to interview petitioner and his family sufficiently to discover this new, purportedly mitigating evidence at the time of petitioner's state habeas corpus proceeding. Under such circumstances, petitioner's failure to exhaust state remedies on his twelfth claim herein does not excuse petitioner's procedural default on same. *See Nobles v. Johnson*, 127 F.3d 409, 422–24 (5th Cir. 1997) (holding: (1) petitioner procedurally defaulted on an unexhausted complaint his trial counsel failed to pursue and present double-edged mitigating evidence; (2) there was nothing objectively unreasonable with trial counsel's failure to present psychological evidence of petitioner's volatile mental state where the trial strategy was to emphasize petitioner's non-violent nature; (3) "mitigation is in the eye of the beholder"; and (4) petitioner was not prejudiced by the absence of evidence showing petitioner's childhood abuse and emotional problems because such evidence would have helped the prosecution on the issue of whether petitioner posed a continuing threat to society), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

### 2. No Deficient Performance

Alternatively, this Court independently concludes, after a *de novo* review of petitioner's assertions supporting his twelfth claim herein, this conclusory complaint does not satisfy the deficient performance prong of *Strickland*.

In evaluating the performance of counsel, a court must indulge a strong presumption counsel's conduct fell within the wide range of reasonable professional assistance; therefore, the defendant must overcome the presumption that, under the circumstances, the challenged action constituted sound trial strategy. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066. Thus, the burden is on petitioner to allege specific facts which show his trial counsels' failure to pursue and present the potentially mitigating evidence in question fell outside the wide range of presumptively reasonable professional performance. *See Amos v. Scott*, 61 F.3d 333, 346 (5th Cir.) (holding the burden is on the petitioner to allege facts which, if proven, entitle him to relief), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995).

▇▇ Petitioner's trial counsel did not abandon petitioner at the punishment phase of trial. On the contrary, petitioner's trial counsel presented sixteen witnesses during the punishment phase of petitioner's capital murder trial, including petitioner's mother, many family friends, and even jail guards. The thrust of this trial testimony was an attempt to portray petitioner as basically a non-violent, religious, good-hearted individual whose murder of Captain Cobo was aberrational and who was worthy of an opportunity for redemption.[145] Many of these same persons expressed sincere surprise petitioner could commit an act as violent as Captain Cobo's brutal murder.[146] Petitioner's mother tes-

---

**145.** *See supra* notes 53–57 and accompanying text.

**146.** *See supra* note 55.

tified, in pertinent part, petitioner's father had been unsupportive of and verbally abusive toward petitioner.[147] Thus, petitioner's trial counsel presented extensive testimony emphasizing petitioner's good character traits in an effort to convince the jury the petitioner was basically non-violent and worthy of a life sentence. Petitioner's trial counsel also made petitioner's sentencing jury aware of at least some evidence showing petitioner's father had been emotionally abusive toward petitioner. Evidence suggesting petitioner's mother was an alcoholic might very well have undermined the efficacy of her trial testimony as well as that of other witnesses regarding petitioner's redeeming personal qualities.

Petitioner has alleged no specific facts establishing the failure of petitioner's trial counsel to pursue and present evidence showing petitioner's father was physically abusive toward petitioner, petitioner's mother was an alcoholic, or petitioner's family had a history of mental illness was objectively unreasonable. Plainly, such evidence could have undermined the objectively reasonable punishment-phase strategy of petitioner's trial counsel (i.e., said counsels' attempt to convince the jury petitioner was basically a nonviolent individual who possessed a good character) by creating or reinforcing the jury's perception that petitioner was the product of a dysfunctional family and for that reason, likely to remain violent. *See Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir.2002) (recognizing evidence showing the petitioner was inadequately supervised as a child permits inferences that not merely reduce the petitioner's moral culpability for his misbehavior but which also suggest the petitioner, as a product of his environment, is likely to continue to be dangerous in the future).

The Fifth Circuit has repeatedly held a strategic decision not to introduce evidence which possesses both mitigating and aggravating qualities is objectively reasonable. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (holding a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable), *cert. denied*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); *Ladd v. Cockrell*, 311 F.3d at 360 (recognizing where evidence is double-edged in nature it is uncertain whether reasonable counsel would have used same had it been available); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir.2002) (holding as long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than a lack of investigation, such decisions are not susceptible to judicial second-guessing), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Foster v. Johnson*, 293 F.3d 766, 778–79 (5th Cir.) (holding a tactical decision not to pursue and present potential mitigating evidence on the grounds it is double-edged in nature is objectively reasonable and does not amount to deficient performance), *cert. denied*, 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Kitchens v. Johnson*, 190 F.3d 698, 701–03 (5th Cir.1999) (holding "objectively reasonable" trial counsel's decisions not to pursue or present double-edged evidence showing petitioner: (1) was physically abused by his father, (2) had abused alcohol from an early age, and (3) had been hospitalized several times for attempted suicide, depression, blackouts, and hallucinations because such evidence would also have revealed instances of extreme violence during petitioner's childhood, petitioner's history of violence even when sober, petitioner's extensive history of drug

---

**147.** S.F. Trial, Volume XXIV, testimony of Irene Gutierrez at pp. 137–38.

abuse, and petitioner's voluntary termination of needed treatment); *Lamb v. Johnson*, 179 F.3d 352, 357–59 (5th Cir.) (holding "objectively reasonable" a trial counsel's decision not to present mitigating evidence in the form of testimony regarding the petitioner's non-violent character in the past because such testimony would have come from persons who had little contact with the petitioner for many years and who could have been asked about their personal knowledge of the petitioner's extensive juvenile criminal record), *cert. denied*, 528 U.S. 1013, 120 S.Ct. 522, 145 L.Ed.2d 401 (1999); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir.1997) (holding "objectively reasonable" a trial counsel's decision not to present potentially mitigating evidence showing the petitioner suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and petitioner's mother was severely and chronically mentally ill because trial counsel believed the jury might consider that evidence aggravating, rather than mitigating), *cert. denied*, 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998). In sum, there may have been valid, strategic reasons for the decision by petitioner's trial counsel not to pursue or present potentially mitigating evidence of the type petitioner now complains his trial counsel should have presented at the punishment phase of trial.

■ The Supreme Court has emphasized the reasonableness of a trial counsel's decision to investigate or not to investigate a particular subject is dependent in considerable part on the information furnished to said counsel by the defendant and others. *See Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. at 2066:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Petitioner does not allege any specific facts showing anything he or his family or any of the other witnesses who testified at trial on petitioner's behalf told petitioner's trial counsel would or could have alerted said counsel to the potential benefits to be derived from further investigation into petitioner's family background or mental health. Nor does petitioner identify any specific areas of inquiry into which he believes his trial counsel's investigation was inadequate. Trial attorneys cannot reasonably be faulted for failing to present mitigating evidence their client and other witnesses failed to disclose. *See Johnson v. Cockrell*, 306 F.3d at 252–53 (noting trial counsel interviewed the petitioner's family members at length concerning a "laundry list" of topics beginning with the petitioner's childhood); *Soria v. Johnson*, 207 F.3d 232, 250–51 (5th Cir.) (trial counsel should not be faulted for the defendant's decision to conceal evidence of physical abuse), *cert. denied*, 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000); *West v. Johnson*, 92 F.3d 1385, 1408–09 (5th Cir. 1996) (holding trial counsel was not deficient in failing to investigate petitioner's

mental health history where: (1) it was undisputed nothing about the petitioner's statements or conduct alerted trial counsel to any history of mental health problems or gave said counsel other reason to suspect the petitioner had suffered organic brain damage, (2) there was no allegation petitioner had ever been hospitalized for a head injury or mental illness or that petitioner had ever been diagnosed with any sort of brain damage, psychosis, or psychiatric or psychological problems, and (3) there was no allegation petitioner or petitioner's family ever gave trial counsel reason to believe pursuing further investigation into petitioner's social, educational, or mental health history would furnish mitigating evidence), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997).

Petitioner's trial counsel presented sixteen witnesses on petitioner's behalf at the punishment phase of trial, including several members of petitioner's family. Obviously, said counsel or petitioner's court-appointed investigator interviewed those witnesses before they testified at petitioner's trial. Petitioner does not allege otherwise. Petitioner's trial counsel elicited testimony from petitioner's mother establishing petitioner's father was aloof, unsupportive, and emotionally distant from petitioner. Petitioner has alleged no specific facts showing his trial counsel were unaware of the accusations that petitioner's father was physically abusive toward petitioner, petitioner's mother was an alcoholic, or that petitioner's family had a history of mental illness. The additional evidence which petitioner complains his trial counsel should have presented to the jury possessed both potentially mitigating and potentially aggravating qualities. Petitioner has presented this Court with no evidence (such as affidavits from petitioner or his family) nor any fact-specific allegations identifying any deficiency in the investigative process petitioner's trial counsel engaged in prior to the punishment phase of petitioner's trial.[148] Under such circumstances, petitioner has failed to allege specific facts sufficient to overcome the presumption of reasonableness accompanying his trial counsel's failure to pursue and present the evidence in question. In short, petitioner has failed to allege any

---

**148.** Petitioner does not allege any specific facts showing his trial defense team's interviews with any of the sixteen witnesses said counsel called to testify at the punishment phase of petitioner's capital murder trial were inadequate to disclose any mitigating evidence said counsel could have reasonably expected those witnesses to reveal. Nor does petitioner allege any specific facts showing his trial counsel were ever alerted to the identities of any other potential punishment-phase witnesses whom said counsel thereafter failed to interview.

The affidavit of petitioner's former state habeas investigator, Gerald Bierbaum, attached to petitioner's petition herein does not allege any specific facts within the personal knowledge of Bierbaum supporting any of petitioner's unexhausted claims for relief herein. Instead, Bierbaum's affidavit appears to be an effort to justify, on financial grounds, what appears to this Court to have been an inept state habeas investigation. Nowhere in Bierbaum's affidavit does he explain why either he or petitioner's state habeas counsel were unable to secure affidavits from either the petitioner or petitioner's family supporting any of petitioner's unexhausted claims herein. Likewise, Bierbaum's affidavit does not furnish any factual information establishing that the factual bases for any of petitioner's unexhausted claims herein were unavailable at the time of petitioner's state habeas corpus proceeding. More significantly, at no point in this cause has petitioner presented this Court with any affidavits from petitioner or petitioner's family establishing that petitioner's trial counsel failed to fully and thoroughly interview them prior to the punishment phase of petitioner's trial or otherwise identifying any deficiency in the investigation into potentially mitigating evidence conducted by petitioner's trial counsel.

specific facts showing this failure was the product of anything other than said trial counsel's objectively reasonable, strategic or tactical decision-making.

Petitioner likewise fails to allege any specific facts showing any information available to petitioner's counsel at the time of trial suggested petitioner, as opposed to other members of petitioner's family, suffered from a mental illness. Petitioner's trial counsel cannot be faulted for failing to investigate petitioner's mental illness absent some showing the failure to undertake such an investigation was itself, objectively unreasonable. *See Wiggins v. Smith,* 539 U.S. at 521–22, 123 S.Ct. at 2535 (holding the reasonableness of an attorney's decision to investigate a particular matter must be evaluated under all the circumstances with a heavy measure of deference to counsel's judgments). Here, petitioner has failed to allege any specific facts showing the existence at the time of petitioner's trial of information which would have alerted a reasonable trial counsel that some potential benefit might be derived from investigating petitioner's mental health history.

### 3. *No Prejudice*

▪ Additionally, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to introduce the double-edged evidence in question, the outcome of the punishment phase of petitioner's trial would have been different. Petitioner's pleadings in this cause offer virtually no fact-specific allegations establishing precisely what additional mitigating evidence would have been disclosed had his trial counsel undertaken a more thorough investigation into petitioner's background and family history. Without a specific, affirmative showing of what the missing evidence would have been, a peti-

tioner asserting ineffective assistance arising from a failure to pursue and present mitigating evidence fails to satisfy the prejudice prong of *Strickland. Rector v. Johnson,* 120 F.3d at 564; *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994). Petitioner also alleges no specific facts showing what additional, potentially mitigating, evidence would have been developed had petitioner's trial counsel sought to have petitioner evaluated for mental illness.

Furthermore, as explained above, at the punishment phase of petitioner's trial, his trial counsel: (1) presented the jury with testimony from petitioner's mother showing petitioner's father had not wanted another child, was unsupportive of petitioner, and was emotionally abusive toward petitioner and (2) presented extensive additional testimony designed to portray the petitioner as basically a non-violent, decent, religious, redeemable human being whose murder of Captain Cobo was aberrational. The additional, potentially mitigating evidence petitioner now faults his trial counsel for failing to present might well have undermined the foregoing, objectively reasonable punishment-phase strategy of petitioner's trial counsel by portraying petitioner's mother as an alcoholic, petitioner's father as physically abusive, and petitioner as the emotionally crippled product of a dysfunctional family environment that left him unequivocally prone toward violence. Petitioner offers no fact-specific allegations showing that, but for the failure of his trial counsel to conduct further investigation, his trial counsel would have abandoned the trial strategy outlined above in favor of one that all but confessed petitioner's inherent tendency toward violence. *See Lamb v. Johnson,* 179 F.3d at 359 (when a defendant alleges his trial counsel's failure to investigate prevented said counsel from making an informed tactical choice, the

defendant must show knowledge of the undiscovered evidence would have altered his trial counsel's strategic decisions and the bases underlying his trial counsel's original strategic choice to pursue or forego a particular course would also have been invalidated).

Having independently reviewed the entirety of the record from petitioner's trial and state habeas corpus proceedings, this Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to present evidence of the type and nature described in petitioner's twelfth claim herein, the outcome of the punishment phase of petitioner's trial would have been different. Petitioner's jury was presented with prosecution evidence establishing petitioner had: (1) brutally and senselessly murdered Captain Cobo, (2) insisted Arroyo slow down so he could shove Captain Cobo's bleeding body from their moving vehicle into rush hour traffic, (3) changed into the dead man's clothing, (4) joked and laughed when he described his crime, and (5) stated he believed Captain Cobo deserved to die for having attempted to leap from a moving vehicle. Captain Cobo's murderers abandoned Cobo's vehicle within hours of the murder and took only a pair of stereo speakers and some clothing from the vehicle. To date, petitioner has neither confessed his involvement in, nor accepted responsibility for Captain Cobo's murder, nor expressed any sincere remorse over his death. At the time of Captain Cobo's murder, petitioner was on probation for a string of residential burglaries and had just completed a stay in a boot camp.

Despite the numerous character witnesses petitioner's trial counsel called to testify at the punishment phase of trial to state petitioner was a non-violent, religious, kind human being, petitioner's jury found beyond a reasonable doubt petitioner posed a threat of future dangerousness.[149] There is no reasonable probability that mitigating evidence showing the petitioner suffered the negative effects of having a dysfunctional family upbringing, a physically abusive father, and an alcoholic mother would have induced the jury to answer the first capital sentencing special issue differently. On the contrary, such evidence would naturally have reinforced the jury's verdict on the first capital sentencing special issue.

Petitioner's proffered, additional, mitigating evidence bears no genuine relationship to the second capital sentencing special issue inquiring whether the petitioner intended to kill or anticipated that a human life would be taken.[150] Captain Cobo's murder was deliberate and clearly intentional. Petitioner shot Captain Cobo twice in the back at point blank range. Petitioner does not allege any facts showing that, but for the failure of his trial counsel to present additional mitigating evidence, the jury would have answered the second capital sentencing special issue differently.

Finally, given the brutal circumstances of Captain Cobo's murder and petitioner's

---

**149.** Trial Transcript, Volume II of II at p. 233. In answer to the first capital sentencing special issue, petitioner's jury found beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society.

**150.** In answer to the second capital sentencing special issue, petitioner's jury found be-

yond a reasonable doubt petitioner: (1) actually caused Captain Cobo's death, (2) if petitioner did not actually cause Cobo's death, petitioner intended to kill Captain Cobo or another person, or (3) petitioner anticipated a human life would be taken. Trial Transcript, Volume II of II at pp. 233–34.

unwillingness to express any sincere remorse or otherwise accept responsibility for his role in that crime, there is simply no reasonable probability that evidence detailing petitioner's allegedly dysfunctional family life and family history of mental illness would have induced the jury to answer the final capital sentencing special issue differently.[151]

### F. Strickland and Petitioner's Complaints About Appellate Counsel

■■■■ The standard for evaluating the performance of counsel on appeal is the familiar two-pronged test of *Strickland* which requires inquiry into: (1) whether appellate counsel's performance was deficient, i.e., objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., is there a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000); *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.2004), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) at 714; *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir.2003), *cert. denied*, 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004); *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d

987 (1983); *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445. Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an informed decision that certain avenues will not prove fruitful. *Busby v. Dretke*, 359 F.3d at 714; *United States v. Williamson*, 183 F.3d at 462. Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *Schaetzle v. Cockrell*, 343 F.3d at 445; *United States v. Williamson*, 183 F.3d at 463.

■■■■ Where, as in petitioner's case appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy both prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores–Ortega*, 528 U.S. 470, 477, 482, 120 S.Ct. 1029, 1034, 1037, 145 L.Ed.2d 985 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287–89, 120 S.Ct. at 765–66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland* ); *Hughes v. Booker*, 220 F.3d 346, 349 (5th Cir.2000) (where a petitioner argues his appellate counsel failed to assert or fully brief a particular claim, he must show his appellate counsel's performance was both deficient and preju-

---

**151.** In answer to the third capital sentencing issue, petitioner's jury found, taking into consideration all of the evidence including the circumstances of petitioner's offense, petitioner's character and background, and petition-

er's personal moral culpability, there were insufficient mitigating circumstances to warrant a life sentence rather than a sentence of death. Trial Transcript, Volume II of II at p. 234.

dicial); *United States v. Phillips*, 210 F.3d 345, 348–50 (5th Cir.2000) (claims of ineffective assistance by appellate counsel are governed by the two prongs of *Strickland* ); *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir.1998) (applying both prongs of *Strickland* to a claim of ineffective assistance on appeal), *cert. denied*, 526 U.S. 1041, 119 S.Ct. 1339, 143 L.Ed.2d 503 (1999).

### G. *Failure to Raise Point of Error Concerning Gerald Becker's Exclusion*

#### 1. *State Court Disposition*

Petitioner complained in his state habeas corpus application his appellate counsel failed to raise a point of error challenging the state trial court's exclusion of venire member Gerald Becker.[152] As explained in Section III.B. above, the state trial court granted the prosecution's challenge for cause to Mr. Becker based on his repeated assertions his religious scruples would all but preclude him from rendering a verdict that imposed a sentence of death. Petitioner's appellate counsel testified during petitioner's state habeas corpus hearing she did not specifically recall reading the voir dire testimony and did not identify any potentially viable voir dire issues.[153] The state habeas court concluded: (1) the trial court's exclusion of Gerald Becker did not violate the Supreme Court's holding in *Witherspoon* and (2) petitioner's complaint about his appellate counsel's failure to raise a point of error addressing Mr. Becker's exclusion did not cause the performance of petitioner's appellate counsel to fall below an objective level of reasonableness.[154]

#### 2. *AEDPA Review*

##### a. *No Deficient Performance*

For the reasons set forth at length in Section III.D. above, the Texas Court of Criminal Appeals' conclusion that Gerald Becker's exclusion was consistent with *Witherspoon* and its progeny, even if erroneous, was nonetheless reasonable under clearly established federal law, which requires reviewing courts to afford a trial court's implicit factual findings on juror bias great deference. For similar reasons, there was nothing unreasonable with the state habeas court's determination that the failure of petitioner's state appellate counsel to pursue a *Witherspoon* claim on direct appeal did not cause the performance of said counsel to fall below an objective level of reasonableness. Appellate counsel are not required to present every nonfrivolous claim that might be available but, rather, are expected to exercise professionally reasonable discretion in selecting which points of error to pursue on direct appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes*, 463 U.S. at 751, 103 S.Ct. at 3313; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Having independently reviewed the record from Gerald Becker's voir dire examination, this Court concludes there was nothing objectively unreasonable with the decision by petitioner's appellate counsel not to present a *Witherspoon* claim on direct appeal premised on Mr. Becker's exclusion. Petitioner's appellate counsel could have concluded, quite reasonably, that Mr. Becker's repeated protests he could not conceive of a situation in which

---

**152.** State Habeas Transcript, Volume I of II at pp. 13–15.

**153.** S.F. State Habeas Hearing, Volume 3 of 6, testimony of Judith K. Wemmert at p. 60.

**154.** State Habeas Transcript, Volume II of II at pp. 211–12.

he could bring himself to render a verdict that imposed the death penalty fully supported the trial court's exclusion of him and effectively left Mr. Becker's exclusion impervious to reversal on appeal. Where a juror has repeatedly indicated he would not be able to render an impartial verdict based solely on the law and the evidence, as did Gerald Becker, the trial judge's implicit credibility finding regarding that juror's bias poses a particularly imposing impediment to reversal on appeal. *See Wainwright v. Witt*, 469 U.S. 412, 430–35, 105 S.Ct. 844, 855–58, 83 L.Ed.2d 841 (1985) (discussing the considerable deference which must be afforded a trial judge's implicit factual findings of juror bias). The decision by petitioner's appellate counsel not to pursue a *Witherspoon* claim concerning Mr. Becker's exclusion on direct appeal was objectively reasonable. Even if such a claim would have been nonfrivolous, counsel could have reasonably concluded that pursuing such a claim on direct appeal posed very little likelihood of success.

### b. *No Prejudice*

Furthermore, for the reasons set forth in Section III.D. above, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's appellate counsel to present a *Witherspoon* point of error on direct appeal, the outcome of petitioner's direct appeal would have been any different. Given the requisite deference to the trial court's implicit factual finding of bias on Mr. Becker's part which the Texas Court of Criminal Appeals would have been required to exercise in its evaluation of a *Witherspoon* complaint about his exclusion, there is no reasonable probability

such a complaint would have prevailed on direct appeal.

### c. *Conclusions*

The state habeas court's determination petitioner's appellate counsel did not render deficient performance by failing to assert a *Witherspoon* point of error on direct appeal was neither contrary to, nor involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and state habeas corpus proceedings. Furthermore, this Court independently concludes petitioner's second claim for relief herein fails to satisfy the prejudice prong of *Strickland.*

### H. *Failure to Raise Point of Error Concerning Denial of Severance*

### 1. *State Court Disposition*

In his state habeas corpus application, petitioner complained his appellate counsel failed to include a point of error in his appellant's brief on direct appeal challenging the trial court's denial of petitioner's motions for severance.[155] Petitioner's state appellate counsel testified at petitioner's state habeas hearing: (1) she was aware of the potential appellate issue in petitioner's case concerning denial of petitioner's motions for severance; (2) she had researched and briefed a similar issue in a previous capital case; (3) she researched the law relevant to severance in petitioner's case; and (4) while she could not specifically recall why she had not included such an issue in petitioner's appellant's brief, she believed it was probably because she concluded it was not an issue she "could develop on appeal."[156] The

---

155. State Habeas Transcript, Volume I of II at pp. 30–31.

156. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Judith K. Wemmert at pp. 160–73 & 178.

state habeas court concluded: (1) petitioner failed to present the trial court with any evidence or proffer of evidence prior to trial showing any evidence would be introduced during the punishment phase of petitioner's trial which warranted a severance of that phase of petitioner's joint capital murder trial with Arroyo; (2) conducting the punishment phase of petitioner's capital murder trial jointly with Arroyo did not deprive petitioner of due process or individualized sentencing; (3) petitioner was not entitled to a severance of either phase of his trial; (4) petitioner's appellate counsel was not professionally deficient for failing to raise such complaints on direct appeal; and (5) petitioner was not prejudiced thereby within the meaning of *Strickland*.[157]

### 2. AEDPA Review

#### a. No Deficient Performance

For the reasons set forth in Section IV.D. above, there was nothing unreasonable with the state habeas court's conclusion petitioner's motions for severance were without merit, under either state or federal legal standards. Further, as explained in Section IV.C. above, the state habeas court also concluded petitioner's failure to either present evidence or a proffer of evidence supporting petitioner's motions for severance effectively foreclosed subsequent state court review of the trial court's denials of those motions. Petitioner's appellate counsel testified she was aware of the law governing severance in Texas capital murder trials and did not include a point of error addressing the severance issue as part of petitioner's direct appeal because she believed same would lack merit.[158] In evaluating the

quality of petitioner's appellate counsel's performance, the state habeas court was free to examine not only the arguable lack of merit underlying petitioner's complaints about the denials of his motions for severance but also the precarious procedural posture in which any point of error complaining about those denials necessarily would have found itself had petitioner's appellate counsel attempted to present same as part of petitioner's direct appeal. Simply put, petitioner's fourth claim for relief herein amounts to a complaint his trial counsel failed to present a procedurally defaulted point of error asserting an extremely tenuous legal argument which petitioner's appellate counsel reasonably believed lacked merit.

As explained in section IV.D. above, the state habeas court's determination that petitioner's motions for severance lacked merit was a reasonable determination in light of clearly established federal law. In view of that same court's determination petitioner procedurally defaulted on these complaints by failing to present any evidence or proffer of evidence to the trial court, there was likewise nothing objectively unreasonable with the state habeas court's conclusion petitioner's appellate counsel did not render deficient performance by failing to pursue state appellate review of the denials of petitioner's motions for severance. Appellate counsel are not required to present for state appellate review procedurally defaulted claims that, when viewed objectively, offer, at best, only a very slim likelihood of success on the merits.

#### b. No Prejudice

For similar reasons, the state habeas reasonably concluded there was no reason-

---

157. State Habeas Transcript, Volume II of II at pp. 229–32.

158. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Judith K. Wemmert at pp. 171–72.

able probability that, but for the failure of petitioner's appellate counsel to present a point of error complaining about the denial of petitioner's motions for severance, the outcome of petitioner's direct appeal would have been different. Petitioner has not identified any evidence admitted during the guilt-innocence phase of his joint trial with Arroyo that would have been inadmissible in a separate proceeding against petitioner.[159] As explained in Section IV.D. above, petitioner's constitutional rights were adequately guarded at the punishment phase of petitioner's joint trial with Arroyo by virtue of the state trial court's clear instructions to the jury to treat all punishment-phase evidence concerning misconduct by either defendant against the respective defendant only.[160]

Finally, given the particularly brutal circumstances of Captain Cobo's murder, petitioner's mocking accounts to others of the murder in the hours immediately after same, and petitioner's inability to muster even a scintilla of sincere remorse over Captain Cobo's senseless death all but forecloses any possibility that, but for the severance of petitioner's trial from Arroyo's, the outcome of either phase of petitioner's capital murder trial would have been different. Petitioner was not prejudiced in any arguable manner by virtue of his joint trial with Arroyo. On the contrary, petitioner's relatively calm conduct during pretrial detention contrasted very favorably with Arroyo's history of repeated violent outbursts. Thus, even if

petitioner's appellate counsel had presented a point of error on direct appeal complaining about the denials of petitioner's motions for severance, there is no reasonable probability the outcome of petitioner's appeal would have been different.

### c. Conclusions

The Texas Court of Criminal Appeals' conclusion petitioner's complaint about his appellate counsel's failure to present a point of error complaining about the denials of petitioner's motions for severance failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and state habeas corpus proceedings.

### I. *Failure to Raise Point of Error Concerning Victim–Impact Testimony*

#### 1. *State Court Disposition*

During the punishment phase of petitioner's trial, Captain Cobo's brother Paul Cobo testified over the objection of both defendants' counsel that the victim, who left a daughter, was a career military officer who worked his way up through the ranks, was a great person, a model citizen, very religious, and possessed high morals.[161] In his state habeas corpus application, petitioner argued the trial court erro-

---

**159.** The only interest, other than judicial economy, which supported trying Arroyo and petitioner jointly appears to have been the prosecution's desire to use against Arroyo, petitioner's hearsay statements as recounted at trial by Christopher Suaste, accusing Arroyo of shouting "Shoot him! Shoot him!" Unlike that testimony, which undoubtedly proved very damaging to Arroyo at both phases of trial, there does not appear to have been

any evidence introduced during the guilt-innocence phase of petitioner and Arroyo's joint trial which implicated petitioner and would have been inadmissible had petitioner and Arroyo been tried separately.

**160.** *See supra* note 77.

**161.** S.F. Trial, Volume XXIII, testimony of Paul Cobo at pp. 219–25.

neously admitted during the prosecution's case-in-chief at the punishment phase of trial victim-impact testimony from the victim's brother describing Captain Cobo in very favorable terms and that such testimony should have been admitted, if at all, only in rebuttal.[162] During his state habeas hearing, petitioner did not question his appellate counsel regarding her reasons for not asserting a point of error on direct appeal regarding admission of Paul Cobo's trial testimony about his brother's good character. The state habeas court concluded: (1) petitioner's appellate counsel's performance was not deficient in this regard because victim impact evidence was admissible at the punishment phase of petitioner's trial and admission of the victim impact testimony offered by Paul Cobo, at most, constituted premature admission of testimony clearly admissible to counter petitioner's extensive evidence concerning his own good character; (2) Paul Cobo's testimony would have been admissible if it had been offered following petitioner's presentation of mitigation testimony; (3) the premature admission of Paul Cobo's testimony did not rise above the level of harmless error; and (4) petitioner was not prejudiced within the meaning of *Strickland* by the failure of petitioner's appellate counsel to challenge the admission of Paul Cobo's trial testimony because there was no reasonable probability the state appellate court would have concluded admission of same warranted a reversal of petitioner's sentence.[163]

### 2. *AEDPA Review*

#### a. *No Deficient Performance*

In *Payne v. Tennessee*, 501 U.S. 808, 825–26, 111 S.Ct. 2597, 2608–09, 115 L.Ed.2d 720 (1991), the Supreme Court overruled its own previous decisions and held the States were free to admit victim impact evidence on the same terms as other evidence informing the sentencing jury about the specific harm caused by the crime in question, assisting the sentencing jury to meaningfully assess the defendant's moral culpability and blameworthiness, and counteracting the defendant's mitigating evidence. The Supreme Court recognized in particular cases, victim-impact evidence that is unduly prejudicial may render a trial fundamentally unfair but in such cases, the Due Process Clause provides a mechanism for relief. *Payne v. Tennessee*, 501 U.S. at 825, 111 S.Ct. at 2608. Nonetheless, the Eighth Amendment erects no *per se* barrier to the admission of victim-impact evidence or prosecutorial argument on that subject. *Id.* at 826, 111 S.Ct. at 2609.

By the time petitioner's appellate counsel filed petitioner's appellant's brief in October of 1999, the Texas Court of Criminal Appeals had clarified its position with regard to the admission of victim-impact testimony at the punishment phase of a capital murder trial, holding in *Mosley v. State*, 983 S.W.2d 249, 262 (Tex.Crim.App. 1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), that both victim impact and victim character evidence are admissible in the context of the mitigation special issue to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence. That court has subsequently held admissible at the punishment phase of a capital murder trial testimony regarding the victim's good character traits and the impact of the victim's death on the victim's family. *See Jackson v. State*, 33 S.W.3d 828, 833 (Tex. Crim.App.2000) (holding victim-impact evi-

---

**162.** State Habeas Transcript, Volume I of II at pp. 60–64.

**163.** State Habeas Transcript, Volume II of II at pp. 258–60.

dence in that case relevant to the future dangerousness issue because the defendant could not have helped but reasonably foresee the impact the victims' deaths would have on others), *cert. denied,* 532 U.S. 1068, 121 S.Ct. 2221, 150 L.Ed.2d 213 (2001); *Ladd v. State,* 3 S.W.3d 547, 571 (Tex.Crim.App.1999) (holding admissible testimony of the victim's mother and sister: (1) regarding the victim's many fine, endearing qualities and (2) the victim's death "shattered" the lives of her family); *Jackson v. State,* 992 S.W.2d 469, 480 (Tex. Crim.App.1999) (holding admissible, just four months before petitioner filed his appellant's brief, victim-impact testimony regarding the effect the victim's death had on the victim's father and grandmother), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *Griffith v. State,* 983 S.W.2d 282, 289 (Tex.Crim.App.1998) (holding admissible testimony regarding the impact the victim's death had on the victim's family), *cert. denied,* 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999).

 Petitioner argues the law in Texas at the time of his trial prohibited the admission of any victim-impact testimony unless and until a capital murder defendant introduced mitigating evidence. However, the opinions cited by petitioner in support of this proposition either pre-date the Texas Court of Criminal Appeals' opinion in *Mosley* or do not address the admissibility of victim-impact testimony of the type given by Paul Cobo at petitioner's capital murder trial. Significantly, since its opinion in *Mosley* the Texas Court of Criminal Appeals has never held that victim-impact testimony from a capital murder victim's family is admissible only as rebuttal to a petitioner's mitigating evidence. Nor has the United States Supreme Court adopted

such an interpretation of its holding in *Payne.* On the contrary, such a rule is at odds with the plain language and reasoning of *Payne v. Tennessee,* 501 U.S. at 825, 111 S.Ct. at 2608 (recognizing rebuttal of a defendant's mitigating evidence as but one of at least three valid justifications for admitting victim-impact testimony at the punishment phase of a capital murder trial), that it is foreclosed from recognition in this federal habeas corpus proceeding by the non-retroactivity principle of *Teague v. Lane.* It is not within the province of this Court to circumscribe the clear holding and implicitly reject the reasoning of *Payne* by imposing a cumbersome procedural shackle on the admission of victim-impact testimony at the punishment phase of a capital murder trial.

Additionally, it is far from clear whether the objection petitioner lodged at the time of trial to Paul Cobo's punishment-phase testimony would have preserved for state appellate review a complaint said testimony was "premature" or admissible only in rebuttal, as opposed to completely inadmissible. During a bench conference, Arroyo's trial counsel objected to Paul Cobo testifying regarding his late brother's good character traits as "not relevant testimony on the issue of punishment" and "not relevant on any issue of punishment." [164] Petitioner's trial counsel adopted this objection.[165] At no point did either defense counsel object that Paul Cobo's trial testimony was "premature" or suggest such testimony was admissible only in rebuttal to the defense's punishment-phase evidence. Generally speaking, Texas law requires an objection to coincide with a point of error on direct appeal. *See Guevara v. State,* 97 S.W.3d 579, 583 (Tex.Crim.App. 2003) (defendant failed to preserve complaint regarding the admission of victim-

---

**164.** S.F. Trial, Volume XXII, testimony of Paul Cobo at pp. 220–21.

**165.** *Id.* at p. 221.

impact evidence by objecting thereto only on the ground the witness was unqualified to render an opinion regarding the impact of the crime on the victim's personality); *Ibarra v. State*, 11 S.W.3d 189, 196–97 (Tex.Crim.App.1999) (holding a hearsay objection did not preserve for appellate review a complaint that the testimony in question was irrelevant), *cert. denied*, 531 U.S. 828, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000).

Moreover, even if admission of Paul Cobo's punishment-phase testimony had violated the procedural requirements of state law, it was clear in this Circuit as of the date petitioner's appellate counsel filed petitioner's appellant's brief that the admission of Paul Cobo's trial testimony did not violate federal law. *See Felder v. Johnson*, 180 F.3d 206, 216 (5th Cir.) (holding admissible at the punishment phase of a Texas capital murder trial testimony regarding the victim's good nature and positive reputation), *cert. denied*, 528 U.S. 1067, 120 S.Ct. 630, 145 L.Ed.2d 520 (1999); *Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir.) (holding a complaint about the admission of victim-impact testimony at the punishment phase of a Texas capital murder trial did not state a basis for federal habeas corpus relief), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998); *Westley v. Johnson*, 83 F.3d 714, 723 (5th Cir.1996) (rejecting complaint that petitioner's state trial counsel rendered ineffective assistance by failing to object to victim-impact testimony at the punishment phase of a Texas capital murder trial), *cert. denied*, 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997); *Black v. Collins*, 962 F.2d 394, 408 (5th Cir.) (holding admission of testimony regarding the impact of the victim's death on the victim's son and mother did not render the petitioner's trial fundamentally unfair), *cert. denied*, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992).

■ Given the Texas Court of Criminal Appeals' holdings in *Mosley* and the subsequent opinions discussed above, there was nothing objectively unreasonable about petitioner's appellate counsel's decision not to mount an appellate challenge to the admission of Paul Cobo's testimony at the punishment phase of petitioner's trial. As of October, 1999, Texas law clearly permitted admission of the same type of testimony Paul Cobo gave petitioner's jury when that testimony was offered at the punishment phase of a capital murder trial. *Jackson v. State*, 992 S.W.2d at 480; *Griffith v. State*, 983 S.W.2d at 289; *Mosley v. State*, 983 S.W.2d at 262. Petitioner's appellate counsel cannot be faulted for failing to assert a point of error on direct appeal that was clearly and unambiguously foreclosed by applicable state law, foreclosed by applicable Circuit authority, directly at odds with an in-point holding of the United States Supreme Court, and quite possibly procedurally defaulted.

b. *No Prejudice*

As explained above, since *Mosley*, the Texas Court of Criminal Appeals has consistently upheld the admission under applicable Texas law of victim-impact testimony such as Paul Cobo's when that testimony has been offered at the punishment phase of a capital murder trial. *See, e.g.*, Jackson v. State, 33 S.W.3d at 833 (holding victim-impact evidence offered in that case admissible not only with regard to the mitigation special issue but also with regard to the future dangerousness issue because the defendant could clearly have foreseen the impact of his offense on others); *Ladd v. State*, 3 S.W.3d at 571 (holding admissible punishment-phase testimony regarding the victim's good character and the harm wrought on the victim's family by the victim's death). Nothing in

*Payne* or any subsequent Supreme Court or Fifth Circuit opinion casts any doubt as to the continuing admissibility of such testimony under current federal constitutional principles. *See*, e.g., *Janecka v. Cockrell*, 301 F.3d 316, 327–29 (5th Cir.2002) (holding harmless the admission of victim-impact testimony at the punishment phase of a Texas capital murder trial), *cert. denied*, 537 U.S. 1196, 123 S.Ct. 1264, 154 L.Ed.2d 1034 (2003); *Beazley v. Johnson*, 242 F.3d 248, 257 (5th Cir.) (admission of victim-impact testimony at the punishment phase of a Texas capital murder trial does not violate the Constitution unless it so infects the sentencing proceedings as to render the result fundamentally unfair), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001). Moreover, as explained above, there is considerable doubt as to whether the objection petitioner's trial counsel lodged at trial to Paul Cobo's testimony preserved for state appellate purposes the specific complaint underlying petitioner's tenth claim herein. Thus, there is no reasonable probability the outcome of petitioner's direct appeal would have been different had petitioner's appellate counsel included a complaint about the admission of Paul Cobo's punishment-phase testimony in petitioner's appellant's brief.

### c. *Conclusion*

The Texas Court of Criminal Appeals' conclusion petitioner's complaint about his appellate counsel's failure to present a point of error complaining about the admission of Paul Cobo's punishment-phase victim-impact testimony failed to satisfy either prong of *Strickland* was neither contrary to, nor involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and state habeas corpus proceedings.

## X. *No Right to Factual Development in Federal Court*

■ The AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *Williams v. Taylor*, 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000) (prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765–66 (5th Cir.), *cert. denied*, 531 U.S. 831, 121 S.Ct. 84, 148 L.Ed.2d 46 (2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir.1998); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law made retroactive on collateral review by the Supreme Court that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence and (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson*, 293 F.3d at 775 n. 9; *Dowthitt v. Johnson*, 230 F.3d at 757; 28 U.S.C. § 2254(e)(2).

Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during the evidentiary hearing held in his state habeas corpus proceeding. Petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at the time petitioner filed and litigated his state habeas corpus claims. Nor does petitioner allege any specific facts showing the factual bases for any of his unexhausted claims herein were unavailable at the time of his state habeas corpus proceeding. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner specifically identify any additional evidence which he and his state habeas counsel were unable to develop and present to petitioner's state habeas court despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

Petitioner had an opportunity during his state habeas corpus hearing to fully develop the factual bases for each of his unexhausted claims herein but failed to do so. Petitioner's complaint about limited funding for investigative expenses incurred during his state habeas corpus proceeding does not excuse the failure of petitioner's state habeas counsel to contact petitioner's family members and others possessing personal knowledge of the matters central to petitioner's unexhausted claims herein. The failure to present the state habeas court with either specific factual allegations or affidavits from petitioner and petitioner's family supporting petitioner's unexhausted claims herein was not of due diligence. Petitioner alleges no specific facts showing his state habeas counsel exercised due diligence to investigate, devel-

op, and present any of petitioner's unexhausted claims herein to petitioner's state habeas court. Petitioner alleges no specific facts establishing the prosecution withheld or suppressed the factual bases for any of petitioner's unexhausted claims herein during petitioner's state habeas proceeding. Under such circumstances, petitioner is not entitled to develop the factual bases for his unexhausted claims in this Court. *See Roberts v. Dretke,* 356 F.3d 632, 641 (5th Cir.2004) (seeking and presenting medical records and affidavits from family members available at the time of the state habeas hearing is within the exercise of due diligence); 28 U.S.C. § 2254(e)(2).

## XI. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997) (holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998). Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–*

*El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002) (holding a CoA is granted on an issue-by-issue basis thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need not show he will prevail on the merits but rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 124 S.Ct. at 2569; *Miller-El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120

S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

▆▆▆▆ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (quoting *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604); *accord Tennard v. Dretke,* 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether: (1) the claim is a valid assertion of the denial of a constitutional right and (2) the

district court's procedural ruling was correct).

Viewed in proper context, there is no basis for disagreement among jurists of reason with regard to this Court's disposition of any of petitioner's claims herein. Petitioner's complaints about the presence of Rosemary Harrell on his petit jury ignore the fact petitioner has offered no court any fact-specific allegations, much less any evidence, showing she was biased in any respect against petitioner. Furthermore, there is no room for disagreement among reasonable jurists with this Court's determination that petitioner failed to present this Court with any fact-specific allegations, much less clear and convincing evidence, establishing Rosemary Harrell was in fact ever convicted of any criminal offense in connection with her January, 1979 theft arrest.

Petitioner's procedurally defaulted complaints about the trial court's granting of the prosecution's challenge for cause to Gerald Becker likewise fail to acknowledge the highly deferential nature of federal habeas review of a state trial judge's implicit factual findings regarding juror bias. Moreover, petitioner also procedurally defaulted on his complaints about Rosemary Harrell's service on his jury, the trial court's denials of his unsupported motions for severance, and allegedly withheld agreements between petitioner's prosecutors and prosecution witness Sean Lowe.

With reference to petitioner's *Brady* claims, petitioner's state habeas counsel failed to offer the state habeas court any evidence showing the materiality of the allegedly withheld evidence and, in some instances (such as the proposed trial testimony of Reena Cobo), failed to present the state habeas court with any evidence establishing the allegedly withheld evidence was favorable to petitioner.

Given the compelling evidence establishing the brutal nature of petitioner's offense and petitioner's refusal to express any remorse for his murder of Captain Cobo, petitioner's complaints about the performance of his trial counsel do not satisfy the prejudice prong of *Strickland.* The same is true for petitioner's complaints about the performance of his appellate counsel, most of which constitute assertions his appellate counsel failed to present points of error that were arguably procedurally defaulted and tenuous at best on the merits. Having independently reviewed the entirety of the state court records from petitioner's trial, appeal, and state habeas corpus proceedings, this Court concludes none of petitioner's complaints about the performance of his trial or appellate counsel satisfy *Strickland.*

There can be no disagreement among reasonable jurists with this Court's conclusions that the Texas Court of Criminal Appeals' rejections on the merits of petitioner's exhausted claims herein were all reasonable in light of clearly established federal law. There can also be no disagreement among reasonable jurists that petitioner has failed to allege any specific facts showing his failure to exhaust available state habeas corpus remedies on his unexhausted claims herein was the product of anything more than the failure of his state habeas counsel to exercise due diligence to investigate, develop, and present those same claims in the course of petitioner's state habeas corpus proceeding. Therefore, petitioner is not entitled to a Certificate of Appealability on any of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's federal habeas corpus petition and other pleadings in this cause [166] is **DENIED.**

---

**166.** Docket entry nos. 10 and 21.

2. Petitioner's requests for an evidentiary hearing and for factual development are **DENIED**.

3. Petitioner is **DENIED** a Certificate of Appealability.

4. All other pending motions are **DISMISSED** as moot.

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

**IT** is so **ORDERED**.